IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 03-1623C
(Judge Sypolt)

KERN OIL & REFINING COMPANY,

Plaintiff

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-2311
Facsimile: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

BERNARD A. DUVAL
Counsel
Defense Energy Support Center
Fort Belvoir, VA 22060

HOWARD M. KAUFER
Trial Attorney
Defense Energy Support Center
Fort Belvoir, VA 22060

November 7, 2003

# TABLE OF CONTENTS

**Page**


STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 2

I. Nature Of The Case ........ 2

II. Other Litigation Concerning The DESC EPA Clauses ........ 2

SUMMARY OF MATERIAL FACTS ........ 4

I. The Contracts ........ 5

II. The FAR Deviations ........ 7

SUMMARY OF THE ARGUMENT ........ 8

ARGUMENT ........ 10

I. The Summary Judgment Standard ........ 10

II. The EPA Clauses In One Of The Four Contracts At Issue Was Unquestionably Legal Because It Was Properly Approved Through The FAR Deviation Process ........ 10

III. Barrett Neither Requires Nor Supports A Finding of Illegality ........ 12

IV. Plaintiff Cannot Demonstrate That The DESC EPA Clauses Are Prohibited ..... 13

A. Plaintiff Must Identify An Explicit Prohibition ........ 13

B. The Clauses At Issue Are "Established Price" Clauses Within FAR 16.203-1(a) ........ 15

C. FAR 16.203-3 Does Not Prohibit The DESC Clauses ........ 21

D. The Agency Did Not Abuse Its Discretion In Selecting The Clauses At Issue ........ 22

E. Conclusion ........ 24

V. Plaintiff Has Waived Its Right To Challenge The EPA Clauses ........................ 25

VI. If The Clauses Are Illegal, Plaintiff Still Must Demonstrate That A Remedy Is Required .................................................................... 32

VII. If Kern Is Entitled To Quantum Valebant, It May Not Disregard Its Contract Prices ............................................................................ 34

CONCLUSION ........................................................................................................ 36

**INDEX TO APPENDIX**

**Documents** **Page Number**

Declaration of John R. Walker .................................................................................. 1-13

Declaration of George R. Schink ............................................................................. 14-17

DESC Notification of Change in Contracting Procedures, dated January 23, 1981 ............. 18-23

Contract No. DLA600-84-D-0521 ............................................................................ 24-33

DESC Request for Deviation, dated January 5, 1993 ................................................ 34-64

DLA Approval of One-Time Deviation, dated January 14, 1993 .............................................. 65

DLA Approval of One-Time Deviation, dated February 3, 1993 .............................................. 66

Memos (two) from Nancy L. Ladd, Colonel, USAF, dated March 9, 1993 ......................... 67-68

Approved Agency/Component Regulations by Eleanor Spector, dated March 22, 1993 ...... 69-75

DESC Request for One-Time Deviation, dated September 6, 1994 ................................... 76-79

DLA Approval of Individual Deviation, dated November 15, 1994 .................................... 80-83

Request for Class Deviation and Permanent Coverage in DLAR, dated January 4, 1995 ..... 84-88

Notice of Proposed Rule, 60 Fed. Reg. 10826, February 28, 1995 ...................................... 89-92

Letter From National Security Industrial Association to DLA, dated May 1, 1995 ............. 93-94

Request for Class Deviation and Permanent Coverage in DLAR, dated May 12, 1995 ........ 95-99

DESC Request for Individual Deviation, dated February 22, 1995 .......... 100

DLA Approval of Individual Deviation, dated March 2, 1995 .......... 101

Certified Claim of Kern Oil & Refining Co. dated February 26, 2002 .......... 102-166

Approval of Class Deviation by Eleanor R. Spector, Director of Defense Procurement, dated October 5, 1995 .......... 167-168

Notice of Final Rule, 64 Fed. Reg. 41834, August 2, 1999 .......... 169-171

Contracting Officer's Final Decision, dated June 30, 2003 .......... 172-179

## TABLE OF AUTHORITIES

### FEDERAL CASES

**Page**

A. C. Auckerman Co. v. R. L. Chaides Construction Co., 960 F.2d 1020 (Fed. Cir. 1992) .......... 27

Ace Services, Inc. v. GSA, GSBCA No. 11331, 92-2 B.C.A. 24 .......... 11

In re American Res. Corp., 840 F.2d 487 (7th Cir. 1987) .......... 21

American Telephone & Telegraph Co. v. United States, 48 Fed. Cl. 156 (2000) .......... 31

American Telephone and Telegraph Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) .......... passim

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .......... 10

Barrett Refining Corp. v. United States, 42 Fed. Cl. 128 (1998) .......... 3, 12, 35

Barrett Refining Corp. v. United States, 45 Fed. Cl. 166 (1999) .......... 3

Barrett Refining Corp. v. United States,
242 F.3d 1055 (Fed. Cir. 2001) ........................................................................ passim

Beacon Oil Co. v. Secretary of Energy,
71 F.3d 391 (Fed. Cir. 1995) ............................................................................... 13

Beta Systems, Inc. v. United States,
838 F.2d 1179 (Fed Cir. 1988) ........................................................................ passim

Boyajian v. United States,
191 Ct. Cl. 233, 423 F.2d 1231 (1970) .............................................................. 32

Brookhard v. Janis,
384 U.S. 1 (1966) ................................................................................................ 26

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ............................................................................................ 10

Chris Berg, Inc. v. United States,
192 Ct. Cl. 426 F.2d 314 (1970) ................................................................... 29, 30

Cities Service Gas Co. v. United States,
205 Ct. Cl. 500 F.2d 448 (1974) ......................................................................... 35

Cubic Applics., Inc. v. United States,
37 Fed. Cl. 345 (1997) ........................................................................................ 25

Durable Metals Products, Inc. v. United States,
27 Fed. Cl. 472 .................................................................................................... 23

Elter, S.A.,
ASBCA No. 52451, 2001-1 B.C.A. ¶ 31,373 ..................................................... 32

E. Walters & Co., Inc. v. United States,
217 Ct. Cl. 576 F.2d 362 (1978) ......................................................................... 26

Firestone Tire & Rubber Co. v. United States,
444 F.2d 547 (Ct. Cl. 1971) ................................................................................ 13

G&H Mach. Co. v. United States,
16 Cl. Ct. 568 (1989) .......................................................................................... 32

Gold Line Refining, Ltd. v. United States,
43 Fed. Cl. 291 (1999) ...................................................................................... 5, 9

Gold Line Refining, Ltd. v. United States,
54 Fed. Cl. 285 (2002) .......... passim

Hartford Accident & Indemnity Co. v. United States,
130 Ct. Cl. 127 F. Supp. 565 (1955) .......... 25

Herman & MacLean v. Huddleston,
459 U.S. 375 (1983) .......... 21

Integrated Logistics Support Systems International, Inc. v. United States,
47 Fed. Cl. 248 (2000) .......... 14

Julius Goldman's Egg City v. United States,
214 Ct. Cl. 556 F.2d 1096 (1977) .......... 22

LaBarge Products, Inc. v. West,
46 F.3d 1547 (Fed. Cir. 1995) .......... 12, 29, 32

Ling-Temco-Vought, Inc. v. United States,
201 Ct. Cl. 475 F.2d 630 (1973) .......... 27

MAPCO Alaska Petroleum, Inc. v. United States,
27 Fed. Cl. 405 (1992) .......... passim

MAPCO Alaska Petroleum, Inc. v. United States,
30 Fed. Cl. 153 (1993) .......... 3

Montana v. United States,
124 F.3d 1269 (Fed. Cir. 1999) .......... 10

Nautilus Shipping Corp. v. United States,
141 Ct. Cl. 391 (1958) .......... 29, 34

Northern Helex Co. v. United States,
197 Ct. Cl. 118, 455 F.2d 546 (1972) .......... 27

Pacific Maritime Associate v. United States,
108 F. Supp. 603 (Ct. Cl. 1952) .......... 35

PCL Constr. Servs., Inc. v. United States,
41 Fed. Cl. 242 (1998) .......... passim

Pennsylvania Department of Transport v. United States,
226 Ct. Cl. 643 F.2d 758 (1981) .......... 32

Peters v. United States,
694 F.2d 687 (Fed. Cir.1982) .......... 14

P. Francini & Co. v. United States,
2 Cl. Ct. 7, 11 (1983) .......... 23

Pride Cos., LP v. United States,
2000 U.S. Claims LEXIS 213 (unpublished May 10, 2000) .......... 3

Promac, Inc. v. West,
203 F.3d 786 (Fed. Cir. 2000) .......... 28

Quiman, S.A. de C.V. v. United States,
39 Fed. Cl. 171 (1997) .......... 32

Ralph Constr., Inc. v. United States,
4 Cl. Ct. 727, 733 (1984) .......... 35

Reservation Ranch v. United States,
39 Fed. Cl. 696 (1997) .......... 25

Rough Diamond Co., Inc. v. United States,
173 Ct. Cl. 351 F.2d 636 (1965) .......... 25, 28, 29

Seaboard Lumber Co. v. United States,
903 F.2d 1560 (Fed. Cir. 1980) .......... 26

Servidone Construction Corp. v. United States,
931 F.2d 860 (Fed. Cir. 1991) .......... 32

St. Louis Hay & Co. v. United States,
191 U.S. 159 (1903) .......... 35

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) .......... 10

Town of Fallsburg v. United States,
22 Cl. Ct. 633 (1991) .......... 22

Trinity Services, Inc.,
GSBCA No. 5825, 81-1 B.C.A. ¶ 15,034 (1981) .......... 14

Union Pac. RR. v. United States,
847 F.2d 1567 (Fed. Cir. 1988) .......... 25

United States v. Carlo Bianchi & Co.,
373 U.S. 709 (1963) .......... 22

United States v. General Electric Corp.,
727 F.2d 1567 (Fed. Cir. 1984) .......... 13, 20

Urban Data System v. United States,
699 F.2d 1147 (Fed. Cir. 1983) .......... 34

Webster v. Fall,
266 U.S. 507 (1925) .......... 13

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) .......... 30, 31

Will v. Michigan Department of State Police,
491 U.S. 58 (1989) .......... 13

**DOCKETED CASES**

Berry v. United States,
No. 02-1462 (Fed. Cl. June 12, 2003) .......... 4, 31

Calcasieu Refining Co. v. United States,
No. 02-1219C (Fed. Cl. July 31, 2003) .......... 4, 13, 27, 31

Gold Line Ref., Ltd. v. United States,
54 Fed. Cl. 285 (2002) .......... 4

Hermes Consolidated, Inc. v. United States,
No. 02-1460C (Fed. Cl. August 7, 2003) .......... passim

La Gloria Oil and Gas Co. v. United States,
No. 02-465C, 2003 U.S. Claims LEXIS 89 (Fed. Cl. Apr. 15, 2003) .......... 4, 11, 31

Phoenix Petroleum Co. v. United States,
No. 97-315C, (Fed. Cl. Apr. 30, 2003) .......... 4, 31

Tesoro HI Corp. v. United States,
No. 02-704C, (Fed. Cl. Sept. 15, 2003) .......... 4

Williams AK Petroleum, Inc. v. United States,
No. 02-705C, (Fed. Cl. October 1, 2003) .......... passim

**FEDERAL STATUTES**

5 U.S.C. § 706(2) .......... 22

10 U.S.C. § 254(b) .......... 34

10 U.S.C. § 2306(a) .......... 22

15 U.S.C. § 772 .......... 6

28 U.S.C. § 1295 .......... 12

28 U.S.C. 1491(b)(4) .......... 23

**FEDERAL REGULATIONS**

DAR 1-1502(b)(ii) .......... 30

FAR 1.4 .......... 8, 11

FAR 1.401 .......... 20

FAR 1.403 .......... 11

FAR 1.404 .......... 11

FAR 15 .......... 5

FAR 15.804-3 .......... 16, 17

FAR 15.804-3(c) .......... 16

FAR 15.804-3(c)(1) .......... 16

FAR 15.804-3(c)(2) .......... 16, 17, 20

FAR 16.103(a) .......... 22

FAR 16.104 .......... 22

FAR 16.203 .......... 10

FAR 16.203-1 .......... passim

FAR 16.203-1(a) ........ 15, 16

FAR 16.203-1(c) ........ 24

FAR 16.203-2 ........ 17, 18

FAR 16.203-3 ........ passim

FAR 16.203-4 ........ 16, 17

FAR 16.203-4(a)(ii) & (b)(ii) ........ 16

FAR 16.203-4(a)(2), (b)(2), (c)(2), and (d)(2) ........ 23

FAR 16.203-4(d) ........ 24

FAR 16.603-2(b) ........ 14

FAR 27.203-1(b) ........ 15

FAR 35.006(b) ........ 22

FAR 52.216-2 ........ 18

FAR 52.216-2(b) ........ 19

FAR 52.216-2(c) ........ 19

FAR 52.216-3 ........ 18

FAR 52.216-3(a) ........ 19

FAR 52.216-3(b) ........ 19

FAR 52.216-3(c) ........ 19

FAR 52.232-19 ........ 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KERN OIL & REFINING COMPANY, | ) | |
| | ) | |
| | ) | No. 03-1623C |
| Plaintiff, | ) | (Judge Sypolt) |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56(b) of the Court's Rules (“RCFC”), the United States respectfully requests the Court to grant it partial summary judgment and dismiss the complaint.[1] In support of this motion, we rely upon the complaint, the following brief, and the accompanying proposed findings of uncontroverted fact ("PFF") and appendix, including declarations from the contracting officer, John Walker, and an industry expert, Dr. George Schink.

**STATEMENT OF THE ISSUES**

1. Whether the economic price adjustment ("EPA") clause contained in one of the four contracts at issue is legal because it was authorized pursuant to the deviation process set forth in Federal Acquisition Regulation ("FAR") subpart 1.4.

---

[1] Although plaintiff presents seven discrete legal theories of relief (illegality, misrepresentation, breach of contract, implied-in-fact contract, failure of consideration and frustration of purpose, mistake, and taking), each rests squarely upon the theory that the challenged clauses violate a regulation. See Compl. ¶¶ 24, 28, 37, 43, 51, 60, 74. Thus, although each theory would require proof of elements not addressed in this brief, (e.g., proof of a mistake, misrepresentation, or an implied-in-fact contract), plaintiff's failure to establish the premise of a regulatory violation forecloses relief upon any of those alternative grounds. We have chosen not to address the remaining theories, because their bases are more obscure and because granting this motion would so dramatically change the scope and posture of the case, that there is no reason to postpone this filing in order for us to investigate the other theories.

2. Whether Barrett Refining Corp. v. United States, 242 F.3d 1055 (Fed. Cir. 2001), compels a finding in favor of plaintiff .

3. Whether the EPA clauses violate the FAR.

4. Whether, because it made offers and signed contracts containing these EPA clauses year after year, without objection or protest, Kern waived any benefits it presumes might have accrued had it contracted for an EPA clause in FAR 16.203.

5. Whether, if the EPA clauses are illegal, Kern is entitled to a remedy notwithstanding that it cannot demonstrate it suffered harm as a result of any illegality.

6. Assuming Kern is entitled to recovery in quantum valebant, whether that relief is correctly defined in its certified claims.

## STATEMENT OF THE CASE

### I. Nature Of The Case

This case arises from four fuel supply contracts between Kern Oil & Refining Co. ("Kern") and the Defense Energy Support Center ("DESC"). PFF 3, 4.[2] These contracts were one year long, and were awarded and performed between 1984 and 1996. Kern asserts that the EPA clauses contained in its contracts violate the FAR and that, therefore it is "entitled to recover based on the fair market value of the fuel . . . delivered to DFSC . . . by way of reformation, quantum valebant, or rescission and restitution." Compl. ¶ 26.

### II. Other Litigation Concerning The DESC EPA Clauses

This action is one of approximately 25 filed since 1989 in this Court by oil companies challenging the legality of DESC's price adjustment clauses. Twenty-two of the cases are

---

[2] Until 1998, DESC was called the Defense Fuel Supply Center ("DFSC"). We use the current name.

pending. In 1992, one judge of this Court ruled that an EPA clause substantially like those at issue here was unauthorized by the FAR. MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992). In granting summary judgment for the plaintiff as to liability, the MAPCO Court did not reach the question of remedy. Id. at 407. That case eventually settled. MAPCO Alaska Petroleum, Inc. v. United States, 30 Fed. Cl. 153, 153 (1993).

In two later cases, the Government declined to contest the alleged illegality, choosing to demonstrate instead, that, regardless of the pricing formula, the supplier received fair market value. Pride Cos., LP v. United States, 2000 U.S. Claims LEXIS 213 (unpublished May 10, 2000) (no appeal); Barrett Ref. Corp. v. United States, 42 Fed. Cl. 128, 129, 134 (1998); see also Barrett Ref. Corp. v. United States, 45 Fed. Cl. 166 (1999), aff'd in part, vacated in part, and remanded, 242 F.3d 1055 (Fed. Cir. 2001).

In Barrett, for example, the Government contended that, if one assumed that (1) the EPA clauses were illegal and (2) recovery should be measured in quantum valebant, then Barrett should not recover, because the contract prices were fair. 42 Fed. Cl. at 128-29 ("The issues before this court . . . are the fair market value of the fuel delivered by plaintiff and whether plaintiff was under-compensated . . . ."). To estimate "fair market value," the Court used a weighted average of prices from the Platts Oilgram Price Report (“Platts”) Gulf Coast Spot (Low). Id. at 138; 45 Fed. Cl. at 170. That formula produced a supposed “fair market value” that, for three of the four contracts at issue, exceeded what Barrett was paid, i.e., Barrett was overpaid for those contracts. 45 Fed. Cl. at 170. The litigation then focused upon Government counterclaims for the overpayments. This Court concluded that the Government could not recover, and entered judgment for Barrett, upon the one contract for which the Court's formula yielded an underpayment. Id. at 174.

In the past year, five judges of this Court have held that EPA clauses contained in DESC fuel supply contracts similar to the ones at issue here were unauthorized. La Gloria Oil & Gas Co. v. United States, 56 Fed. Cl. 211 (2003); Gold Line Ref., Ltd. v. United States, 54 Fed. Cl. 285 (2002); Tesoro HI Corp. v. United States, No. 02-704C (Fed. Cl. Sept. 15, 2003); Hermes Consolid., Inc. v. United States, No. 02-1460C, (Fed. Cl. Aug. 7, 2003); Calcasieu Ref. Co. v. United States, 2003 WL 22049528 (Fed. Cl. July 31, 2003); Berry Petroleum v. United States, No. 02-1462 C (Fed. Cl. June 12, 2003); Phoenix Petroleum Co. v. United States, No. 97-315C, (Fed. Cl. Apr. 30, 2003). In those cases, the Court has generally set for trial the question of what relief would best effectuate the parties' intent to adjust prices in compliance with the FAR.

In contrast, in October 2003, another judge of the Court held that EPA clauses like those at issue here are legal and authorized, and granted the Government's motion for partial summary judgment, virtually or entirely disposing of that case. Williams AK Petroleum, Inc. v. United States, __ Fed. Cl. ____, No. 02-705C (Oct. 1, 2003). And, in November 2003, the Court in Hermes, having earlier found the EPA clauses unauthorized, nonetheless granted the Government's partial summary judgment motion – substantially identical to this motion – upon the grounds that the contractor's claim of illegality is untimely and, therefore, waived. Hermes Consolid., Inc. v. United States, ___ Fed. Cl. ___, No. 02-1460C (Nov. 3, 2003).

## SUMMARY OF MATERIAL FACTS

The uncontroverted facts set forth in the accompanying filing are sufficient to establish the Government's right to summary judgment. Generally, our factual statement describes the suitability of the clauses at issue for the generic, bulk fuel purchases at issue; DESC's long and uncontroversial use of the clauses at issue; Kern's lack of objection to the use of, or application of, the clauses; and its continued efforts to win contracts that used the clauses.

I. The Contracts

Kern operates a refinery in Bakersfield, California. Compl. ¶ 2; Def. App. 1, ¶ 3. DESC paid Kern more than $41 million pursuant to the contracts at issue here, buying more than 61 million gallons of two jet fuels, known as "JP-4," and "JP-5." PFF 1, 4, 5, 7. The contracts were competitively awarded under FAR part 15 and lasted for approximately one year. PFF 3, 6.

Kern's contracts were nominally fixed-price, but contained a DESC-drafted price adjustment clause. PFF 9, 11, 12, 13, 14, 15. The general operation of these "EPA" clauses has been described in, among other decisions, MAPCO, 27 Fed. Cl. at 407, and Gold Line, 43 Fed. Cl. at 292 n.4. In essence, for each type of fuel to be supplied, offerors proposed a "base price" per gallon that the agency used for evaluation purposes. PFF 12. Offerors also acknowledged a "reference price," which, since the early 1980s, has been taken from one of several widely-used industry publications. PFF 12-14; Def. App. 28 ("Reference Price Tabulation"). After award, the base price per gallon was periodically adjusted up or down, by the exact number of cents (and fractions of a cent) that the published reference price had risen or fallen since the last price adjustment. PFF 12; Def. App. 60 (part D(c)). Thus, changes in the contract prices were linked to changes in the prices of similar products. See Def. App. 4, 5 (¶ 11).

DESC began using EPA clauses during the 1973 oil embargo. At that time, the agency allowed offerors to choose between basing price adjustments upon either published prices of refined products, or actual crude oil costs. DESC began using published market prices as escalators exclusively in the early 1980s, mainly because the prior practice made it difficult to compare offers. PFF 11. Further, changes in the prices of particular refined products may not always track with changes in crude oil prices over the short term. PFF 8.

Kern's contracts from 1985 through 1994 contained EPA clauses providing for price adjustments based upon monthly average sales prices, by region, as reported by the Department of Energy ("DOE"), Energy Information Administration, in its publication the Petroleum Marketing Monthly ("PMM"). PFF 13. The PMM is compiled from transaction price reports that refiners, including the contractors, are required by law to submit to DOE monthly. PFF 13; 15 U.S.C. § 772. Kern's prices under those contracts were adjusted monthly. PFF 13, 14.

The 1995 contract, in contrast, used an EPA clause based upon regional average prices reported in the industry publication Platts Oilgram Price Report ("Platts") – upon which this Court relied in Barrett to determine "market value." PFF 15; see 45 Fed. Cl. at 170. Platts is published each weekday. PFF 15. Contract prices were adjusted weekly pursuant to DESC's Platts-based EPA clause; that is, contract prices remained in effect for one week. Id.

For example, for a 1995 contract, Kern proposed a base price of 57.35 cents per gallon for JP-5, tied to a Platts-based reference price, supplied by DESC, of 53.95 cents per gallon for February 1995. Def. App. 132, 134. Assuming hypothetically that, when Kern delivered fuel under that contract, the reference price was one tenth of a cent (.10 cents) higher than in February 1995 (i.e., 54.05 cents), the contract price would have been adjusted by adding the same one tenth of a cent (.10 cents) to the base price, yielding 57.45 cents per gallon.

Agency records disclose no objection by Kern, or any other supplier, to any version of the EPA clause, or to any of the scores of price adjustments made pursuant to the clauses, throughout the 11 years in which these contracts were performed. PFF 16. It was not until Kern submitted its certified claims in February 2002 – approximately 18 years after its first contract was awarded, a decade after MAPCO was decided, and six years after the last contract ended – that Kern alleged the EPA clauses were illegal, citing MAPCO. PFF 26.

II. The FAR Deviations

After the MAPCO decision in 1992, DESC turned almost immediately to authorized agency officials for a formal review of its EPA clauses, through the FAR deviation process. Def. App. 34–64. Specifically, DESC sought approval to use EPA clauses

> based on industry or Government price summaries, averages, reports, or indexes of refined petroleum products and natural gas. These . . . include, but are not limited to, figures contained in the Petroleum Marketing Monthly, the Oil Price Information Service, Platts Oilgram Price Report, Lundberg Survey, Computer Petroleum Corporation, and Bloomberg Oil Buyer's Guide.

Id. at 35.

DESC's deviation request acknowledged and attached the MAPCO decision, but explained that DESC disagreed with the result. DESC maintained, among other things, that "[t]he use of product index [price] escalators ensures that the sale will be at the market price, which is a fair and reasonable price. Not only is the Government protected, but the contractor is protected by knowing that its price will always be related to the price it could obtain in the commercial marketplace." Id. at 37.

The agency obtained several individual FAR deviations during the next two years. In January 1993, February 1993, November 1994, and March 1995, the chief procurement officials of the Defense Logistics Agency ("DLA,") DESC's parent, approved one-time, individual deviations for the use of market-price-based EPA clauses. PFF 17-19, 23. In January 1995, DESC sought a permanent class deviation for its EPA clauses, forwarding its request, pursuant to agency procedures, through the Defense Acquisition Regulations ("DAR") Council. PFF 20. While that request was pending, Kern's contract SP0600-95-D-0507 was awarded pursuant to a March 1995 individual deviation under solicitation SP0600-95-R-0161. PFF 23.

Concurrently with its request for a class deviation, DLA published a proposed regulatory revision in the Federal Register. PFF 21. That notice stated that market-price publications, such as Platts, were widely-used to adjust commercial prices for refined products. Def. App. 89-92. Only one comment, from a trade association, was received. That commenter did not object to the use of market prices to adjust contract prices. Rather, it wished to ensure that DESC selected the correct market prices. PFF 22.

In October 1995, Eleanor Spector, the Director of Defense Procurement ("DDP"), approved DESC's request for a permanent class deviation "to develop and use [EPA] clauses that are based on . . . established prices[,] to encompass industry-wide and geographically based market price references . . . ." PFF 24. A confirmatory amendment to the DLA's FAR supplement was published in the Federal Register in 1999. PFF 25.

## SUMMARY OF THE ARGUMENT

This case presents the incredible claim that a sophisticated oil contractor that continued to seek and perform the contracts at issue without complaint for 11 years and then waited seven more years to file its claims is entitled to a remedy. Remarkably, Kern does not allege that it misunderstood the contract clauses at issue, or that the clauses did not operate in accordance with their plain language. Kern's attempt to secure a post hoc windfall fails as a matter of law and simple fairness, for several reasons.

First, assuming the EPA clauses at issue were inconsistent with the FAR, that inconsistency was resolved before one of the four contracts were awarded, when, pursuant to the authority contained in FAR subpart 1.4, DESC obtained a FAR deviation authorizing the use of its EPA clause for that procurement. The ease with which that solicitation and others were approved by FAR authorities underscores the artificiality of Kern's claims of "illegality."

Second, contrary to Kern's assertion, the court of appeals in Barrett, 242 F.3d 1055, did not hold the clauses at issue to be illegal. In fact, the court of appeals has never been presented with the issue of the legality of these clauses. Therefore, there is no precedential decision supporting Kern's claims.

Third, the clauses at issue were not prohibited by the FAR, were well-calculated to protect the contractors and the Government from significant fluctuations in costs, as required by FAR 16.203-3, and are the sort of "established prices" clauses specifically authorized in FAR 16.203-1. However, even if the Court were to adopt the reasoning in MAPCO, Gold Line, and other cases adverse to the Government, and reject the reasoning of Williams, Kern still could not prevail without demonstrating that the clauses at issue failed to address "one of the two mischiefs" described by FAR 16.203-3 (significant fluctuations in labor or material costs or changes in the contractor's established prices). MAPCO, 27 Fed. Cl. at 412. That Kern continued to seek these contracts and performed them for years without complaint demonstrates that the clauses more than adequately addressed these "mischiefs."

Fourth, even if Kern could meet its burden of proof, it has, like the supplier in Hermes, waived its claims or is estopped from making them, by its knowing, persistent acceptance of the challenged clauses, and its failure to timely object to their use.

Fifth, assuming Kern has not forfeited its claims, Kern deserves no remedy because it cannot demonstrate resultant harm, i.e., that the illegality caused it to do, or refrain from doing, something to its detriment. Simply put, even if, absent a deviation, these clauses were technically unauthorized or "illegal," Kern obtained everything it had a right to expect under each contract, whether or not a deviation was in place for any given contract.

Finally, even assuming Kern is entitled to a quantum valebant recovery, it has greatly inflated the applicable quantum by ignoring its original proposal prices as the best indicators of "fair market value" at the time of award.

## ARGUMENT

### I. The Summary Judgment Standard

Summary judgment is warranted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c); accord Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1999). A factual issue is material if it could affect the outcome of the case in light of the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute exists only if a reasonable trier of fact could find for the nonmoving party. Id. The movant need not "produce evidence" of the absence of factual disputes; it need only "point[] out" that the record does not support the other party's case. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

### II. The EPA Clauses In One Of The Four Contracts At Issue Was Unquestionably Legal Because It Was Properly Approved Through The FAR Deviation Process

The linchpin of Kern's complaint is that the EPA clauses impermissibly conflict with FAR 16.203 – not a statute. Although we demonstrate below that the clauses are, by their terms, wholly consistent with the FAR and, therefore, lawful and enforceable, the Court need not even reach those arguments with respect to one of the four contracts. The legality of the EPA clause in that contract (SP0600-95-D-0507) is independently established by the fact that DESC prudently obtained a so-called "deviation" for it, through the legally authorized channels.

Subpart 1.4 of the FAR expressly provides for deviations – essentially, exceptions to FAR provisions that are not expressly required by another law. These can be individual deviations (FAR 1.403) or class deviations (FAR 1.404). See also PCL Constr. Servs., Inc. v. United States, 41 Fed. Cl. 242, 252 (1998) (describing deviation process). An individual deviation excludes a single "contract action" from a FAR requirement. A class deviation affects more than one contract action, and may be issued upon a permanent basis. FAR 1.404; see Ace Servs., Inc. v. GSA, GSBCA No. 11331, 92-2 BCA 24,943 (noting that agency obtained class deviation for agency-drafted EPA clause for multi-year contracts).

Immediately after the MAPCO Court's ruling that DESC's PMM-based EPA clause violated the FAR, the agency approached the appropriate DoD officials for a formal review of its clauses through the deviation process. As set forth in our proposed findings, DLA obtained individual FAR deviations from its chief contracting authority in January 1993, February 1993, November 1994, and March 1995, to permit the use of its market-based EPA clauses in several solicitations, under which Kern was awarded one contract. PFF 17-19, 23. Then, in October 1995, the DDP approved DESC's request for a permanent class deviation to use EPA clauses "based on . . . industry-wide and geographically based market price references," which would include the PMM and Platts-based clauses. PFF 24.

Accordingly, the basis for Kern's complaint – a regulatory violation, as found in MAPCO – simply does not apply to contract SP0600-95-D-0507, because the EPA clause in that contract was expressly authorized by the proper FAR authority. Cf. Williams, No, 02-705C, slip op. at 14-15. But see La Gloria, 56 Fed. Cl. at 217-19 (holding that individual deviations improperly addressed more than one "contract action," and class deviation is invalid for lack of notice). The concerns expressed by the La Gloria Court regarding the agency's adherence to its deviation

procedures, echoed in more recent decisions, are answered in Williams. At bottom, even assuming there were ministerial defects in the approval process for the individual deviations or the class deviation (which we do not concede), Kern, which fully understood the pricing mechanism in its contracts, cannot demonstrate prejudice, i.e., that it was "harmed by the [alleged procedural defects] in any concrete way contemplated by the FAR[.] [T]herefore, [it] is not entitled to relief." LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1557 (Fed. Cir. 1995).

III. Barrett Neither Requires Nor Supports A Finding Of Illegality

The complaint asserts, among other things, that the court of appeals in Barrett has already decided that "the Government's economic price adjustment clause was illegal." Compl. ¶ 15. As this Court explained in Williams, slip op. at 7, there is no such holding, because "the Federal Circuit did not address the issue [of illegality] now before us."

All that was at issue in the entire Barrett litigation was quantum. Indeed, this Court noted in the first paragraph of its first Barrett decision that "[t]he parties agree that the clauses are unenforceable . . . . The issues before this court . . . are the fair market value of the fuel . . . and whether plaintiff was under-compensated . . .." 42 Fed. Cl. at 129. The appeal of that decision was brought by the Government, which raised only three issues: (1) whether this Court possessed jurisdiction to hear quantum meruit claims; (2) if so, whether the Court correctly dismissed the Government's counterclaims; and (3) whether the Court used the proper valuation methodology. Barrett, 242 F.3d at 1058-59.

In sustaining this Court's exercise of jurisdiction, the court of appeals noted that appellate jurisdiction was conferred by 28 U.S.C. § 1295. 242 F.3d at 1058. The appellate court assumed the EPA clauses were unauthorized – as this Court had, id. at 1060 -- but it did not so rule. Even if the appellate court in Barrett had, without saying so, somehow decided the illegality

issue that never was argued, that silent "ruling" would not be precedential here. A decision is not precedential as to issues that "merely lurk in the record," Webster v. Fall, 266 U.S. 507, 511 (1925), including jurisdictional issues. Will v. Michigan Dept. of State Police, 491 U.S. 58, 63 n.4 (1989) (jurisdiction not decided sub silentio); see also Beacon Oil Co. v. Secretary of Energy, 71 F. 3d 391, 395 (Fed. Cir. 1995); Williams, slip op. at 8.

In sum, as each judge of this Court, but one, that has examined the issue has held, Barrett provides no precedent, nor even guidance, regarding liability. But see Calcasieu, 2003 WL 22049528, at * 2 n.5 (holding that the FAR authorizes market-based "established price" escalators, but that the Federal Circuit in Barrett affirmed "evidentiary findings" that the PMM is not an "established price" escalator).

## IV. Plaintiff Cannot Demonstrate That The DESC EPA Clauses Are Prohibited

### A. Plaintiff Must Identify An Explicit Prohibition

Apparently recognizing it lacks any ground for increasing its contract price by complaining that it was deceived about, or justifiably failed to comprehend, the meaning or operation of the clauses at issue, plaintiff asserts that the clauses at issue were "illegal." However, before it can succeed upon any such claim, plaintiff must demonstrate that the clauses at issue were prohibited, because when no statute or regulation prohibits the use of a clause, the clause is authorized and will be given effect. United States v. General Elec. Corp., 727 F.2d 1567, 1573 (Fed. Cir. 1984) ("GE").

Firestone Tire & Rubber Co. v. United States, 444 F.2d 547 (Ct. Cl. 1971), for example, concerned an allegation that a price escalator not specifically recognized by a predecessor of FAR 16.203-1 (Armed Services Procurement Regulation ("ASPR") 3.404-3(a)) was illegal. Acknowledging that the ASPR was "law which governs the award and interpretation of contracts

as fully as if it were made a part thereof," the Court of Claims nonetheless held that the ASPR's enumeration of "two broad types" provided "useful and valuable guidelines," but did not prevent the parties from agreeing upon a different type of EPA clause. 444 F.2d at 553. See also Peters v. United States, 694 F.2d 687, 692 (Fed. Cir.1982) (regulation providing four grounds for unilateral modification of contract by the Government did not prohibit bilateral modification where none of those grounds was applicable); Trinity Servs., Inc., GSBCA No. 5825, 81-1 BCA ¶ 15,034 (1981) (FAR "Description" clause does not prohibit reasonable contract terms).

This Court has followed this principle in analogous situations, in which a contractor has argued that a contracting officer may utilize clauses only when expressly authorized to do so. For example, in Integrated Logistics Support Systems International, Inc. v. United States, 47 Fed. Cl. 248 (2000), aff'd mem., 2002 WL 1291856 (Fed. Cir. 2002), the contractor argued that a contracting officer could not insert a price ceiling in a sole-source letter contract, because the FAR required price ceilings only in contracts awarded pursuant to "price competition." Id. at 259 (quoting FAR 16.603-2(b)). The Court held that simply because the clause was not required in a sole source contract "does not mean it was forbidden . . . ." Id. Similarly, in PCL Construction Services, plaintiff argued that the "subject to availability of funds" clause (FAR 52.232-19) could be used only in the special contracting situations for which it is prescribed. As in the cases cited above, the Court held that because the FAR did not prohibit the use of the clause in other situations, its use was authorized. PCL, 41 Fed. Cl. at 252.

The court of appeals recently applied this principle in American Telephone and Telegraph Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) ("AT&T V"). There, the court considered AT&T's allegation that, in selecting a fixed-price contract, the Navy had "violated a variety of procurement regulations and directives that guide a contracting officer's selection of

contract type." Id. at 1379. After concluding that regulations that "cautioned" against a fixed-price contract type did not amount to a prohibition, the court concluded that the contracting officer was free to select that type of contract. Id. at 1380.

Accordingly, neither the absence of authority to use a clause nor nonmandatory guidance concerning the clause can be relied upon to urge prohibition of a clause. We expect that plaintiff will argue that FAR 16.203-1 and FAR 16.203-3 prohibit DESC's EPA clauses. As demonstrated below, the contrary is true.

B. The Clauses At Issue Are "Established Price" Clauses Within FAR 16.203-1(a)

FAR 16.203-1 provides:

> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:
>
> (a) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.
>
> (b) Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

Nothing contained in section 16.203-1 purports to be proscriptive. The sentence, "Economic price adjustments are of three general types," is a simple declarative statement. It does not state that contracting officers "shall use one of the three general types" or that the three named are "the only acceptable types." Had the regulation intended to restrict EPA provisions to the three described, it would have included language of that sort. Cf. FAR 27.203-1(b)

(prohibiting use of patent indemnity clause in certain situations). Nonetheless, 16.203-1 supports the Government position, because, as this Court has held, the clauses at issue are one of the three explicitly endorsed, i.e., "established price" clauses. Williams, slip op. at 6-13; cf. Calcasieu, slip op. at 4 n.5 (holding “established prices” does not mean contractor’s prices).

FAR Subsection 16.203-1(a) authorizes contract prices to be adjusted upon the basis of changes in "published or otherwise established prices." It does not define those terms. However, FAR 16.203-4 ("Contract Clauses") sets forth the circumstances in which the contracting officer may use either a FAR or agency-prescribed EPA clause based on “published or otherwise established prices”. That subsection expressly authorizes the use of such provisions where the requirement is for supplies that have an “established catalog or market price.” FAR 16.203-4(a)(ii), (b)(ii). Since a January 1997 revision, FAR 16.203-4 has not explicitly defined the terms “catalog or market price.” However, its predecessor made clear that the terms “established catalog or market price” referred to the definitions found in FAR 15.804-3. The predecessor stated that, before using a “published or otherwise established price” EPA clause, the contracting officer must determine that “the requirement is for . . . supplies that have an established catalog or market price verified using the criteria in FAR 15.804-3” (emphasis added). FAR 15.804-3 (c), in turn, defined “established catalog prices” as "prices (including discount prices) recorded in a catalog, price list, schedule, or other verifiable and established record that (A) are regularly maintained by the manufacturer or vendor; and (B) are published or otherwise available for customer inspection." FAR 15.804-3(c)(1) (1995). It defined “established market prices” as “current prices that (i) are established in the course of ordinary and usual trade between buyers and sellers free to bargain and (ii) can be substantiated by data

from sources independent of the manufacturer or vendor." Id. § 15.804-3(c)(2) (emphasis added).

As the Court noted in Williams, section 16.203-2 also suggests that the definition of established market prices in section 15.804-3(c)(2) refers to prices other than the contractor's prices. Section 16.203-2 provides: "[p]rice adjustments based on established prices should normally be restricted to industry-wide contingencies." This reference to industry-wide contingencies demonstrates that market prices are not limited to the contractor's prices. Thus, if the contractor's established prices rise, but prices in the rest of the industry do not rise, then the EPA clause should not provide for an upward adjustment in the contract prices. If, however, the contractor's prices rise along with those of industry generally, then the EPA clause should provide for an upward adjustment in contract prices as indicated by the increase in industry market prices.

The escalators used in the clauses at issue track market prices, and clearly fit within the definition of "established market prices." The PMM, for example, is based upon sales data from a large number of refiners and sellers of petroleum products and reports averages of the actual prices paid for various products in different states and regions of the country. PFF 13. Because the prices are established in actual sales between a number of sellers and buyers, they satisfy the FAR 15.804-3 requirement that market prices be established in the ordinary course of business between buyers and sellers free to bargain. Thus, a contracting officer encountering FAR 16.203-1 and 16.203-4 has no reason to suppose that "established prices" must be a "contractor's established prices."

MAPCO and decisions following it disagreed with this conclusion, although the MAPCO Court was not presented with the foregoing argument. Those Courts concluded that FAR

16.203-1's reference to adjustments by "established prices" referred to contractor established prices and, therefore, did not include the market-price adjustment used in Clause B19.33. Gold Line, 54 Fed. Cl. at 295. The bases for this conclusion, as summarized in Gold Line, were : (1) FAR 16.203-3 specifically refers only to "contractor's established prices," and appears in the same "section" as 16.203-1 (which uses the term "established prices"); (2) a neighboring provision, FAR 16.203-2, refers to "contractor established prices;" and (3) the FAR's standard EPA clauses (FAR 52.216-2 and FAR 52.216-3) "base adjustments to contact price on fluctuations in the contractor's established prices," and used the terms "established prices" and "contractor's established prices" interchangeably. 54 Fed. Cl. at 294-95.

The MAPCO Court also relied upon its observation that FAR 16.203-1 was intended to replicate a Defense Acquisition Regulation ("DAR") EPA provision, without substantive change. 27 Fed. Cl. at 409. The significance of that, according to the Court, was that, in the DAR, the predecessor of FAR 16.203-3 (which refers to contractor established prices) appeared before the predecessor of FAR 16.203-1 (which refers only to "established prices."). Thus, the Court concluded, the word contractor "could . . . be omitted" from FAR 16.203-1 and it still could refer to contractor prices. Id.

As explained in Williams, these arguments are unsound because they insert the word "contractor's" to an otherwise clear regulation and undermine the purpose of EPA clauses, which is to adjust for market conditions, not contractor conditions. In addition, these arguments do not establish that the term "established prices," as used in FAR 16.203-1, refers to "contractor's established prices," because the arguments simply beg the question. Thus, while it is true that the word contractor might be inferred in FAR 16.203-1, based upon its use in adjoining sections, absent a textual or policy reason for doing so, that is not a necessary or even logical inference.

We understand that drafters might reasonably, and without risking ambiguity, shorten a term that is repeated in very close proximity to its original mention, such as within the same sentence, or, when used repeatedly within the same paragraph. In fact, the drafters did that in FAR 52.216-2(b), 52.216-2(c), 52.216-3(a), 52.216-3(b), and 52.216-3(c) where, as the MAPCO Court notes, the terms “contractor established prices” and “established prices” were used interchangeably. Indeed, that clause is a standard clause for the use of contractor established prices, and its context makes clear that every use of the term “established prices” does, indeed, refer to the contractor's established prices.

However, users should not be required to assume that a term that appears in one section of the FAR (FAR 16.203-3), was transported to a completely different section of the FAR (FAR 16.203-1) via an ersatz shorthand that is never explicitly defined. It is doubly unreasonable to expect readers to make that assumption when the phrase to be imported does not occur until later in the regulation, and when the alleged shorthand (established prices) has a clearly separate meaning from its allegedly intended reference (contractor's established prices). In fact, the argument necessarily assumes the drafters were sloppy.

This argument also applies to the DAR predecessor provisions. Their simple co-location and order within the DAR alone do not indicate that both provisions were intended to refer to contractor established prices. Thus, whether there was a substantive change from the DAR to the FAR is immaterial, unless one assumes that FAR 16.203-1's predecessor was intended to refer to "contractor established prices."

The MAPCO Court also found support in the dictionary for the conclusion that “established prices” meant “contractor established prices,” reasoning that the word “established” (defined as, among others things, “stable” and “firm”) implies that “a purchaser would have to

have assurance that he could go to a particular vendor and insist on the advertised price." 27 Fed. Cl. at 410-11. That ignores, however, the fact that established market prices for price adjustment purposes must be more than mere advertised prices. What makes a price established is that sales occurred at the particular price. An advertised price at which no sales take place should not be used as an adjustment mechanism for a Government contract price. A contractor's past sales prices are simply one part of the overall market constituting established market prices.

The Court in MAPCO also found that the PMM did not reflect "established prices" because it is "an amalgamation of the previous month's petroleum sales data [and] not, as FAR 15.804-3(c)(2) contemplates, determinative of any particular corporation's current prices." 27 Fed. Cl. at 410. The Court appears to have misunderstood the EPA clauses. Although each PMM reports a previous month's sales, price adjustments were made based upon the PMM prices in effect "during the month of delivery." Def. App. 28 (pt. D(a)). Thus, current prices always were used. Furthermore, nowhere does the FAR state that any "particular [contractor's] current price" better reflects "established prices" than an "amalgamation" of prices.

In Gold Line, 54 Fed. Cl. 285, the Court placed special emphasis upon what it viewed as the "mandatory" nature of FAR 16.203-1. The Court's reasoning was based upon its assumption that contracting officers are prohibited from using clauses unless the FAR permits, and that FAR 16.203-1 is the full extent of any such permission. 54 Fed. Cl. at 292-94. Yet, we know of no authority that requires a duly appointed contracting officer, acting within his warrant of authority, first to seek permission to use a clause if it is not contained in the FAR. To the contrary, absent a prohibition, "a contracting officer may use a clause not specified in the applicable procurement regulation." GE, 727 F.2d at 1573; see also AT&T V, 307 F.3d at 1379.

The Gold Line decision also relied upon FAR 1.401 and an interpretive rule for support of its conclusion that only a "described" clause is permitted, 54 Fed. Cl. at 290-91, but, respectfully, these references beg the question. The Court stated that FAR 1.401 "expressly precludes the use of a contract procedure or clause that is inconsistent with the FAR," and that the applicable rule of statutory construction provided that "if a statute provides that a thing shall be done a certain way, there is a rebuttable presumption . . . [of] an implied prohibition against doing that thing in any other way." Id. (emphasis added).[3] We agree, but the question remains: Where is the "express" preclusion, prescription, or prohibition?

C. FAR 16.203-3 Does Not Prohibit The DESC Clauses

FAR 16.203-3 restricts the use of contracts with EPA clauses to those instances where

> the contracting officer determines that it is necessary either to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices.

In MAPCO, the Court relied upon this provision to find an EPA clause illegal. The Court reasoned that, a "legal" EPA clause must address one of the "two mischiefs" described in

---

[3] Without saying so, the Court was applying the rule of expressio unius est exclusio alterius, but such rules "long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose." Herman & MacLean v. Huddleston, 459 U.S. 375, 387 (1983). Thus, absent clear language establishing "purpose,"

> [t]he application of the maxim . . . suffers form the usual weakness of that canon. It begs the question. Why should we infer from the list of ways to do something that there are no others? The legislature does not tie up every knot in every statutory subsection. A list of four ways may imply only that Congress has yet to consider whether there should be others. The history and structure of a statute may show that a list is exhaustive . . . but also may show that Congress has not grappled with the problem . . . .

In re American Res. Corp., 840 F.2d 487, 492 (7th Cir. 1987).

16.203-3, and the EPA clause there did not. 27 Fed. Cl. at 412. But, even if MAPCO was correctly decided, plaintiff cannot turn to FAR 16.203-3 to supply the necessary prohibition without demonstrating that, in this case, the clauses at issue failed to "protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustments in the event of changes in the contractor's established prices." Plaintiff has not even alleged as much – preferring to rest upon its conclusory assertion that the clauses are "illegal." Plaintiff's failure to allege that the EPA clauses failed in their purpose comes as no surprise, inasmuch as the clauses at issue tracked market fluctuations penny for penny, and plaintiff and many other contractors willingly accepted them year after year.

Should plaintiff now attempt to supply the necessary proof – as it must in response to a motion for summary judgment – the Court should note that FAR 16.203-3 concerns only protection from "significant" cost fluctuations. Thus, it does not require that every cost fluctuation be passed along to the Government. Indeed, it is unlikely that a proper escalator would cover every increase in a particular contractor's costs.

D. The Agency Did Not Abuse Its Discretion In Selecting The Clauses At Issue

As we have demonstrated, there was no prohibition against the clauses at issue. As discussed above, absent a prohibition, the agency had the discretion to select an appropriate clause. Accord 10 U.S.C. § 2306(a) (agency head generally "may enter into any kind of contract that he considers will promote the best interests of the United States"); 16.103(a) ("Selecting the contract type is generally a matter for negotiation and requires the exercise of sound judgment."), 16.104 (selection of contract type turns upon "many factors"), 35.006(b) ("Selecting the appropriate contract type is the responsibility of the contracting officer."); see also AT&T III, 307 F.3d at 1378-80.

When agencies make decisions within their discretion, the appropriate standard of review, absent a statute establishing another review scheme, is that contained in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) ("unsupported by substantial evidence . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). See, e.g., United States v. Carlo Bianchi & Co., 373 U.S. 709 (1963); Julius Goldman's Egg City v. United States, 214 Ct. Cl. 345, 556 F.2d 1096 (1977); Town of Fallsburg v. United States, 22 Cl. Ct. 633 (1991). See also 28 U.S.C. 1491(b)(4) (bid protest review standard). Accordingly, "determinations in procurement matters should ordinarily be left to the discretion of administrative officials exercising procurement authority." Durable Metals Prods., Inc. v. United States, 27 Fed. Cl. 472, 477 n.6 (quoting P. Francini & Co. v. United States, 2 Cl. Ct. 7, 11 (1983)), aff'd, 11 F.3d 1071 (Fed. Cir. 1993) (table).

With regard to the selection of EPA clauses, the FAR expressly gives the contracting officer latitude to use an agency-prescribed clause when the standard FAR clauses are "inappropriate." FAR 16.203-4 (a)(2), (b)(2), (c)(2), and (d)(2). The agency could have chosen to adjust based upon contractor prices or costs, but, given the nature of the refined oil business (price-driven, bulk commodity), decided that doing so was inappropriate.

As a DESC deviation memorandum explained:

> A refinery produces a stream of different products from a barrel of crude oil. . . . Petroleum refiners price their products on the basis of the market price for the finished product, not the cost to produce the product. Because there are a number of oil industry publications which report the market prices of petroleum products on a daily, weekly, and monthly basis, purchasers know the current market price of the products they buy, and do not normally pay more than the going market price.
>
> DFSC contracts contain EPA provisions based on market indexes of the product being purchased or of a similar product. All EPA

> references are tested for accuracy and then recommended for use by DFSC's Office Of Market Research and Analysis. These EPA provisions ensure that the Government, like commercial customers, will pay the market price for the fuel throughout the duration of the contract, whether market prices increase or decrease.

Def. App. 36.

Tying contract prices to relevant market prices, as the DESC clauses did, was a proper exercise of discretion and provided the protection envisioned by FAR 16.203-3, because the forces operating upon costs were reflected in the prices set by refineries every day – prices that presumably covered the refineries' costs.[4] FAR 16.203-3 requires only that the contracting officer determine that price "protection" is necessary for "the contractor and the Government." The FAR does not define "protection," but it is clear that any clause that would automatically allow increases in "contractor costs" to drive contract prices upward or downward, in a market where costs do not directly relate to prices, would leave the Government substantially unprotected. Moreover, the FAR permits agencies to use EPA clauses to protect against "significant" cost fluctuations – which means, not every fluctuation. FAR 16.203-3.

E. Conclusion

Any doubt concerning the reasonableness and efficacy of the published market prices used as escalators in this case is erased by the uncontroverted facts of this case. During 11 years of contract performance, plaintiff did not complain about the use or operation of the EPA clauses. PFF 4, 16. Affirmatively demonstrating its satisfaction with these clauses, plaintiff competed for DESC contracts over a number of years. PFF 4, 6, 16. And, when DESC

[4] The escalator was not a true "cost index" (see 16.203-1(C) and 16.203-4(d)), in the sense of actually tracking refineries' crude oil costs, for example. Nonetheless, it serves as the functional equivalent by tracking refiners' allocation of those costs to specific products, as reflected by the prices the refiners charge.

published its proposed revision to its procurement directive in the Federal Register, plaintiff offered no comments. No refiner did. PFF 22.[5] That silence is telling.

In sum, there is nothing inherently suspicious or illegal about DESC's fuel contracts. And, plaintiff, which, as claimant must prove otherwise, has not done so.

V. Plaintiff Has Waived Its Right To Challenge the EPA Clauses

It is well-settled that, absent an affirmative prohibition by Congress, a contractor may waive applicable regulatory, statutory, or constitutional rights. See, e.g., Union Pac. RR. v. United States, 847 F.2d 1567, 1570 (Fed. Cir. 1988) (contractor estopped from asserting illegality of longstanding contract provision when it entered into the contract without protest); Rough Diamond Co., Inc. v. United States, 173 Ct. Cl. 15, 351 F.2d 636 (1965) (violation of statute concerning Government's cotton pricing did not require refund of any overpayment); Hartford Accident & Indem. Co. v. United States, 130 Ct. Cl. 490, 494, 127 F. Supp. 565, 567 (1955) (surety that executed performance and payment bonds with knowledge of terms of Government contract was estopped to assert that contract was executed without authority); PCL, 41 Fed. Cl. 242 (contractor waived objection to contract provision that "was apparent on the face of the solicitation, so that any objections . . . should have been raised prior to the submission of bids"); Reservation Ranch v. United States, 39 Fed. Cl. 696, 711 (1997) (waiver of regulatory provision allegedly in conflict with contract provision when plaintiff "agreed to the contract"), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table); Cubic Applics., Inc. v. United States, 37 Fed. Cl.

[5] Indeed, the only comment was from an industry organization concerned that DESC might select a reference source that did not reflect market prices. PFF 22. That comment did not complain about DESC's choice of market-price escalators over other types of escalators, as Kern does here.

345, 357-58 (1997) (rejecting an equitable remedy when the plaintiff knew of an illegality argument but attempted to win the contract).

Waiver requires only that the party waiving a right do so "voluntarily" and "knowingly." Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (Fed. Cir. 1980) (citing Brookhard v. Janis, 384 U.S. 1, 4, 5 (1966)). Estoppel requires that the party asserting estoppel rely to its detriment upon its opponent's action or inaction. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362, 368 (1978) ("Had plaintiff protested the use of the option provision at the time of award, defendant would have been in a position to either reaffirm its use of the option provision. in apparent disregard of the ASPR prohibition, with the further knowledge that it could later be faced with a claim for the [higher] price; or it could have elected instead, to award the [contract] in the next least expensive manner . . . . Plaintiff's silence deprived the Government of that relatively painless alternative.").

Here, plaintiff acted voluntarily and knowingly when it incorporated the EPA clauses from the solicitations into its offers over many years. To be sure, its offers adopted, and did not originate, the EPA clauses. But that was also true in the cases cited above. Indeed, the critical factor in those cases was the fact that the contractor failed to protest. To avoid waiver, as did the contractor in Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed Cir. 1988) (a case upon which plaintiff will no doubt rely), plaintiff could have objected to the clause contained in the solicitation, or offered a clause it believed was more suitable. Instead, plaintiff offered the EPA clauses at issue again and again (after having performed under them again and again) – and did so without complaint.

As this Court explained in Hermes, a key factual distinction between Beta and this case is the fact that, there, the contractor complained during contract formation. Hermes, No. 02-

1460C, slip op. at 20. Borrowing from the Court's language in Hermes, Kern never complained that it was not making a profit, never complained the contract it was fulfilling was unlawful. This conduct is far more egregious than what occurred in Beta.

Plaintiff is estopped from rescinding its adoption of these EPA clauses in its offers because DESC relied upon those offers. DESC evaluated competing offers based upon the inclusion of these clauses, and continued to include the clauses in its solicitations. Had plaintiff protested an EPA clause anytime prior to submitting its belated claims, DESC could, at a minimum, have obtained a deviation or revised the clause. Instead, plaintiff "in effect retained all options for itself . . . made its calculations entirely in its own favor, without proper consideration of the defendant's position," and violated the "basic principle calling for fair treatment of both parties." Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 148, 149, 475 F.2d 630, 638 (1973).[6]

Plaintiff's conduct also implicates the doctrine of laches, which is similar to estoppel. The equitable doctrine of laches provides that a plaintiff's claim will be dismissed if there is (1) an unreasonable and inexcusable delay in bringing the claim, and (2) material prejudice (economic or defense) to the defendant as a result. E.g., A. C. Auckerman Co. v. R. L. Chaides Construction Co., 960 F.2d 1020, 1032-33 (Fed. Cir. 1992) (en banc); Hermes, No. 02-1460 C, slip op. at 21-22. See also Calcasieu, No. 02-1219 C, slip op. at 18-19 ("The spectre of laches could be present").

[6] Ling-Temco-Vought involved a performance breach about which the court observed: "As a general proposition, one side cannot continue after a material breach by the other . . ., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court." 201 Ct. Cl. at 146, 475 F.2d at 637 (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 455 F.2d 546 (1972)).

Under these circumstances, plaintiff willingly abandoned and waived any benefit it assertedly might have gained from FAR 16.203, and, instead, manifested satisfaction with the EPA clauses contained in the solicitations. At a very minimum, plaintiff's acquiescence requires the Court to examine whether plaintiff has "done equity" in order to deserve a remedy in equity, such as reformation. Promac, Inc. v. West, 203 F.3d 786, 789 (Fed. Cir. 2000).

Kern likely will respond that this is all irrelevant, because the terms are "illegal." That might be so, if the regulations here expressed a fundamental public policy that bound both the agency and the contractor. That was the case in the series of decisions that grew out of the sale of Government-owned vessels after World War II. In those cases, the United States Court of Claims held that ship purchasers who had been charged higher prices than those established by the Merchant Ship Sales Act of 1946 were entitled to refunds, despite the fact that they agreed to pay those higher prices. The court reasoned that the parties could not, by agreement, avoid the statutory terms and thwart Congress's forcefully expressed intent.

As the court summarized its rulings and the applicable principle years later:

> The marine statutes, we thought, embodied the Congressional wish that the Government's surplus ships should be sold at prices, uniform for all purchasers, and ascertainable by mathematical application of the statutory formula, properly interpreted; this Congressional purpose was strong enough to override any general legal doctrine, applicable in other situations, but which, if applied in the instant situation, would result in different persons paying different prices for the same type of ship . . . As this court saw it, the basic test in deciding whether a purchaser could recover would always be the particular Congressional will reflected in the particular piece of legislation under scrutiny . . . .

Rough Diamond, 351 F.2d at 639-40 (internal quotation marks omitted).

Thus, to establish that is may still raise its claim of illegality, plaintiff first must demonstrate that the price adjustment clauses at issue reflect a strong congressional purpose and,

therefore, cannot be waived as a matter of law. We doubt plaintiff can do so and expect, instead, that it will rely upon Chris Berg, Inc. v. United States, 192 Ct. Cl. 176, 426 F.2d 314 (1970), and its offspring, Beta Systems, 838 F.2d 1179, to argue that, when a contract violates a statute or regulation intended for the benefit of the contractor, the contractor is not bound by its "estoppel or acquiescence or even failing to protest." Chris Berg, 426 F.2d at 317.[7] However, plaintiff cannot plausibly read Chris Berg broadly enough to succeed here.

In support of the general proposition that acquiescence is ineffective in the face of an illegal contract, Chris Berg cited Nautilus Shipping Corp. v. United States, 141 Ct. Cl. 391 (1958), and Rough Diamond, 173 Ct. Cl. 15, 351 F.2d 636. Nautilus was one of the series of cases that arose under the Merchant Ship Sales Act of 1946. As discussed above, the court found that this statute expressed a strong congressional purpose to preclude waiver. In Rough Diamond, the court found no waiver, because it found no similar legislative purpose. Only by reading Chris Berg in its historical context can the decision be harmonized with the principles of waiver law summarized at the beginning of this section.

Chris Berg fails to aid plaintiff for two additional reasons. First, Chris Berg is a mistake-in-bid case. There is no mistake here. Plaintiff offered what it intended to offer, and this case concerns only the legal character of the offers – not what plaintiff intended to offer. The regulation at issue in Chris Berg addressed how a contracting officer should treat a claim that the contractor's bid did not reflect its intent. In essence, the contractor asserted that the price offered was not what the Government perceived. The Government argued that, because the contractor "signed the contract anyway," there was no basis for reformation. 426 F.2d at 316. The court

[7] LaBarge, 46 F.3d 1547, also cites this proposition from Chris Berg in discussing whether the court possessed jurisdiction to entertain a claim of reformation, after performance.

responded that the regulation permitted the contractor to reform its offer from the outset, and governed "the award and interpretation of contracts as fully as if it were made a part thereof." Accordingly, the court held, the parties' agreement was at the contractor's intended price. Id. at 317. Here, there is no question what plaintiff intended to offer and the contracting officer had no obligation to interpret it any differently than its plain language suggested. The second reason plaintiff cannot rely on Chris Berg is that, unlike plaintiff, the contractor there protested from the outset. Thus, the statement concerning the effect of a "protest" is dictum, because the plaintiff in that case did protest. 426 F.2d at 315.

Beta Systems, which relies directly upon Chris Berg, adds nothing to plaintiff's argument as there, too, the contractor protested from the outset, insisting that the agency accept an offer consistent with the applicable regulation. The agency refused and it is not surprising that, given this sort of overreaching in the very formation of the contract, the court was willing to intervene. By contrast, plaintiff incorporated the EPA clauses in its offers over many years, having had ample opportunity to assess the performance of the clauses, and to object if the clauses were not performing as expected. In so doing, plaintiff removed any doubt concerning whether its waiver was knowing and voluntary and whether the parties had reached a meeting of the minds.

It also is clear from cases more recent than Beta Systems that waiver is a viable defense even when a plaintiff alleges a violation of a regulation. For example, in Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997), the contractor argued that its contract was void *ab initio*, because the option clause in the contract allocated "undue risks" to it in violation of DAR 1-1502(b)(ii). The court found, however, that the contractor had waived any grounds for rescinding or voiding the contract based upon a violation of the DAR because the contractor

had failed to make a timely objection to the option clause, or to any "undue risk" it believed it bore improperly, or to assert a violation of the regulation.

Since Whittaker, this Court has applied the doctrine of waiver in several cases to reject claims for additional payments based upon alleged or actual violations of procurement regulations. See AT&T v. United States, 48 Fed. Cl. 156 (2000) (even if contracting officer's selection of contract type violated regulations, the time to have raised such concerns was during negotiations, not years after contract completion), aff'd, 307 F.3d 1374 (Fed. Cir. 2002); PCL, 41 Fed. Cl. 242 (use of the "subject to availability clause" was apparent on the face of the solicitation, so that any objections to the use of the clause or failure to follow FAR administrative procedures should have been raised prior to submission of bids). In cases of this sort, at least two judges appear to agree, waiver is possible, but have asked for further factual development. Calcasieu v. United States No. 02-1219C, (Fed. Cl. July 31, 2003), Hermes v. United States, No. 02-1460 C, (Fed. Cl. August 7, 2003). But see Gold Line, and LaGloria (following Gold Line). For the reasons given, we respectfully disagree with the Gold Line and La Gloria cases.[8]

Considering the Federal Circuit's continued willingness to find waiver, the overwhelming evidence of plaintiff's knowing eagerness to offer and perform under the clauses at issue, and the absence of congressional purpose concerning contract price adjustment clauses, there is no basis for rescinding plaintiff's voluntary waiver of whatever unattained benefit it presume might flow from FAR 16.203.

---

[8] In unpublished decisions in Berry, No. 02-1462C, and Phoenix, No. 97-315C, Judge Margolis followed Gold Line.

VI. If The Clauses Are Illegal, Plaintiff Still Must Demonstrate That A Remedy Is Required

To recover, Kern must demonstrate that it was injured, damaged, or harmed by the Government's allegedly wrongful action. Failure to prove harm or the existence of injury as part of entitlement is a failure of plaintiff's cause of action. Pennsylvania Dept. of Transp. v. United States, 226 Ct. Cl. 444, 451, 643 F.2d 758, 762-63 (1981) (observing the "well-established rule" that Government contractors have the "burden of establishing the fundamental facts of liability, causation, and resultant injury"); Servidone Constr. Corp. v. United States, 931 F.2d 860 (Fed. Cir. 1991); G & H Mach. Co. v. United States, 16 Cl. Ct. 568, 571 (1989); Elter, S.A., ASBCA No. 52451, 2001-1 BCA ¶ 31,373 (denying entitlement because the contractor failed to establish that a Government delay caused injury).

The appellate decision in LaBarge, 46 F.3d 1547, is instructive. There, as here, plaintiff asserted that it was entitled to reformation of its contract (resulting in an increase in price), because the Government had violated the FAR by sharing plaintiff's prices with a competitor. The court rejected that argument, explaining that "[e]ven though the [price] disclosures to [a competitor] clearly violated the FAR . . . LaBarge was not harmed by the disclosures in any concrete way contemplated by the FAR and, therefore, is not entitled to relief." Id. at 1556. See also Boyajian v. United States, 191 Ct. Cl. 233, 239-40, 423 F.2d 1231, 1235 (1970) (no recovery when plaintiff could not show damages resulted from and were caused by the Government's breach); PCL, 41 Fed. Cl. 242 (no damages where plaintiff could not demonstrate prejudice stemming from the Government's inclusion of "subject to availability of funds" clause in its contract); Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997).

Thus, assuming the clauses at issue are illegal, before plaintiff is entitled to a remedy, it first must demonstrate that the illegality itself harmed it in some way, i.e., caused it to do or

refrain from doing something to its detriment, for example, by offering prices it otherwise would not have offered. In other words, even if it is true that this pricing mechanism was not "permitted" by the FAR, that is an allegation only of "injury without harm" and, therefore, must be dismissed.

Plaintiff's claims do not indicate that the EPA clauses in its contracts harmed or damaged it in a legal sense. Those claims merely assert that if plaintiff's witnesses were permitted to revalue the fuel, the value would be greater than the prices paid under plaintiff's contracts. But such a difference does not establish legally cognizable damage or harm.

Fuel, like many products, is sold at a variety of prices at a given time. The lowest price in a market is just as "fair" as the highest price. For example, Kern submitted bids that priced fuel to the hundredths of a cent per gallon. Other suppliers were awarded contracts at different prices, in the same solicitations as Kern. Those differences do not indicate that one contractor is harmed or damaged vis-a-vis another contractor simply because its prices may be lower. Moreover, if Kern's contracts contained price adjustment clauses expressly approved by the FAR, and if such contracts were similarly revalued by experts with an upward bias on value, it is virtually certain that those experts would arrive at a higher value than that contained in the contracts. Once again, however, such a difference would not logically indicate harm or damage.

In order to show harm or damage, plaintiff must connect in a logical, causative way the presence of the EPA clauses in its contracts with its failure to obtain what it now believes is the correct value for its fuel. Plaintiff has utterly failed to provide such a connection. Plaintiff does not assert that the EPA clauses in its contracts misperformed in any way so as to cause the shortfall in contract payments. Plaintiff does not say that the EPA clauses were biased in favor of the Government. Plaintiff does not say that the EPA clauses failed to accomplish the

objectives of the FAR. Instead, plaintiff would purport to show harm merely by adducing testimony that some hypothetical market yields higher prices. That puts the cart before the horse. Plaintiff first must offer some basis upon which to conclude that the EPA clauses unexpectedly or improperly suppressed its revenues. Only then is the application of a remedy justified, and then only one that cures the harm demonstrated and no more.

This is not to say that, if a statute required that plaintiff be paid a certain amount (see Nautilus Shipping, 141 Ct. Cl. 391 (ship sale contract)) or, if plaintiff was victim of misrepresentation or duress such that its price did not represent a true “meeting of the minds,” that plaintiff would not be entitled to some price other than the contract price. Similarly, had DESC asserted that a contract was void and paid nothing, equitable principles might come to plaintiff’s aid and require that DESC pay at least the value of the benefit it received. E.g., Urban Data Sys. v. United States, 699 F.2d 1147 (Fed. Cir. 1983) (10 U.S.C. § 254(b) prohibited Government from paying cost plus a percentage of cost). But, here, the Government paid the agreed amount. And, if plaintiff’s allegations that the EPA clause fails to properly allocate risk is true, the EPA clauses prompted plaintiff to propose a higher offer than it otherwise might have. Thus, it is inconceivable that plaintiff would be entitled to still more money.

## VII. If Kern Is Entitled To Quantum Valebant, It May Not Disregard Its Contract Prices

Assuming, for argument's sake, that Kern could establish entitlement to recovery in quantum valebant,[9] the Court should dismiss those portions of the complaint that rest upon the presumption that plaintiff may disregard its original offers, as it did in its certified claims. Kern's insertion of hypothetical starting prices – including substantial add-ons – in

[9] Literally, "what it is worth." Barrett, 242 F.3d at 1059 & n.1.

place of its own offers, principally explains why its quantum calculations yield contract prices substantially higher than the prices it was paid.

Kern's certified claims purport to calculate "fair market value." The claims throw out Kern's bid prices, however, and start with published prices – for example, the Platts Los Angeles Spot Price Average for kerojet. Kern then adds "long-term contract premiums" and mark-ups for transportation and additives. PFF 27. Kern's retrospective revaluations simply do not form a proper basis for quantum valebant relief.

Assuming Kern may recover in quantum valebant, it must establish the value of the products it sold in the relevant market. As the Court of Claims explained, quantum valebant relief "is not based on costs . . . but on the reasonable value in the marketplace of the property sold." Cities Serv. Gas Co. v. United States, 205 Ct. Cl. 16, 32, 500 F.2d 448, 457 (1974) (emphasis added). In these circumstances, that means the base prices as-offered. Pacific Maritime Assoc. v. United States, 108 F. Supp. 603, 607 (Ct. Cl. 1952) ("[N]o better [measure of market value] can be given than what the parties agreed upon);" cf. St. Louis Hay & Co. v. United States, 191 U.S. 159, 163 (1903) (enforcing price of invalid oral contract); Ralph Constr., Inc. v. United States, 4 Cl. Ct. 727, 733 (1984) (same).

This Court and the court of appeals have applied this principle in other cases involving EPA clauses. In Barrett, for example, this Court found an implied-in-fact EPA clause. 42 Fed. Cl. at 134-35. The court of appeals held that the implied-in-fact clause could be substituted for the parties' "express clause." 242 F.3d at 1060-61. Neither this Court nor the court of appeals, however, allowed the plaintiff to ignore its original offer as the starting point for price adjustments. To the contrary, this Court specifically "reject[ed] any approach that [did] not begin with the bargain the parties initially struck." 42 Fed. Cl. at 135. The remedy, the Court

held, was "using the contract award price adjusted monthly pursuant to a modified final EPA clause." Id. at 138. That was consistent with the court of appeals decision, which held that where "there was no longer any express clause covering price escalation," there could be "an implied-in-fact agreement on that term." Barrett, 242 F.3d at 1060 (emphasis added).

Similarly, in Beta Systems, the court of appeals held that the remedy for use of a noncompliant cost index was simply to substitute a "complian[t]" index. 838 F.2d at 1186. It is evident from the appellate opinion that there was no thought of voiding the base contract price. See id. at 1185 ("The error or mutual mistake, if any, lies in the specific index chosen . . . .").

Applying these principles, if this Court were to hold that Kern may recover in quantum valebant, the measure of recovery would be no greater than the difference (if any) between what plaintiff actually was paid and what it would have been paid using an alternative escalator with the same base prices. Permitting Kern to discard its offered prices in favor of higher ones would not only be contrary to law; it would presume, as fact, that Kern proposed prices below market. As a sophisticated contractor, Kern was not forced to sell to the Government, and the assumption that it did so at below-market prices lacks any foundation. Further, even if Kern underbid – either by error or design – any remedy that excuses it from the consequences of its decisions would only confer a windfall upon Kern.

**CONCLUSION**

For these reasons, defendant respectfully requests the Court to grant defendant partial summary judgment and dismiss the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Steven J. Gillingham
STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

BERNARD A. DUVAL
Counsel
Defense Energy Support Center
Ft. Belvoir, VA

HOWARD M. KAUFER
Trial Attorney
Defense Energy Support Center
Fort Belvoir, VA

November 7, 2003

CERTIFICATE OF FILING

I hereby certify that on November 7, 2003, a copy of foregoing "DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham