IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KERN OIL & REFINING COMPANY, | ) | |
| | ) | |
| | ) | |
| | ) | No. 03-1623C |
| Plaintiff, | ) | (Judge Sypolt) |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF JOHN R. WALKER

1. My name is John R. Walker and I am a contracting officer with the Defense Energy Support Center (DESC). I have been with DESC since 1983, except for a period from 1987-1989, when I worked for the Naval Sea Systems Command. I have been a DESC contracting officer since 1989.

2. DESC or its predecessor, the Defense Fuel Supply Center (DFSC), awarded Kern Oil & Refining Company (Kern) a series of four contracts, between 1984 and 1995 that are the subject of these economic price adjustment (EPA) clause claims.

3. The subject of the claims is the JP-4 and JP-5 jet fuel provided under DESC bulk contracts. JP-5 is a kerosene-based jet fuel used by the Navy. Its salient characteristic is a high flashpoint, which enhances its safety for use in planes that land on aircraft carriers. JP-4 is a naphtha-based jet fuel and was primarily used by the Air Force and Army in aircraft. The contracts were awarded for performance from Kern's refinery in Bakersfield, California.

4. The contracts were awarded pursuant to competitive negotiated solicitations under Federal Acquisition Regulation (FAR) Part 15. The solicitations were done on an annual basis and were for indefinite quantity-type contracts for one year. The contracts called for the delivery of large volumes of fuel. According to our records, the Government paid Kern in excess of $41 million for more than 61 million gallons of fuel under the contracts.

5. The contracts contained a base price for each line item, which was subject to an EPA clause. Clause B19.33 is DESC's principal EPA clause. The contracts provided that the contract base prices would be adjusted as called for in the EPA clauses because the petroleum market is dynamic and ever changing. Using any petroleum market escalator, whether daily, weekly, or monthly, will result in contract price adjustments. Thus, the base price in the contracts was used for evaluation purposes, and, more importantly, as the baseline from which price adjustments were calculated under the EPA clauses in the contracts. As a result of the operation of the EPA clauses, when the market declines below the level it was at as of the effective date of the base price as measured by the escalator, the contractor is paid less than the base price.

6. DESC's general practice with regard to making the FAR 16.203-3 determination to use an economic price adjustment clause is to include the determination in the acquisition plan for the solicitation. Based on this general practice, I can state that DESC made a determination to use an EPA clause in each of the contracts that contained an EPA clause. The acquisition plan is maintained

in what we call the pre-award or solicitation file, because the plan applies to the solicitation as a whole. Copies of the plan are not kept in individual contract files. Because of the age of most of the contracts, many of the acquisition plans have been destroyed as permitted by FAR record retention procedures. However, I was able to locate the acquisition plans to two solicitations under which two of the contracts were awarded. The solicitations for which acquisition plans have been located and the contracts to which they apply are as follows:

| Solicitation | Contract(s) |
|---|---|
| DLA600-94-R-0161 | DLA600-94-D-0537 |
| SP0600-95-R-0161 | SP0600-95-D-0507 |

I have attached a copy of those acquisition plans to this declaration.

7. DESC, for its annual domestic bulk solicitations, typically receives dozens of offers, which in combination exceed the Government's requirements. The Government's annual fuel requirements are sufficiently large that no single offeror is capable of satisfying them. Consequently, the Government accepts that combination of offers from multiple suppliers that results in the lowest overall cost.

8. DESC ensured that contracts were awarded at fair and reasonable prices as mandated by the FAR. Prices were determined fair and reasonable based on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public. See FAR 15.403, formerly 15.804-3.

9. The EPA clauses in Kern's 1984-1994 contracts provided for price adjustments based upon the monthly average sales price or market price of refined petroleum products as reported by the Department of Energy, Energy Information Administration, in its publication the Petroleum Marketing Monthly ("PMM"). Prices under the PMM clauses were effective for one month. The PMM is a compilation of transaction prices in U.S. petroleum markets. Refiners, including the contractors, are required by law to submit sales data to DOE on a monthly basis. The PMM price averages are based on petroleum product sales information reported to DOE and grouped by product, type of sale, states, and by geographic regions. Because the PMM contains averages of actual sales prices, DESC considers it to be a reliable indicator of price movements in the petroleum products market. There is a three-month lag time from DOE to obtain the sales data and publish the PMM. Thus, for example, January sales data is published in April, and February data in May. Prices were adjusted monthly under the PMM clauses. Because of the time lag, interim adjustments were made, subject to reconciliation when the PMM was published.

10. Kern's 1995 contract included an EPA clause based on a widely used industry publication, Platts Oilgram Price Report ("Platts"). Platts is published weekdays. Contract prices under the Platts-based EPA clauses were based on weekly averages.

11. The EPA clauses ensured that the prices that were offered and agreed to in the contracts were adjusted according to the movements of fuel prices in the

publications. If the market price went up one cent, the contract price would likewise go up one cent. If the market price went down a penny, the contract price went down a penny. The contract prices were adjusted in this way on a regular basis through the term of the contracts.

12. Based on my review of the files, Kern made no objection to the legality of the EPA clauses, and made no complaints that it was not being paid a fair price for its products until it submitted the claims described below. For each contract where the Government's contract file still exists, Kern specifically stated in its offer that it agreed to the EPA clauses. Price change modifications were issued monthly or weekly, depending on the particular contract, for the products that are the subject of the claims under these contracts. Kern did not object to any of these price change notices. It submitted offers periodically during the period 1984-1995.

13. Kern submitted certified claims on February 28, 2002, for approximately $7.7 million. Its principal contention was that the EPA clauses in its contracts were illegal, citing the MAPCO court decision.

14. I denied the claims in a final decision dated July 26, 2002. I concluded that the EPA clauses were legal and authorized and that Kern had received fair market value for its fuel.

15. Prior to the MAPCO decision, DESC contracting officers believed that the market-based EPA clauses were authorized and that they protected contractors in the ways identified in the FAR. However, in response to the Court's decision in the MAPCO case, DESC took steps to ensure the validity of its EPA clauses. In January

1993 and February 1993, in accordance with FAR 1.403, DESC obtained an "individual deviation" which authorized use of the market-based EPA clause for contracts awarded pursuant to Solicitations DLA600-93-R-0061 and DLA600-93-R-0062.

16. In late 1994, following a study by DESC's Office of Market Research and Analysis, DESC decided to switch domestic bulk EPA references from the PMM to two industry price publications, Platts and Oil Price Information Service, because their assessments were found to adequately track PMM's sales prices and because there would no longer be a need to use an interim adjustment provision. DESC sought a class deviation for the new clause, publishing it for comment in the February 28, 1995, Federal Register. Neither Kern, nor any other oil company commented on the proposal. On October 5, 1995, the Director of Defense Procurement, who has authority to approve clauses, approved DESC's EPA clauses.

17. While DESC was seeking the class deviation, it obtained individual deviations to allow the use of the revised EPA clause. These deviations included one issued on November 5, 1994, which covered contracts awarded under Solicitation SP0600-95-R-0061, and one issued on March 2, 1995, which covered contracts awarded under Solicitation SP0600-95-R-0161. Contract SP0600-95-D-0507 was awarded under Solicitation SP0600-95-R-0161.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 10-29-03.

JOHN R. WALKER
Contracting Officer

# ACQUISITION PLAN

1. Division: DFSC-PZA
2. Purchase Program #: 2.2B, 2.2D, 2.5B, 2.99
3. Del Period: 1 OCT 94 - 30 SEP 95
4. Buyer: KEN BELL
5. Location: INLAND/WEST COAST & ROCKY MTN
6. PR/MIPR Number: SCO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,0212,0213
7. Date PR/MIPR Rec'd: 16 FEB 94
8. Estimated Total Price: $878,055,750
9. Past Acq. Qty: IN/WEST EAST/GULF
10. This Acq. Qty: IN/WEST/ROCKY MTN

SEE BLOCK 29 FOR PRODUCT BREAKDOWN

11. Item Description/Product Code: TURBINE FUEL, AVIATION JP8 NSN:9130-01-031-5816
12. Urgent/Compelling Acquisition? [X] No [ ] Yes

13. Program Description (include solicitation no.):

SOLICITATION NO. DLA600-94-R-0161 TURBINE FUEL, AVIATION, GRADE JP8, JP5 FOR WEST COAST AND OFFSHORE ACTIVITIES, TURBINE FUEL, AVIATION, GRADE JP5, JP4 FOR INLAND AND ROCKY MOUNTAIN ACTIVITIES, NAVAL DISTILLATE, F76 FOR WEST COAST AND OFFSHORE ACTIVITIES. THE DELIVERY PERIOD IS 1 OCT 94 THROUGH 30 SEP 95.

14. Purchase History (identify extent of competition, recurring problems, summary price range etc.):

SOLICITED SOURCES WILL BE HISTORICAL OFFERORS. PRODUCT PURCHASED UNDER THIS PROGRAM IS NORMALLY COMPETITIVELY PRICED. RECURRING PROBLEMS MAY BE A LARGE NUMBER OF IN-DEPTH PRE-AWARD SURVEYS, RECEIPT OF ADEQUATE SUPPLY AGREEMENTS BETWEEN REGULAR DEALERS AND THEIR SUPPLIERS, RECEIPT OF SALES DATA, COC REFERRALS AND THEIR RESOLUTIONS, LENGTHY EVALUATION PROCESS INVOLVING SOCIO-ECONOMIC PROGRAMS. HISTORICALLY THERE HAVE BEEN LIMITED COVERAGE FOR PRODUCT IN THE ROCKY MOUNTAIN AREA.

FEB 94 MARKET RANGES WILL BE USED.

15. Set-Aside:

| | 100% | Partial | None | Est. Vol. |
|---|---|---|---|---|
| Small: | | X | | 900,000,000 USG |
| Labor Surplus: | | | X | |
| SDB: | | | | |

Progress Pay: Prior buys: Yes [ ] No [X] Current buy: Yes [ ] No [X]

Proposed Method of Acquisition and Acquisition Plan:

16. [X] Competitive Proposal:
    [X] Intend to award w/discussions
    [ ] Intend to award w/o discussions (e.g., emergency)

17. [X] Written [ ] Oral

18. [ ] Multiyear. The criteria of FAR 17.103-1 & DFARS 217.103-1 have been met.

19. a. [ ] Sealed Bid
    b. [X] Sealed Bid not appropriate:
        (i) [ ] Time does not permit.
        (ii) [X] Discussions are necessary.
        (iii) [ ] Award will be made on other than price and related factors.
        (iv) [ ] More than one bid is not expected.

20. a. [X] Full and Open Competition (FAR 6.1).
    b. [ ] Full and Open Competition After Exclusion of Sources (FAR 6.2).
    c. [ ] Other Than Full and Open Competition (FAR 6.3)

21. Cost or Pricing Data.
a. [ ] Not anticipated. b. [ ] SF 1411 to be requested. c. [X] SF 1412 to be requested.

22. a. PIN or PSN issued?
[ ] Yes; Date ______________
[X] No

b. [X] Synopsized
[ ] Not synopsized or period curtailed pursuant to FAR 5.202.

23. a. Certificate of Conformance authorized? [ ] Yes [X] No (See FAR 46.504)

b. [ ] Solicitation will include option provision (see attached justification FAR 17.203(g)(2) and DLAR 17.203(g)).
[X] Solicitation will not include option provision.

24. Contract Type: [ ] FFP [X] FP w/EPA [ ] Other ______________

25. Economic Price Adjustment (EPA): The Contracting Officer has considered the stability of market or labor conditions expected to exist during the period of contract performance and has determined that provisions are necessary to (1) preclude the inclusion of contingencies in the contract price(s), and (2) protect against significant economic fluctuations in labor/material costs, or provide for contract price adjustments in the event of changes in established or market prices.

[X] Acquisition is subject to and meets requirements set forth in FAR 16.203-4.
[ ] Acquisition is not subject to the requirements of FAR 16.203-4.

Complete both (1) & (2):

(1) EPA reference (crude costs, product postings, published index, etc.): PUBLISHED INDEX

(2) Price Ceiling Clause No. B20.02
Price Ceiling of 60 applies.

26. Market Survey Results (Discuss nature and results of market survey).

In Nov 91, the USAF announced to industry the CONUS JPJ-8 conversion plan, including scheduled solicitation and conversion dates for each of the four CONUS areas. Since that time, DFSC has made a concerted effort to meet with companies and industry groups to encourage participation in the JP-8 conversion purchases. Potential new sources will be contacted when the RFP is issued. Based on the response to previous conversion region buys, coverage is expected to be adequate. No problems are anticipated with the acquisition of JP5, JP4 and F76 given previous results. DFSC-N was requested on 16 May 94 to provide a market survey by 17 May 94. cf

27. Market Research (Discuss purpose, nature, extent, involved personnel/offices and results/status and estimated completion date of any market research initiated/to be initiated in support of the instant purchase request or anticipated future requirements (see also FAR and DLAR 10.001 and 11.004)).

See block 26.

28. Proposed Milestones (enter dates):
- a. Receipt of MIPR/PR 16 FEB 94
- b. AP Approval per DLAR 7.104-90
- c. Source Selection Plan Approval N/A
- d. Published Synopsis Date 29 MAR 94
- e. Issuance of Solicitation 14 APR 94
- f. Solicitation XXXXXXX/Closing 17 MAY 94
- g. DCAA Audit Due (if required) N/A
- h. CAPO Analysis Due (if required) N/A
- i. Prenegotiation Briefing 3 JUN 94
- j. Acquisition Review Board/DLA Preneg Review
- k. Open Negotiations 3 JUN 94
- l. Receive Preneg Review Approval
- m. Close Negotiations 8 JUL 94
- n. Award Date 1 SEP 94

29. Additional Comments (Optional):

**RE: #9 PAST ACQ. QTY:**

**INLAND/WEST**

| | |
|---|---|
| JP4 | 632,370,000 USG |
| JP5 | 27,575,000 USG |
| JP8 | 5,000,000 USG |
| F76 | 206,794,000 USG |
| MUM | 840,000 USG |

**EAST/GULF**

| | |
|---|---|
| JP8 | 1,099,460,000 USG |
| JP5 | 532,380,000 USG |

**RE: #10 THIS ACQ. QTY:**

**INLAND/WEST & OFFSHORE**

| | |
|---|---|
| JP8 | ~~825,705,000~~ USG 817,525,000 USG |
| JP4 | 202,155,000 USG |
| JP5 | 365,774,000 USG |
| F76 | ~~200,729,000 USG~~ 201,601,000 USG |
| JP8 | 17,993,000 USG (LOW SULPHUR) |

**ROCKY MOUNTAIN**

| | |
|---|---|
| JP5 | 1,230,000 USG |

30. BUYER KEN BELL K. Bell
DATE 16MAR94

31. Approvals:
- a. CONTRACTING OFFICER'S NAME: CAROL FAGNANI
- b. SIGNATURE: Carol Fagnani DATE: 16 Mar 94
- c. DIVISION CHIEF'S NAME: PETER J. DEWALD (ACTING)
- d. SIGNATURE: [signature] DATE: 16 March 94
- e. SUPPORT DIRECTORATES' COORD: DFSC-OT [initials]; OI [initials]; OII [initials] DFSC-G; [initials]
  DFSC-QS; RLG 3/16 DFSC-PT; [initials] 3/18/94
  DFSC-N; [initials] 3/21
- f. DIRECTOR'S NAME: L. H. CARPENTER, CAPT, SC, USN
- g. SIGNATURE: L H Carpenter DATE: 17 March 94

DFSC Form 15.10, FEB 94 Supersedes OCT 93 EDITION

# ACQUISITION PLAN

1. Division DFSC-PZB
2. Purchase Program #: 2.2B/D;2.5B
3. Del Period: 1 OCT 95 - 30 SEP 96
4. Buyer: Lori Bovee
5. Location: Inland/West Coast & Offshore
6. PR/MIPR Number: SCO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;0509;0511
7. Date PR/MIPR Rec'd: 06 FEB 95
8. Estimated Total Price: $951,808,457
9. Past Acq. Qty: 1,266,333,000.
10. This Acq. Qty: 1,693,954,000 USG

11. Item Description/Product Code: Aviation Turbine JP8/5/4; LS JP8, Naval Distillate F76

12. Urgent/Compelling Acquisition? [ X ] No [ ] Yes

13. Program Description (Include solicitation no.): RFP SP0600-95-R-0161:

Inland/West Coast/Offshore, JP8 (NSN: 9130-01-031-5816); Quantity - 1,148,447,000 usg
Inland/West Coast/Offshore, JP5 (NSN: 9130-00-273-2379); Quantity - 330,349,000 usg
West Coast/Offshore; F76 (NSN: 9140-00-273-2377); Quantity - 192,805,000 usg
Alaska, JP4 (NSN: 9130-00-256-8613); Quantity - 1,700,000 usg
Inland/West Coast ,Low Sulfur JP8 (NSN: 9130-01-395-0945), Quantity - 20,663,000 usg

14. Purchase History (Identify extent of competition, recurring problems, summary price range etc.):
Sources solicited will include historical offerors and other parties indicating interest. Adequate price competition is anticipated. Recurring problems may be a large number of in-depth pre-award surveys, receipt of adequate supply agreements between regular dealers and their suppliers, receipt of sales data, CoC referrals and their resolutions and lengthy evaluation process involving socio-economic programs. FEB 95 market data will be used. NOTE: The quantity increase from the previous RFP is due in large part to the return of the Inland requirements to this solicitation. However, the Rocky Mountain requirements for this delivery period are not included, having been purchased under DLA600-95-R-0061 in accordance with JP8 conversion schedule.. Summary Price Ranges attached.

| 15. Set-Aside: | 100% | Partial | None | Est. Vol. |
|---|---|---|---|---|
| Small: | | X | | 710,419,200 |
| Labor Surplus: | | | X | |
| SDB* | | | X | *(SDB premiums are included) |

Progress Pay: Prior buys: Yes [ ] No [X] Current buy: Yes [ ] No [X]

Proposed Method of Acquisition and Acquisition Plan:

16. [ x] Competitive Proposal:
[ x] Intend to award w/discussions
[ ] Intend to award w/o discussions (e.g., emergency)

17. [X] Written [ ] Oral

18. [ ] Multiyear. The criteria of FAR 17.103-1 & DFARS 217.103-1 have been met.

19. a. [ ] Sealed Bid
b. [X] Sealed Bid not appropriate:
(i) [ ] Time does not permit.
(ii) [ x] Discussions are necessary.
(iii) [ ] Award will be made on other than price and related factors.
(iv) [ ] More than one bid is not expected

20. a. [X] Full and Open Competition (FAR 6.1)
**All requirements except McConnell JP8**
b. [ ] Full and Open Competition After Exclusion of Sources (FAR 6.2)
c. [X] Other Than Full and Open Competition (FAR 6.3). McConnell AFB 14,400,000 usg JP8



DFSC Form 15.10, FEB 94 Supersedes OCT 93 Edition

21. Cost or Pricing Data:
a. [ ] Not anticipated.
b. [ ] SF 1411 to be requested
c. [X] SF 1412 to be requested

22. a. PIN or PSN issued?
[ ] Yes; Date ______________
[X] No

b. [ x ] Synopsized
[ ] Not synopsized or period curtailed pursuant to FAR 5.202.

23. a. Certificate of Conformance authorized? [ ] Yes [X ] No
(See FAR 46.504)

b. [ ] Solicitation will include option provision (see attached justification FAR 17.203(g)(2) and DLAR 17.203(g)).
[X] Solicitation will not include option provision.

24. Contract Type: [ ] FFP [X ] FP w/EPA [ ] Other ______________

25. Economic Price Adjustment (EPA): The Contracting Officer has considered the stability of market or labor conditions expected to exist during the period of contract performance and has determined that provisions are necessary to (1) preclude the inclusion of contingencies in the contract price(s), and (2) protect against significant economic fluctuations in labor/material costs, or provide for contract price adjustments in the event of changes in established or market prices.

[ X ] Acquisition is subject to and meets requirements set forth in FAR 16.203-4.
[ ] Acquisition is not subject to the requirements of FAR 16.203-4.

Complete both (1) & (2):

(1) EPA reference (crude costs, product postings, published index, etc.): Published Index.
(2) Price Ceiling Clause No. B19.33.
Price Ceiling of 60% applies.

26. Market Survey Results (Discuss nature and results of market survey).

Based on historical experience, coverage is expected to be adequate, with possible exception of Low Sulfur JP8 in WA. For those quantities, lack of a supplier in the vicinity and terminal support is an anticipated problem Also, DFSC will introduce the use of publication-based, weekly EPA's to the regions solicited. With the exception of AK, where a supplier has proposed crude-based escalators in the past, anticipated industry response is expected to be positive

27. Market Research (Discuss purpose, nature, extent, involved personnel/offices and results/status and estimated completion date of any market research initiated/to be initiated in support of the instant purchase request or anticipated future requirements (see also FAR and DLAR 10.001 and 11.004)).

A full market analysis has been requested for the pre-negotiation memorandum scheduled for presentation on 17 MAY 95.

28. Proposed Milestones (enter dates):

| | |
|---|---|
| a. Receipt of MIPR/PR | 6 FEB 95 |
| b. AP Approval per DLAR 7.104-90 | N/A |
| c. Source Selection Plan Approval | N/A |
| d. Published Synopsis Date | 27 FEB 95 |
| e. Issuance of Solicitation | 31 MAR 95 |
| f. Solicitation Opening/Closing | 1 MAY 95 |
| g. DCAA Audit Due (if required) | N/A |
| h. CAPO Analysis Due (if required) | N/A |
| i. Prenegotiation Briefing | 17 MAY 95 |
| j. Acquisition Review Board/DLA Preneg Review | |
| k. Open Negotiations | 17 MAY 95 |
| l. Receive Preneg Review Approval | |
| m. Close Negotiations | 28 JUN 95 |
| n. Award Date | 01 SEP 95 |

29. Additional Comments (Optional):

30. BUYER LORI D. BOVEE Lori D Bovee
DATE: 3-7-95

31. Approvals:
a. CONTRACTING OFFICER'S NAME: JOHN R. WALKER
b. SIGNATURE: [signature] DATE: 3-7-95
c. DIVISION CHIEF'S NAME: DONALD E. PESCHKA
d. SIGNATURE: [signature] DATE: 3-15-95
e. SUPPORT DIRECTORATES' COORD: DFSC-OT: ; OI ; OII ; G ; OS ; PT ;
OIB: N:
f. DIRECTOR'S NAME: L.H. CARPENTER, CAPT, SC, USN
g. SIGNATURE: [signature] DATE: 3/16/95

0013

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KERN OIL & REFINING COMPANY, | ) | |
| | ) | |
| | ) | |
| | ) | No. 03-1623C |
| Plaintiff, | ) | (Judge Sypolt) |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF GEORGE SCHINK

1. My name is George Schink, and I am a director of Law and Economics Consulting Group. I have a Ph.D. in economics from the University of Pennsylvania. I was at Wharton Econometric Forecasting Associates (subsequently the WEFA Group and currently Global Insight) for 16 years where I was involved in a wide variety of consulting, forecasting and econometric modeling activities including analyses of various industries such as the energy industry. Since leaving the WEFA Group, my work has included consulting in the oil and gas pipeline industries, and damage estimation. I have extensive experience in the oil industry and in the pricing and valuation of petroleum products.

2. I have reviewed the claims submitted by Kern Oil & Refining Company (Kern) under four contracts in connection with the economic price adjustment (EPA) clauses contained in its Defense Energy Support Center (DESC) contracts. According to Kern, it did not receive fair market value for its fuel.

3. Kern provided JP-4 and JP-5 jet fuel to DESC. JP-4 is a naphtha-based jet fuel that was used primarily by the Air Force and Army in aircraft. JP-5 is a kerosene-based jet fuel that is used by the Navy.

4. The EPA clauses in the contracts from 1984-1994 were based on refined product sales data in a Department of Energy (DOE) publication, the Petroleum Marketing Monthly (PMM).

5. The PMM prices are averages of transaction prices in U.S. petroleum markets. Refiners such as the contractors and resellers are required by law to submit price data to DOE for their refined products on a monthly basis. The PMM price averages are based on petroleum product sales information that refiners and resellers report to DOE and are grouped by geographic regions and by state. The PMM for a given month represents actual average sales prices during that month for a given product in a given state or region. The PMM price data are based on a virtual census of all spot and contract transactions. Therefore, the PMM price accurately reflects market prices for petroleum products.

6. The EPA clause in Kern's 1995 contract was based on a widely used industry publication, Platts Oilgram Price Report ("Platts"). Platts is published weekdays. Contract prices under the Platts-based EPA clauses were based on weekly averages.

7. Refiners use crude oil to produce petroleum products, including the products the contractors sold to the Government. However, the refining process yields a number of different petroleum products from a barrel of crude oil. Depending upon the crude oil processed and the refinery complexity, a refiner can substantially alter the natural yield from crude oils in order to meet customer demand. For example, the average demand for gasoline from a refinery is approximately 50% of the crude oil barrel.

8. Although, there is a logical relationship between crude oil and refined products over a period of time, I do not believe that crude oil would necessarily make a good price adjustment provision for an individual petroleum product. As described above, a barrel