B19.22 ECONOMIC PRICE ADJUSTMENT-PUBLISHED MARKET PRICE (DFSC 1984 APR)

The Contractor represents that the unit prices set forth in this contract do not include any contingencyallowance to cover the possibility of increases in the reference price(s) in the Contractor's bid or proposal.

PART A

As used throughout this provision:

(a) The term "listed items" means the items of Section B of the contract that are listed in the Price Tabulations, PART C and PART D of this provision, and are the only items to which price adjustment shall apply, unless otherwise provided in the contract.

(b) The term "base price" means the unit price set forth opposite the item in Section B of the contract schedule.

(c) The term "interim reference price" means an approved company posting set forth in PART C of this provision which will be used to adjust the base price until such time as the reference price (as set forth in PART D of this provision) becomes available. An example of a company posting is an individual company posting for Jet-A which represents actual sales in substantial quantities to the Airlines. The posting must be approved by the Defense Fuel Supply Center. Offerors are required to submit the most recent two (2) year history of the posting which they request to use.

(d) The term "reference price" means the Independent Published Price Listing set forth in PART D of this provision which will be used to adjust the base price. The reference price is the average or weighted average sales price of Kerosene-Type Jet Fuel, Sales to End-Users, in the specified PAD District of the <u>Petroleum Marketing Monthly</u> published by the Energy Information Administration.

(e) The term "base interim reference price" means the weighted average of the approved company posting(s) in effect during the month in which Best and Final Offers are due.

(f) The term "base reference price" means the reference price that will be established when the <u>Petroleum Marketing Monthly</u> publication becomes available for the month in which Best and Final offers are due. For example, if Best and Final offers ... in April, the base reference price for April would be based on the April data of the <u>Petroleum Marketing Monthly's</u> specified Sales Prices of Petroleum Products Tables which would generally be published in mid-July.

(g) The term "date of delivery" means:

(i) the date and time vessel begins to load where the contract calls for delivery at origin into tanker or barge;

(ii) the date and time vessel begins to discharge where the contract calls for delivery at destination by tanker or barge;

(iii) the date and time product commences to move past the specified f.o.b. point where the contract calls for delivery by pipeline;

(iv) the date product is received for all methods of delivery other than (i), (ii) or (iii) above.

PART B

(a) Notwithstanding any provision of this clause to the contrary the prices payable under this contract shall in no event exceed the maximum prices described in the clause entitled UPWARD CEILING ON ECONOMIC PRICE ADJUSTMENT.

(b) The Contractor warrants that the prices to be invoiced hereunder for listed items shall be computed in accordance with this provision.

(c) In the event the reference price or interim reference price is discontinued, or its method of calculation is altered substantially, the parties shall mutually agree upon an appropriate and comparable substitute for determining the price adjustment described herein. This contract shall be amended to reflect such substitute reference price or interim reference price, effective on the date the prior reference price or interim reference price is discontinued or altered. In the event the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the DISPUTES clause of the contract.

(d) The Contracting Officer will issue a modification to this contract to reflect each change in the reference price and interim billing price pursuant to this provision.

(e) The interim reference price(s), as set forth in PART C, in effect on the first of each month shall be used to calculate the interim billing unit price for all deliveries occurring in that month, subject to final adjustment at such time as the applicable published reference, as set forth in PART D, becomes available.

(f) Final price adjustments under this clause for deliveries previously invoiced will be accomplished (after issuance of the appropriate contract modification) through supplemental payments or credits under the contract on the basis of the Contractor's supplemental invoice statements. The statements will identify: (i) the original invoice, (ii) items and quantities, unit prices and amounts originally invoiced, (iii) the contract modification pursuant to which the supplemental invoice statement is made, (iv) and the amount of increase or decrease from the earlier invoiced price on each item of the invoice.

(g) Notwithstanding any other provision of this clause, no upward adjustment shall apply to ...ies which are required to be delivered prior to the effective date of the adjustment but ... subsequently, unless the Contractor's failure to deliver in accordance with the delivery schedule arises ... beyond the control and without the fault or negligence of the Contractor within the meaning of the clause ... this contract entitled DEFAULT, in which case the contract shall be amended to make an equitable extension of the delivery schedule.

(h) The Contractor shall have the right to appeal under the clause entitled DISPUTES from any determination made by the Contracting Officer under this clause.

PART C - INTERIM BILLING PRICE ADJUSTMENTS

(a) Provision is made for interim billing price adjustments based on interim reference prices subject to final adjustment on a monthly basis in accordance with Part D of this clause.

(b) Subject to (c) and (d) below, posting(s) in effect on the first day of each month shall be used to establish interim billing prices for all deliveries occuring during that month.

(c) The Contractor shall notify the Contracting Officer, Defense Fuel Supply Center, Cameron Station, Alexandria, VA 22314 of any change in the interim reference price by telegram (preferably confirmed promptly by letter).

(d) No interim change in the interim billing price shall be processed under this clause until notification of the posting change has been received by the Contracting Officer.

(e) A Contractor using his own company postings warrants:

(i) During the term of this contract, substantial sales to non-government customers of the interim reference price product are made by the Contractor at prices which move directly with the interim reference price.

(ii) During the term of this contract, each change in the interim reference price furnished under this economic price adjustment clause will be reflected in corresponding price changes in sale of the reference price product of non-government customers except where constrained by contract.

(f) In connection with the warranties in (e) above, the Contractor agrees that the Contracting Officer or its designated representative, who are employees of the U.S. Government, shall have the right to examine books, records, documents, and other data of the Contractor as may be required to verify the Contractor's compliance.

(g) The interim billing prices payable under this contract for listed items shall be the base price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the interim reference price for the listed item shall have been increased or decreased per like unit of measure from the base interim reference price.

INTERIM REFERENCE PRICE TABULATION

| I<br>Economic Price Adjustment Region and Item No. (Listed Items) | II<br>Name of Company | III<br>Company Name of Product | IV<br>Location where Posted Price is Applicable | V<br>Method of Delivery Applicable to Posted Price | VI<br>Interim Reference Price As Of (Date) 01 OCT 84 (Excludes All Taxes) |
|---|---|---|---|---|---|
| West Coast<br>0101 thru 0501 | Kern Oil & Refining Co. | Jet A | Bakersfield, Ca. | TT | .865000 |

PART D - PETROLEUM MARKETING MONTHLY SALES PRICES OF PETROLEUM PRODUCTS TABLES

(a) Contract prices for each month's deliveries will be based on the specified references listed by the Petroleum Marketing Monthly under the Sales Prices of Petroleum Products Tables for the month dated during the month of delivery. In accordance with the Petroleum Marketing Monthly practice, the Petroleum Marketing Monthly publication for a given month represents actual sales prices during that month. For example, the contract price for April deliveries will be based on the April data of the Petroleum Marketing Monthly which would usually be published sometime in mid-July. In the event the Petroleum Marketing Monthly Sales Prices of Petroleum Products Tables are adjusted after publication for that month and the adjustment results in an adjustment to the contract price of more than $.002 per gallon, retroactive adjustments to the contract price shall be made. In this case, final contract prices for that month will be based on the final revised version of the applicable Petroleum Marketing Monthly Sales Prices of Petroleum Products Tables.

(b) The Contractor, upon receipt of each modification incorporating the final adjusted price for a month, shall submit a proper supplemental invoice statement. Payment tendered to the Contractor by the Government as a result of submission of a proper supplemental invoice statement shall be in accordance with the clause entitled NET PAYMENT.

(c) The prices payable under this contract for listed items shall be the base price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price.

(d) The reference price with which the base price for the listed item is to fluctuate is as set forth in the Reference Price Tabulation:

REFERENCE PRICE TABULATION

NOTE: For ease of reference the appropriate petroleum sales price table shall be identified as follows:

Jet Fuel = Refiner and Gas Plant Operator Sales Prices of Finished Aviation Gasoline and Kerosene-Type Jet Fuel, by PAD District (PADD).

| I | II | III | IV |
|---|---|---|---|
| Economic Price Adjustment Region and Item No. (Listed Items) | Name Of Publication | Heading Under Which Reference Price is Published and Name Of Product | Reference Price as of 01 JUN 1984 (Excludes all taxes) |
| WEST COAST JP-5<br>0101 thru 0501 | Petroleum Marketing Monthly (PMM) | Jet Fuel Kerosene-Type Jet Fuel Sales to End-Users PAD District V Average | .862000 |

The Reference Price shall be determined as follows:

100% (PADD V Kero Jet)

Contractor agrees that the total increase in any unit price pursuant to the Economic Price Adjustment provision of this contract shall not exceed 20 percent of the original base price for individual contract items, except in the situations provided hereafter.

(a) If at any time the Contractor has reason to believe that within the near future a price adjustment will be required under the Economic Price Adjustment provision of this contract and that the resultant adjustment when added to the latest contract price for the item(s) in question will exceed the current contract ceiling price for the item(s), the Contractor shall notify the Contracting Officer of the expected increase. At the same time, the Contractor shall propose a revised ceiling which he believes to be sufficient to permit completion of remaining contract performance. Contractor's proposal shall be supported by appropriate explanations and documentation as required by the Contracting Officer. The parties agree to promptly undertake negotiations regarding the proposed new ceiling.

(b) If, in the absence of an agreement on a new ceiling, notice is given by the Contractor of an actual price change which results in a unit price for contract item(s) which exceeds the current ceiling, the Contractor will have no further obligation under this contract to fill pending or future orders for the specific line item(s) in question as of the effective date of the increase, as long as the unit price exceeds the ceiling. If, however, notwithstanding the lack of agreement on a new ceiling the Contracting Officer indicates in writing that the Government is prepared to purchase the line item(s) for the price as adjusted under the Economic Price Adjustment provisions beyond the current ceiling, the Contractor will be obligated to continue to honor orders placed for the specific line item in question.

14.02 INSPECTION AND ACCEPTANCE (DESC 1979 NOV)

On deliveries F.O.B. origin, acceptance of the supplies furnished hereunder will take place at origin notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. On deliveries F.O.B. destination, acceptance of the supplies furnished hereunder will take place at destination notwithstanding that inspection by the Government may take place elsewhere prior to acceptance. The office responsible for inspection, in behalf of the Government, shall be as follows:

| ITEM(S) | SOURCE OF PRODUCT AND/OR SHIPPING POINT | INSPECTOR(S) |
|---|---|---|
| 0101, 0201<br>0301, 0401<br>and 0501 | Kern Oil & Refining Co.<br>Panama Line and<br>Weedpath Hwy<br>Bakersfield, CA 93307 | DCASMA Inglewood<br>9920 South La Cienega Blvd.<br>Inglewood, CA 90301 |

?.02 TRANSPORT TRUCK AND TRUCK AND TRAILER FREE TIME AND DETENTION RATES (DFSC 1979 MAY)

Upon arrival of Contractor's transport truck or truck and trailer, the receiving activity shall promptly designate the tanks into which the load is to be discharged. Free time will commence at the time the discharge hose is connected to fill pipe at the delivery point specified and will end when discharge is completed. For items involving multiple drops, time between drops will not be included in free time. Contractor shall be paid for detention beyond free time for delays caused by the Government. A minimum of one hour free time is required. Rate for detention shall be comparable to regulated tariffs governing the local area of receiving activity.

(a) Free time for unloading transport truck or truck and trailer:
1 1/2 hours free

(b) Rate for detention beyond the free time: $14.50 hr based on quarterly hour incremen:

The above will not be considéred in the evaluation of offers for award, except that free time of less than one hour or detention rates not comparable to regulated tariffs may render an offer unacceptable/bid unresponsive.

UNLESS OFFEROR INDICATES OTHERWISE, FREE TIME WILL BE CONSIDERED UNLIMITED.

C9.04 ELECTRONIC TRANSFER OF FUNDS PAYMENTS (DFSC 1983 MAY)

a. By submission of the following data, the contractor elects to receive payments under this contract by electronic transfer of funds through the Treasury Financial Communications System (TFCS);

NAME OF RECEIVING BANK FIRST NATIONAL BANK OF BOSTON

CITY AND STATE OF RECEIVING BANK 100 FEDERAL STREET, BOSTON, MA

AMERICAN BANKERS ASSOCIATION NINE DIGIT IDENTIFIER OF RECEIVING BANK 0110-0039-0

MESSAGE TYPE CODE: (CONTRACTOR TO DESIGNATE ONE) 12 (IMMEDIATE ADVICE)

[ ] NONE ADVICE TYPE 10 (Immediate notification to commercial bank not required.)

[X] IMMEDIATE ADVICE TYPE 12. (Immediate notification to commercial bank required.)

[ ] FOREIGN PAYMENT TYPE 15. (If receiving bank is a foreign central bank or international organization.)

Recipient's account number enclosed in parentheses: (532-21601)

Recipient's name: KERN OIL & REFINING COMPANY

Any other necessary identifying information (limited to a maximum of 200 positions):

The following example illustrates the requested data:

AMERICAN BANK AND TRUST COMPANY
NEW YORK NY
0210-0670-3 IMMEDIATE ADVICE TYPE 12
(1133107) BNY COMPANY
FOR INVESTMENT IN BANK C/DS

b. Electronic transfer of funds into the bank account designated by the contractor in this clause will be deemed to discharge the Government of its obligation to pay the contractor to the extent of the funds so transferred. Any change by the contractor in designation of the bank account to receive electronic transfer of funds in accordance with this clause must be received by the Contracting Officer no later than 15 days prior to the date the change is to become effective.

c. The electronic transfer of funds does not constitute an assignment of such funds in any form or fashion.

115 SUBMISSION OF INVOICES BY PHOTOCOPIER (DFSC 1983 JAN)

a. When the Contractor has elected to transmit invoices by photocopier, he is responsible for validat: receipt of his photographic invoice. Because DASC-F cannot be held accountable for transmissions not received, the Contractor must verify receipt of his photocopy by telephoning DFSC-CDK on (202) 274-7055.

b. Utilization of the photocopier invoicing method is contingent upon the Contractor's submission of invoices by this method <u>at all times</u>.

c. The receiving number for the photocopier, located in DFSC-CDX, Building 5, Cameron Station, is (202) 274-9210. An alternate receiving number, (202) 274-7919, for equipment located in DASC-DT, Building 4, Cameron Station, may also be used.

d. The Contractor shall include his photocopier (FAX) number on each document transmitted.

e. After transmitting the original invoice, the Contractor shall mark that invoice "Original Invoice - Telefaxed" and retain it. The hard copy is <u>not</u> required for payment and shall <u>not</u> be mailed to the payment offi (DASC-F) unless DASC-F specifically requests it for audit purposes.

f. When photocopying an invoice for F.O.B. origin deliveries, the Contractor shall, if possible, also transmit the applicable original Material Inspection and Receiving Report, DD Form 250, or Tanker/Barge Material Inspection and Receiving Report, DD Form 250-1, signed by the Quality Assurance Representative (QAR). The signe copy, which certifies acceptance by the QAR of the product prior to submission of the invoice, will have the following information stamped, printed or typed on it: <u>ORIGINAL RECEIVING REPORT FOR PAYMENT INVOICE</u>. <u>However, in order to receive payment</u>, the Contractor <u>must mail</u> four copies (one of which will contain an original signature) of the DD Form 250 or DD Form 250-1 to the payment office as follows:

Defense Fuel Supply Center
ATTN: DFSC-CDX
Cameron Station, Bldg. 5
Alexandria, Virginia 22314

g. Failure to comply with these requirements will revoke the Contractor's right to submit invoices by the photocopier method.

h. <u>ORDERS BY OTHER FEDERAL AGENCIES</u>--On orders placed by activities of Federal Departments other than the Department of Defense, invoices shall be submitted as instructed by those activities. Such activities placi orders under this contract will furnish the Contractor with the name and proper address of the activity to whom invoices shall be rendered and the name and address of the Disbursing Officer responsible for payment. Such activities will also indicate the procedure for processing tax exemption certificates.

i. <u>CLASSIFIED CONTRACTS</u>--To prevent disclosure of classified information, invoices submitted under classified contracts shall be so prepared that the supplies or services covered thereby can be identified only by reference to the contract. For example, the invoices may state "Contract DLA600______, Item 0101, 5,000 at $0.15 = $750.00". The security classification shown on the contract shall not appear on the invoices.

DEFENSE LOGISTICS AGENCY
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION
ALEXANDRIA, VIRGINIA 22304-6160

IN REPLY REFER TO DFSC-P

5 JAN 1993

SUBJECT: Request for Deviation from FAR 16.203

TO: DLA-P

1. The Defense Fuel Supply Center (DFSC) requires an interim deviation from FAR 16.203 to permit DFSC to continue the use of the economic price adjustment provisions it has used for 11 years. The United States Court of Federal Claims recently held that use of these provisions is not authorized by the FAR.

2. Enclosed is a copy of the request for deviation which we are forwarding for action. As more fully explained in the memorandum, we request approval to continue using product index escalators to adjust the prices of fuel we purchase. We have made successful use of these or similar provisions with DLA's approval since the early 1980's. However, a court has ruled that the provisions are not specifically authorized by the FAR, and are therefore invalid.

3. We intend to seek a permanent deviation from the FAR in order to validate our EPA provisions. However, that can be a time consuming process. It makes good business sense to continue doing business as we have been for many years while our permanent deviation request is pending. There is no good alternative to our present system of price escalation. Additionally, it would be unsatisfactory to force contractors to learn a new system for a brief period of time until a permanent deviation is obtained. This would be an undue burden on the contractors and could result in some firms dropping out of our procurements. Accordingly, we request your approval of an interim deviation.

4. We are in the middle of several major Bulk Fuels Division acquisitions. In order to continue with these procurements and meet award deadlines, we require approval of this deviation by 8 January 1993.

5. The contact at DFSC is Ms. Cheri Bohman, DFSC-PPR, x45500.

*Edward J. Biddle*
EDWARD J. BIDDLE
Deputy Director
Directorate, Contracting
and Production

4 Encl
1. Request for Deviation
2. Court Decision in
3. FAR § 16.203 and § 16.501
4. Bulk Fuels Solicitations Immediately Impacted by MAPCO Court Decision

DEFENSE LOGISTICS AGENCY
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION
ALEXANDRIA, VIRGINIA 22304-6160

IN REPLY REFER TO DFSC-P

MEMORANDUM FOR THE EXECUTIVE DIRECTOR, CONTRACTING

SUBJECT: Request for Deviation-Escalation Provisions

I. PROBLEM

The Defense Fuel Supply Center (DFSC), a component of the Defense Logistics Agency (DLA), currently uses economic price adjustment (EPA) provisions based on indexes of the market prices of the products DFSC is purchasing. A contractor challenged the use of these provisions in the United States Court of Federal Claims, alleging that their use violated FAR 16.203. The Court agreed and invalidated the EPA provisions, holding that DFSC's EPA provisions are not of the type authorized by the FAR. The court's decision involved DFSC's largest program, the $ 4 billion per year Bulk Fuels Division. Without an interim deviation authorizing use of DFSC's EPA provisions, DFSC fuels contracting will be in disarray, forced to use EPA provisions based either on cost of crude oil, which would not necessarily be reflective of the market prices of the refined products DFSC purchases, or on a contractor's own price postings, which may not always be reliable or available.

II. RECOMMENDATION

That the Executive Director, Contracting, pursuant to the authority contained in DLAR 1.403, grant approval to DFSC for the following individual deviation, until such time as a permanent deviation is obtained: "Contracts for the purchase of refined petroleum products and natural gas may use economic price adjustment provisions which provide for price adjustment based on industry or Government price summaries, averages, reports, or indexes of refined petroleum products and natural gas. These price summaries, averages, reports, or indexes include, but are not limited to, figures contained in the Petroleum Marketing Monthly, the Oil Price Information Service, Platts Oilgram Price Report, Lundberg Survey, Computer Petroleum Corporation, and Bloomberg Oil Buyer's Guide."

III. DISCUSSION

A. Background

DFSC purchases fuel products and related services on a worldwide basis to meet the Government's energy requirements. Contracts are