normally awarded on a competitive basis; approximately 98 per cent of DFSC contract dollars are awarded competitively. Contracts are generally requirements or indefinite quantity in nature, and run for one or two years.

When purchasing petroleum, DFSC is, in effect, another entrant in the commercial marketplace. A refinery produces a stream of different products from a barrel of crude oil. These products can vary, depending on the type of refinery, the refining process, the type of crude oil used, and the needs of the refinery's customers. Petroleum refiners price their products on the basis of the market price for the finished product, not the cost to produce the product. Because there are a number of oil industry publications which report the market prices of petroleum products on a daily, weekly, and monthly basis, purchasers know the current market price of the products they buy, and do not normally pay more than the going market price.

DFSC contracts contain EPA provisions based on market indexes of the product being purchased or of a similar product. All EPA references are tested for accuracy and then recommended for use by DFSC's Office of Market Research and Analysis. These EPA provisions ensure that the Government, like commercial customers, will pay the market price for the fuel throughout the duration of the contract, whether market prices increase or decrease.

The Department of Energy (DOE) publication, Petroleum Monthly Marketing (PMM), is the basis for adjusting the price of bulk fuels purchased by DFSC. The PMM is published monthly and presents average price and total sales volume data by month, by state and region, and for several classes of trade for a number of petroleum products (motor gasolines, aviation gasoline, kerosene-type jet fuel, kerosene, No. 1 and No. 2 distillate fuels, No. 4 Fuel, residual fuel oil, and propane). The PMM also publishes monthly average crude oil costs. The figures DFSC uses are gathered by DOE through a mandatory monthly report of sales prices and volumes by all refiners and gas plant operators in the United States. These reports are subject to audit by DOE.

The PMM is the only publication which presents price data on a statewide basis using comprehensive sales data provided by sellers in the marketplace. Thus, the PMM price series are the best indicators of actual petroleum product prices on a state, regional, or national basis.

The PMM is the most reliable, comprehensive indicator of market prices of petroleum products. By law, all refiners are required to report their average sales prices to DOE on a monthly basis. There is no question that the average monthly prices reported by the PMM constitute the most accurate compilation available.

Another important quality of the PMM is that it is a neutral, independent publication that is not subject to control by either sellers or buyers. The PMM reports prices without regard to the impact on either side of a transaction.

The use of product index escalators ensures that the sale will be at the market price, which is a fair and reasonable price. Not only is the Government protected, but the contractor is protected by knowing that its price will always be related to the price it could obtain in the commercial marketplace. The contract price will always be reflective of the market, whether the market price is increasing or decreasing.

Use of the PMM for price adjustment purposes guarantees that the prices of products bought by DFSC in its bulk fuels programs will vary on a cent-for-cent basis with the prices of similar products in the commercial marketplace, and that the EPA will not be a source of advantage or disadvantage, on average, for either DFSC or the contractor over the life of the contract. The prices reported in the PMM reflect average conditions over the course of the month and thus will reflect approximately the price situation facing any seller in the marketplace for that fuel in that month, on average. Thus, the PMM can be expected to approximate the price changes of individual DFSC contractors. Use of PMM also guarantees that the contractors' prices for military fuels will not vary relative to the average prices of the commercial products the refiners could have produced instead of the military products. Therefore, the contractor will not gain or lose, on average, relative to the alternate civilian markets for the materials used in the manufacture of military fuels, and the price of the latter will accurately reflect the fair market value of the military fuels on a monthly basis.

The PMM provides the additional benefit of allowing DFSC to attain "commonality of EPAs in its domestic bulk programs. Under the common EPA policy, all offerors within a given region accept the same EPA provision for each fuel that they offer to supply. This guarantees that the relationship among the prices of all offerors will remain identical over the course of the prospective delivery period (the lowest price offers will remain lowest). If common EPA provisions are not used, the lowest price offerors at the time contracts are awarded may not remain the lowest over the course of the contracts. Thus, non-common EPAs may lead to situations where DFSC is unable to discern, with certainty, the prospective contractors who represent the true lowest cost to the Government.

DFSC's market price EPA provisions are consistent with commercial practice in that refiners price their products with regard to the going market price, not costs to produce the product. Long-term petroleum contracts between commercial entities contain "reopeners" or "walk-away" provisions which allow the buyer to terminate the contract if the price is too high or otherwise fails to reflect the market price of the product. The use of product-based prices and walk-away provisions ensures the parties that the sale will be at the market price at the time of delivery. Likewise, DFSC's market index EPA provision, while not the refiner's own price, ensures that the contract will be awarded and remain at the market price. The product escalators have proven to

be very reflective of the market prices of petroleum products and are accepted by all of DFSC's bulk contractors with the exception of the one that filed suit.

B. CURRENT SITUATION

Mapco Alaska Petroleum, Inc. (MAPCO), a refiner and a longtime DFSC supplier, filed suit in the United States Court of Federal Claims, alleging that the DFSC escalators violate FAR 16.203 because they are based on market indexes of product rather than the individual contractor's prices. MAPCO contends that a cost-based escalator which reflects crude oil costs should have been used, and not the market-based product price escalator. Without deciding the type of EPA provision that DFSC should have used, the Court ruled in favor of MAPCO. (See Attachment) The Court held that because FAR 16.203 does not permit the use of market price indexes not based on the contractor's costs, DFSC's PMM provisions were invalid. The court did not address the merits of DFSC's EPA provisions, holding only that they are unauthorized.

C. Relevant FAR Provisions

FAR 16.203-1 sets forth the three general types of EPA provisions: (1) Adjustments based on established prices. According to the Court of Federal Claims, this is limited to the published or otherwise established prices of the contractor. (2) Adjustments based on actual cost of labor or material. (3) Adjustments based on cost indexes of labor or material.

FAR 16.203-3 limits the use of EPA provisions to situations where it is necessary to protect the parties from significant fluctuations in labor or material costs (e.g. crude oil costs) or to provide for price adjustment in the event of changes in the contractor's established prices (e.g. the contractor's refinery posting). The section does not discuss market fluctuations of the product being purchased by the Government.

FAR 16.203-4(a)(2) and 16.203-4(b)(2) prescribe the standard EPA clauses at FAR 52.216-2 and 52.216-3 for price adjustments based on contractor established prices.

D. ALTERNATIVES ARE UNSATISFACTORY

The types of EPA provisions specifically authorized by the FAR are not satisfactory alternatives to the market indexes DFSC utilizes in petroleum contracting. DFSC has studied and used EPA provisions for many years and has tried several different types. As discussed below, crude oil escalators, which would reflect 80-90 per cent of the refiner's cost to produce a petroleum product, and are authorized by FAR 16.203-1(b, c), are not normally reflective of product prices and create evaluation problems in competitive procurements. Refinery postings, on the other hand, which are authorized by FAR 16.203-1(a), are not always available or reliable, as discussed below.

1. CRUDE OIL ACQUISITION COSTS

In 1973, when DFSC began using price escalation provisions, Bulk Fuels Division contractors were permitted to use their crude oil acquisition costs as reference prices for economic price adjustments. The contractor's crude oil costs incurred several months prior to the sale of refined product to the Government were used to account for the time to transport and refine the crude oil.

In February 1981, DLA approved DFSC's request to discontinue the use of crude oil as an EPA reference in DFSC bulk fuel contracts for a number of reasons. First, it was difficult to compare offers based on crude oil with offers based on the price of refined products. The result was that there was no assurance that awards were being made to the lowest price offerors. In addition, it was difficult to determine the price reasonableness of offers based on crude oil cost escalation. Lastly, contract prices adjusted on the basis of crude oil costs did not consistently follow the market for refined products with the result being that the Government paid too much for supplies.

There are separate markets for crude oil and refined petroleum products, which respond to different events, therefore the price of crude oil may fluctuate independently from the price of refined product, as occurred in the MAPCO case. Because certain events, such as OPEC meetings, wars, oil spills, and rumors can lead to sudden changes in crude oil prices that are not related to product prices, the use of crude oil escalators can have distorted and politically unacceptable results. For example, assume the Government has a contract that escalates with crude oil and an airline has a contract with the same refiner based on product prices, and that the prices of the contracts start out the same. Then, because of a rumor, crude oil prices increase while product price markets remain steady. The Government ends up paying more than the airline for the same fuel on the same day, a premium over the market price. Such a result could not be justified to the public or Congress.

Other situations could end up harming the contractor. The price of heating oil normally rises in winter due to heavier demand. Gasoline prices normally increase during the summer driving season. If crude oil prices do not increase during these periods, and they may well not, the Government would be paying less than the market price paid by commercial customers for the two products. There is also the risk that contractors would deliver less to the Government in order to sell more to their commercial customers. These examples show that the use of crude oil cost escalators is neither appropriate nor effective in the petroleum industry.

Contractors might not see the use of crude oil escalators as protecting them from risks, rather they could view it as a gamble. By doing business with the Government, contractors would risk

getting paid more or less than the market price for their products, depending on how the crude oil prices varied compared to the product prices. This is a risk many contractors may not want to take. Accordingly, crude oil cost EPA provisions are largely inappropriate for the purchase of refined petroleum products.

The use of a crude oil cost type EPA provision would be inconsistent with commercial practice. As discussed above, petroleum refiners base their prices on the market price for the refined product, not the cost to produce it. DFSC contractors have repeatedly stated that they determine prices on the basis of market prices for petroleum products and on economic judgments, not on the basis of costs. For example, Exxon, a major refiner and principal DFSC contractor, has repeatedly advised DFSC that it does not accumulate costs allocated to individual products. Rather, Exxon determines its prices on the basis of economic judgments and market values of petroleum.

2. REFINER'S PRICES

The only other alternative, use of the refiner's posted price, is also not a viable approach. DFSC used this type of EPA reference during the period of time it allowed crude oil cost escalators. A number of small refineries do the majority of their business with the Government. Thus, these refiners would have insufficient commercial sales to ensure that their price changes were the result of market forces rather than some other factors. In addition, much of what is purchased by the Bulk Fuels Division is military specification product that does not have a commercial equivalent. Therefore, there are no commercial sales to set a price. If we tried to use the prices of similar products for EPA purposes, there would be problems with different refineries changing prices differently. As with a crude oil EPA provision, common escalation would likely be lost and the Government would not be assured of awarding contracts to bidders whose prices would remain low throughout the term of the contract.

DFSC permitted the use of refinery postings for EPA purposes in 1980-1982, and experienced the administrative burden of contractor delays in furnishing price change information in an untimely fashion. This basis for price adjustments proved to be a time-consuming, cumbersome task, apart from the problems discussed above. Moreover, the refinery posting method of price adjustments, has proven to be subject to manipulation and abuse by contractors in other DFSC fuel procurement programs where, due to lack of competition, a common EPA provision is unavailable.

Satisfactory alternatives to the use of product indices are not available. Granting this deviation would ensure that DFSC could continue to use adjustments that are most reflective of the market and which ensures that DFSC is paying the proper price for the fuel it purchases.

E. OTHER FUEL PROCUREMENT PROGRAMS

DFSC's other fuel acquisition programs were not the subject of the MAPCO decision. These programs rely on industry publications such as Platt's Oilgram Price Report, Oil Price Information Service, Lundberg Survey, Computer Petroleum Corporation, and Bloomberg Oil Buyer's Guide for price adjustment purposes. These programs normally adjust prices on the basis of the market price for the refined product being purchased. Although these publications are not as comprehensive as the PMM, they accurately reflect market price trends of the products they measure, and have proven reliable over the years.

Unlike the bulk fuels programs, these other programs primarily do business with regular dealers in petroleum products, not refiners. Accordingly, the industry publication method of price adjustments does not appear to be subject to the arguments accepted by the court in the Mapco case. Rather, these programs fit within the cost index method of price adjustments authorized by FAR 16.203-1(c). In order to forestall an attack on the validity of these programs, however, we have drafted our deviation request in a way to include the other fuel procurement programs.

Floyd, S.

# In the United States Claims Court

RECEIVED DEC 22 PM 12:53

No. 550-89C

(Filed: December 22, 1992)

* * * * * * * * * * * * * * * * * * * * *

MAPCO ALASKA PETROLEUM, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

* * * * * * * * * * * * * * * * * * * * *

Contract; Economic Price Adjustment Clause.

**FILED**

DEC 22 1992

U.S. COURT OF FEDERAL CLAIMS

Allen B. Green, Washington, D.C., for plaintiff. J. Keith Burt, Washington, D.C., and Lin Patterson, Tulsa, Oklahoma, of counsel.

Sheryl L. Floyd, with whom were Assistant Attorney General Stuart M. Gerson, David M. Cohen, and Terrence S. Hartman, Washington, D.C., for defendant. Howard M. Kaufer, Defense Fuel Supply Center, Alexandria, Virginia, of counsel.

## OPINION

BRUGGINK, Judge.

Pending are cross-motions for summary judgment as to Count I of plaintiff's complaint. The primary issue raised is whether two economic price adjustment ("EPA") clauses contained in a fuel supply contract are contrary to the Federal Acquisition Regulations ("FAR"), thus rendering that portion of the contract unenforceable. We find that the EPA clauses employed by the Government were unauthorized, but ruling is deferred as to the ultimate effect of that illegality.

## I. FACTUAL BACKGROUND

On September 24, 1986, the Government, acting through the Defense Fuel Supply Center ("DFSC"), awarded contract No. DLA600-86-D-0852 to plaintiff, MAPCO Alaska Petroleum, Inc. ("MAPCO"). Under the contract, MAPCO agreed to sell three types of fuel to DFSC at various delivery points within the state of Alaska for one year. The three types of fuel to be delivered were DFA, a diesel fuel; MUR, an unleaded regular gasoline; and JP-4, a jet fuel.

The contract contained a base price for each of the fuel types. Periodically during the course of contract performance, these prices were adjusted by means of two EPA clauses, B19.22 and B19.33. The clauses adjusted the price upward or downward depending on fluctuations in price indexes reported in Petroleum Marketing Monthly ("PMM"), a publication issued monthly by the Energy Information Agency, a division of the Department of Energy ("DOE"). Every petroleum refiner in the United States is required to report its sales prices and volumes to the DOE, which in turn publishes in PMM the average prices, broken down by state and region, for each of several petroleum products. The average sales price for a product is referred to as its "PMM Index."

The device or reference used in an EPA clause to adjust the prices is called the "escalator." The escalator in clauses B19.22 and B19.33 was the PMM Index. Under the MAPCO contract, the price for each fuel type was increased or decreased depending on changes in the current applicable PMM Index as compared with the level of that index at the time the contract was executed. Clause B19.22 adjusted the prices of DFA fuel based on fluctuations in the PMM Index for Alaska sales of kerosene-type jet fuel. Similarly, clause B19.33 adjusted the price of MUR based on fluctuations in the PMM Index for Alaska sales of unleaded regular gasoline. PMM does not publish an index for JP-4,[1] so the price of JP-4 was adjusted based on the fluctuation of a composite index derived from a weighted average of the other two PMM Indexes used. Because JP-4 is approximately 30% kerosene and 70% naphtha, the composite index for the price of JP-4 was calculated by adding 30% of the kerosene-type jet fuel index to 70% of the unleaded gasoline index.

---

[illegible]

Over the course of the contract, the margin between MAPCO's crude oil costs and the price it received from DFSC for refined petroleum products declined sharply. During the first five months of performance, the contract price of JP-4 was decreased by clause B19.33 from $0.3800 per gallon to $0.2469 per gallon. During that same period, MAPCO's crude oil costs, as set by the state of Alaska, rose from approximately $4.61 a barrel to $8.99 a barrel. Thus, while the price MAPCO received under the contract fell approximately 35%, its raw material costs increased nearly 95%.

On November 2, 1988, MAPCO filed a claim with Robert Petrosky, the DFSC's contracting officer, seeking a $10,289,649 adjustment pursuant to the contract's disputes clause. MAPCO stated that it had arrived at this amount by applying an index based on the contractor's costs rather than the PMM Index then in effect. MAPCO argued that the index used in the contract violated applicable provisions of the FAR. DFSC's final decision, dated March 30, 1989, denied that the PMM Index violated procurement regulations and refused to reform the contract. MAPCO initiated the present action on October 10, 1989. In Count I, MAPCO renewed its allegation that the PMM Index was contrary to the regulations. MAPCO now seeks partial summary judgment as to Count I. The Government likewise moves for summary judgment on that count. It continues to argue that the price index to which the parties contracted complies with all relevant regulations.

## II. DISCUSSION

In Count I of the complaint, MAPCO alleges that EPA clauses B19.22 and B19.33 violate the FAR.[2] It is well-settled that applicable provisions of the FAR are incorporated into every federal government procurement contract and have the same effect as if they were set forth in the contract itself. See Chris Berg, Inc. v. United States, 192 Ct. Cl. 176, 182, 426 F.2d 314, 317 (1970). As the Court of Appeals for the Federal Circuit has stated in reference to an index used in an EPA clause, "[i]f the . . . index violate[s] the [procurement regulations], the government cannot, by law, benefit from it." Beta Sys. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988); see also Craft Mach. Works, Inc., 90-3 B.C.A. (CCH) ¶ 23,095 at 115,969 (ASBCA June 29, 1990). Under such circumstances, the contract is rendered illegal. The court treads warily into the territory of contract illegality, however. The Federal Circuit and its predecessor, the Court of Claims, have warned that contracts should not be nullified on the basis of illegality unless the illegality is plain. United States v. Amdahl Corp., 786 F.2d 387, 394 (Fed. Cir. 1986);

see also Torncello v. United States, 231 Ct. Cl. 20, 27, 681 F.2d 756, 761 (1982). After a thorough search of the record and the arguments offered by each party, however, the court is satisfied that the EPA clauses are plainly inconsistent with the FAR.

A. FAR § 16.203-1

The agreement in question describes itself as a "Fixed Price with Economic Price Adjustment" contract. MAPCO therefore contends that the applicable FAR provision is § 16.203 ("Fixed-price contracts with economic price adjustment"). FAR § 16.203-1, entitled "Description," provides as follows:

> Economic price adjustments are of three general types:
>
> (a) *Adjustments based on established prices.* These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.
>
> (b) *Adjustments based on actual costs of labor or material.* These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) *Adjustments based on cost indexes of labor or material.* These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

48 C.F.R. § 16.203-1. MAPCO contends that EPA clauses B19.22 and B19.33, which use the PMM Index as an escalator, do not fit within any of these three types.

In response to this argument, defendant first asserts that clauses B19.22 and B19.33 satisfy the description set out in FAR § 16.203-1(a), in other words, that the average price figures taken from the PMM Index constitute agreed-upon, "published or otherwise established prices of specific items or the contract end items." Id. This argument turns on the meaning of the phrase "established prices." MAPCO interprets the phrase to mean the contractor's own established prices rather than a price index or the average of other refiners' prices as was the case with clauses B19.22 and B19.33.