> prepared by the United States Department of Labor (DOL)); American Transparents Plastic Corp., 83-2 [Comp. Gen.] ¶ 539 at 2 [(Nov. 8, 1983)] (DOL's PPI for polyethylene resin).

Neither of these cases support defendant's position that the definitions of price indexes and cost indexes are interchangeable. The regulations specifically use the word "index" to refer to cost but not price, considering the two as separate terms. See FAR § 15.801 (defining "cost analysis," "price," and "price analysis" with respect to cost and price negotiation policies and procedures).

Moreover, defendant is incorrect in its assertion that the index used here is "similar to" those used as escalators for EPA clauses in Glopak and American Transparents. The contracts in those two cases were for the supply of plastic bags to the GSA. The PPI upon which the EPA clauses were based was an average of sales prices for polyethylene resin, a raw material used in the production of the bags. The price of the resin was part of the contractor's costs, not the contractor's prices. Thus, unlike clauses B19.22 and B19.33, the EPA clauses in Glopak and American Transparents clearly constitute an adjustment based on a cost index of material within the meaning of § 16.203-1(c).

B. FAR § 16.203-3

Additionally, MAPCO argues, clauses B19.22 and B19.33 contravene the "Limitations" provision, FAR § 16.203-3. It asserts that the EPA clauses in this case are not, as § 16.203-3 mandates, drafted "to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices." Therefore, according to MAPCO, the clauses are prohibited.

The Government responds that once DFSC determined that an EPA clause was warranted, it had discretion to abandon the previously discussed standard EPA clauses set out in FAR § 52.216 in favor of its own "agency-prescribed clause" outside the descriptions of § 16.203-1 and exempt from the requirements of § 16.203-3, the "Limitations" provision. According to defendant, § 16.203-3 requires only that contracting officers make a threshold determination whether there will be a need "to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices." Once that determination is made, however, contracting officers are free to insert a clause to further any purpose they deem

appropriate, so long as the agency sanctions the insertion. The Government argues that § 16.203-3 only prevents contracting officers from using any EPA clause at all unless they determine that one of those two needs exists. It claims, moreover, that the goals of the regulation would not be served by an EPA clause tied to the contractor's established prices, and that such clauses are disfavored because a contractor could raise his prices without regard to market conditions.[8]

The Government is correct that the contracting officer may replace the standard EPA clause for an "agency-prescribed clause" if the officer deems the standard clauses inappropriate. FAR § 16.203-4(a). However, we cannot accept the additional step in defendant's logic – namely, that the "Limitations" section places no restrictions on the clause to be inserted once the contracting officer discards the standard clauses. Section 16.203-3 does not merely call for a determination as to whether the parties will require protection from cost fluctuations or adjustment for changes in the contractor's established prices. It mandates that the officer may only enter a fixed-price contract with an EPA clause when such a contract "is necessary" to effectuate that protection or adjustment. It would be folly if an EPA clause could only be utilized if one of the two mischiefs described by the "Limitations" provision were present, but then the solution were not limited to addressing that mischief. Logically, therefore, the purpose of using an EPA clause is to make adjustments specifically to meet the two forms of instability set out in § 16.203-3. Otherwise, the word "Limitations" is emptied of meaning.

Defendant, however, questions whether the "Limitations" provision sets forth the only purposes for using an EPA clause. It claims that the clauses at issue were properly intended to provide a common basis on which the bids could be evaluated and to ensure that the low bidder remained low throughout the term of the contract. The Government notes that until 1981, DFSC contracts contained EPA clauses based on the contractor's crude oil acquisition costs. In 1981, however, DFSC began to complain of the difficulty it encountered in comparing the bids from different offerors because each offeror relied on a different escalator in its bid. Because of these difficulties, DFSC decided to use market price summaries of the contract end items as escalators in its fuel supply contracts instead of acquisition costs. Defendant argues that

[8] Whether such clauses are unfavored is irrelevant. They would be permitted under the FAR. Whether they are in fact used is up to the contracting officer. In any event, defendant's argument is [illegible] FAR § 16.203-2 provides [illegible] price adjustments based on established [illegible] [illegible]

it was within the discretion of DFSC to change its policy in order to use what it calls a more common escalator. While common escalation and bid evaluation are certainly legitimate goals, those objectives do not put the clauses in question beyond the reach of the applicable regulations. For the "Limitations" section to have an effect, it must serve not only as an entry point for using an EPA clause, but also as the method to justify the clause actually used.

In any event, defendant's government-oriented view of the purpose of an EPA clause is much more cramped than either the "Limitations" clause would suggest, or prior cases indicate. The courts and boards that have addressed this question have universally found that the purpose of an EPA clause is to divide the risk of economic uncertainty between the parties. Beta Sys. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988); Craft Mach. Works, Inc., 90-3 B.C.A. (CCH) ¶ 23,095 at 115,967-69 (ASBCA June 29, 1990); Gale Barstow, Inc., 86-2 B.C.A. (CCH) ¶ 18,758 (ASBCA Jan. 24, 1986). Without an EPA clause, the contractor would be forced to submit a higher bid to include a contingency to cover any unexpected increases in its costs. By using an EPA clause, the Government is assured of not having to pay that contingency. In fact, both the FAR[9] and the MAPCO contract clauses at issue[10] prohibit the contractor from including such a contingency.

---

[9] FAR § 16.203-2, entitled "Application," provides:

> A fixed price contract with economic price adjustment may be used when (i) there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance, and (ii) contingencies that would otherwise be included in the contract price can be identified and covered separately in the contract. . . .
>
> (a) In establishing the base level from which adjustment will be made, the contracting officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause.

[10] Clauses B19.22 and B19.33 both provide that "[t]he Contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of [illegible] [illegible] increases in the Contractor's bid or proposal.

Unaccountably, however, defendant contends that the real cause of MAPCO's losses was its failure to bid high enough to cover unexpected deviations in the price escalator relative to its costs.[11] See Craft Mach. Works, Inc., 90-3 B.C.A. (CCH) ¶ 23,095 (ASBCA June 29, 1990); but see American Transparents Plastic Corp., 83-2 Comp. Gen. ¶ 539 (Nov. 8, 1983).[12] Further, defendant argues that "FAR § 16.203-2(ii), by its own

---

[11] During the course of performance, MAPCO registered several complaints with the contracting officer which stated that escalation by means of the PMM Index was causing it to lose money. In response, a DFSC official wrote a memorandum to the contracting officer asserting that MAPCO's problems were "self-inflicted." The memorandum states:

> [W]hile assuming a constant price/cost relationship, MAPCO in 1986 bid very low at a time when that relationship had already deviated greatly from its historical norm. The return of the price/cost relationship to its historical level has put MAPCO in a price/cost squeeze because their prices are escalated on commercial prices (which generally declined) while they based their bid prices on costs (which rose).

[12] In Craft, the Government argued a position similar to that which it now argues here. The Board addressed the argument as follows:

> The Government recognizes that the economic relief offered by its [EPA] clause is wanting from an overall inflation perspective, but argues that appellant has no reason to complain since the Government placed it on notice of this fact, and appellant failed to place "contingencies" in its bid to account for this less-then-comprehensive [sic] treatment. However, the Government ignores the fact that the very purpose of the EPA clause, as stated in the regulations, is to eliminate contingencies from a bid that would otherwise be included due to projected long term market instability, and to cover them separately under the EPA clause, FAR 16.203-2. Indeed, under FAR 16.203-2(a), the contracting officer is tasked to insure that continguencies [sic] are not duplicated by the contractor by their inclusion "in both the base price and the adjustment requested . . . ." This raises the serious question [of] whether the Government's purported encouragement of contingencies is

(continued...)

terms, is permissive and does not require that all contingencies be covered." But what is permissive about FAR § 16.203-2 is whether an EPA clause may be used at all, not whether the contractor may include a contingency in its bid once an EPA clause is chosen. The compulsory nature of the regulation's prohibition on contingencies could not be more unambiguous than the statement that "the contracting officer shall ensure that contingency allowances

---

[12](...continued)
consistent with its own regulations.

Craft Mach. Works, 90-3 B.C.A. at 115,969 (emphasis in original).

Defendant argues that this language is dicta and asks us to apply the reasoning of American Transparents instead. Defendant claims that American Transparents supports its position that contingencies are allowed in bids for contracts with EPA clauses. In American Transparents, the Comptroller General found that the presence of an EPA clause did not preclude a bidder from formulating a rational bid. The Comptroller General stated:

> The purpose for including an EPA clause is to protect bidders to some extent against unexpected price increases and to reduce the necessity for contingency amounts in their bid prices. However, to the extent that the EPA clause does not achieve that result from the bidder's standpoint, it is the bidder's responsibility to project costs and to include in the basic contract price a factor covering any otherwise uncompensated cost increases.

American Transparents, 83-2 Comp. Gen. at 6.

Although the bidding in American Transparents took place prior to May 26, 1983, the regulations construed here were promulgated on September 9, 1983. The regulation in effect in American Transparents provided: "In the establishment of the base levels from which adjustment will operate, contingency allowances shall be eliminated from the base to be set forth in the contract to the extent that adjustment is provided for any particular contingency." 41 C.F.R. § 3.404-3 (1981). Thus, at the time American Transparents was decided, the regulations prohibited contingencies only to the extent they were covered by the EPA clause. Under the FAR, the prohibition on contingencies is absolute. Because Craft is more recent and involved the regulation at issue in the present case, its reasoning is more persuasive than that of American Transparents.

are not duplicated by inclusion in both the base price and the adjustment requested under [the] economic price adjustment clause." FAR § 16.203-2(a) (emphasis added).

Defendant further argues that we should defer to the discretion of the contracting officer in developing and incorporating B19.22 and B19.33 into MAPCO's contract because the officer acted in good faith. Deference to the contracting officer's discretion is not always appropriate, however. See Caiola v. Carroll, 851 F.2d 395, 399 (D.C. Cir. 1988). In Caiola, the Court of Appeals for the District of Columbia refused to defer interpretation of FAR § 9.406-2 to an official of the Defense Logistics Agency ("DLA") who debarred the president and secretary of a contracting corporation from entering further business with the federal government. Of the Caiola court's three rationales for disregarding the official's interpretation, the first two directly apply to this case:

> First, the [FAR] regulation was written and promulgated not only by DOD, but by GSA and NASA as well. The diffusion of the interpretive authority among several agencies, and the possibility of inconsistent interpretations, weaken the case for deference. Second, the only agency official to construe FAR 9.406-5(b) was . . . the DLA's debarring official, not the head of the agency. While [the debarring official]'s interpretation is, of course, entitled to a "modicum of respect" in this court, we need not accord it dispositive weight.

Caiola, 851 F.2d at 399 (emphasis in original) (citations omitted). Like the controlling regulation in Caiola, FAR Part 16 was "written and promulgated not only by DOD, buaby GSA and NASA as well." The authority to interpret Part 16 is equally diffuse. See "Establishing the Federal Acquisition Regulation," 48 Fed. Reg. 42,102 (1983) (as codified at 48 C.F.R. §§ 1-99). Also, neither the contracting officer nor the drafters of B19.22 and B19.33 have any more authority to interpret the FAR than did the debarring officer in Caiola. None of them is head of the DOD. This court will not grant any weight to the Government's application of the regulations in the present case, when the result would be at odds with the plain meaning of the regulations.

C. FAR Subpart 16.5

In its reply brief, and as more clearly articulated in its post-[illegible] argument supplementary briefs, defendant has substantially altered [illegible] argument. It now contends in the alternative that the contract was not [illegible] price contract pursuant to Subpart 16 [illegible]

indefinite-quantity contract within the scope of FAR Subpart 16.5.[13] According to defendant, clauses B19.22 and B19.33 are acceptable under that subpart "separate and apart from the authority granted by FAR Subpart 16.2."

The Government cites the court to three clauses included within the solicitation which allegedly indicate that an indefinite-quantity contract was

---

[13]FAR § 16.501(a) provides for "three types of indefinite-delivery contracts–definite-quantity contracts, requirements contracts, and indefinite-quantity contracts." Section 16.504(a) describes indefinite-quantity contracts as follows:

> An indefinite-quantity contract provides for an indefinite quantity, within stated limits, of specific supplies or services to be furnished during a fixed period, with deliveries to be scheduled by placing orders with the contractor.
>
> > (1) The contract shall require the Government to order and the contractor to furnish at least a stated minimum quantity of supplies or services and, if and as ordered, the contractor to furnish any additional quantities, not to exceed a stated minimum. The contracting officer may obtain the basis for the maximum from records of previous requirements and consumption, or by other means, but the maximum quantity should be realistic an based on the most current information available.
> >
> > (2) To ensure that the contract is binding, the minimum quantity must be more than a nominal quantity, but it should not exceed the amount that the Government is fairly certain to order.
> >
> > (3) The contract may also specify maximum or minimum quantities that the Government may order under each delivery order and the maximum that it may order during a specific period of time

contemplated.[14] Defendant argues that these three clauses are "consistent with" or "substantially similar to" the three clauses that FAR § 16.505 requires to be included in indefinite-quantity contracts.[15] MAPCO's objection to this characterization focuses on clause F1.08, the only clause of the three that is not an authorized deviation from the standard clauses pursuant to FAR Subpart 1.4. MAPCO disputes that clause F1.08 is "substantially the same as" the clause at FAR § 52.216-19 as required by § 16.505(b). Although there may be some basis for this assertion, for the reasons stated below, it is not fundamental to the holding. We will assume, without deciding, that defendant has established that an indefinite-delivery indefinite-quantity contract has been created. The real problem with defendant's alternative theory is that the type of indefinite-delivery indefinite-quantity contract to which the parties allegedly agreed does not justify defendant's use of clauses B19.22 and B19.33.

Defendant points to FAR § 16.501(c), which delineates four types of pricing mechanisms when contemplating an indefinite-delivery contract:

> Indefinite-delivery contracts may provide for firm fixed prices (see 16.202), fixed prices with economic price adjustment (see 16.203), fixed prices with prospective redetermination (see 16.205), or prices based on catalog or market prices (see 15.804-3(c)). When prices are based on catalog or market prices, the price to be paid may be determined by establishing an adjustment factor and applying it to the price in industrywide pricing guides or manufacturers' price catalogs. Normally, the adjustment factor will be a fixed percentage discount to be applied to the price in effect on the date of each order.

48 C.F.R. § 16.501(c). Defendant suggests that the last of these four options -- contracts based on "catalog or market prices" -- authorizes its use of the PMM Index as a market price escalator in its contract with MAPCO. This is a distortion of FAR § 16.501(c), however. The fourth alternative refers to "[i]ndefinite-delivery contracts . . . provid[ing] for . . . prices based on catalog or market prices." It omits the element of a fixed price. The catalog or market price becomes the fixed price at time of consummation of the particular order. This is distinct from the first option, "[i]ndefinite-delivery

[15] Clauses I212 ORDERING, F1.08 DELIVERIES AND CONTRACT PERIOD, and I81.05 INDEFINITE QUANTITY - SCOPE OF CONTRACT.

contracts . . . providing for . . . firm fixed prices with economic price adjustment (see 16.203)."

Even if "catalog or market prices" in § 16.501(c) are not limited to the contractor's established catalog or market prices, as was the case with § 16.203,[16] the simple answer to defendant's suggestion is that the fourth alternative does not describe the contract at bar. The parties plainly utilized the first option under § 16.501(c), not the fourth. As MAPCO points out, defendant included within the solicitation the following standard clause required by FAR § 16.105, filling in the blank as shown:

> L74(F) TYPE OF CONTRACT (APR 1984)
> The Government contemplates award of a FIXED PRICE WITH ECONOMIC PRICE ADJUSTMENT contract resulting from this solicitation. (FAR 52.216-1)

In all, no fewer than nine clauses contain references to the contract in the terms "fixed price" or "economic price adjustment" (including "EPA") or both.[17] With one exception,[18] references to "market prices" are confined to clauses discussing economic price adjustment.[19] Additionally, on March 31, 1986, less than three weeks before the solicitation was issued, the Contracting Officer, Division Chief and the Director of the DFSC approved a two-page document entitled "Acquisition Plan" which contained language largely drawn from FAR §§ 16.203-2 and -3, to wit:

> The Contracting Officer has considered the stability of market or labor conditions which are expected to exist during the period of contract performance and has determined that Economic Price Adjustment (EPA) provisions are necessary to

---

[16] Defendant assumes, without proving, that the clauses at issue reflect a contract price "based on market prices." However, it is far from clear that the PMM Index actually does so. See discussion supra pp. 8-9.

[17] Specifically, contract clauses B19.12, B19.22, B19.33, B19.36, B20.02, E5(F), L74(F), M19.05 and M71.

[18] Clause K7.04, COST ACCOUNTING STANDARDS - EXEMPTION BASED ON ESTABLISHED CATALOG OR MARKET PRICES. See 48 C.F.R. § 15.804-3.

[19] [illegible]

> (a) preclude the inclusion of contingencies in the contract price(s), (b) protect the contractor and the Government against significant economic fluctuations in labor or material costs, or (c) provide for contract price adjustments in the event of changes in the contractor's established prices.

Having chosen to use the mechanism of an economic price adjustment clause, defendant is obligated to comply with applicable regulations limiting its use. It offers no principled reason for not doing so.

In its final supplemental brief, defendant proposes to expand the reach of § 16.501(c) by permitting a mutant clause -- an indefinite delivery contract having fixed prices with economic price adjustment based on market prices [read 'index']. Even if such a hybrid contract served defendant's purposes, it is not contemplated by the regulations. While the Government can be commended for adaptability in conforming its argument to the developing exigencies of the case, its briefing has evolved beyond the permissible scope of the regulation.

In sum, it is plain that the parties intended a fixed price contract with economic price adjustment. Whether they also intended an indefinite-delivery indefinite-quantity contract is immaterial. Either way, the contract must comply with FAR § 16.203. As previously discussed, the present contract fails to do so.

D. Waiver

Defendant's final argument is that MAPCO waived its right to protest the contract by acquiescing to the Government's insistence that the PMM Index be included in this and other contracts with MAPCO. Assumption-of-the-risk analysis is not applicable under these circumstances, however. The contractor cannot, by waiver, permit the Government to enter an illegal contract. We agree with the following statement by the ASBCA: "When a contract clause drafted by the Government is inconsistent with law, whether the appellant inquired, protested, accepted or otherwise assumed any risks regarding the same is not controlling; the impropriety will not be allowed to stand." Craft Mach. Works, Inc., 90-3 B.C.A. (CCH) ¶ 23,095 at 115,969 (ASBCA June 29, 1990); see also Beta Sys. v. United States, 838 F.2d 1179 (Fed. Cir. 1988); Chris Berg, Inc. v. United States, 192 Ct. Cl. 176, 183, 426 F.2d 314, 317 (1970).