0 6 SEP 1994

DFSC-PPR

SUBJECT: Request for One-Time Deviation to FAR 16.203-1 for Approval of New Method of Economic Price Adjustment (EPA)

TO: AQPLL

1. We request a one-time deviation to FAR 16.203-1 for approval of a proposed EPA clause to cover all domestic bulk fuels solicitations for a period of one year or until a class deviation is approved. Details of the request are contained in the enclosure.

2. We appreciate your prompt attention to this request. The point of contact for this office is Betsy Murray, extension 45500, for any questions you may have.

Original Signed By
L. H. CARPENTER
Captain, SC, USN
Director, Contracting
and Production

Encl

PREPARED BY: BETSY MURRAY/PPR/45500/30 AUG 94/EPA-PZ.DOC
INTERNAL DIST.: DFSC-PP READ DFSC-PPR READ & RECORD

MEMORANDUM FOR THE EXECUTIVE DIRECTOR (PROCUREMENT), DEFENSE LOGISTICS AGENCY

SUBJECT: Request for One-Time Deviation from FAR 16.203-1

I. PROBLEM.

The current system of price adjustment for the Defense Fuel Supply Center's (DFSC) domestic bulk fuels programs requires all offerors to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the *Petroleum Marketing Monthly (PMM)*. Because the PMM data is not published until the third month following the month for which data is effective, interim adjustments are made based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, the final billing adjustments can be substantial. Although this method has proved to be a reliable means of price adjustment, it has several disadvantages. First, it requires double calculations of price adjustments. Second, because of the time lag between interim and final billing, contractors likely build in a price cushion. Finally, the process is overly complicated.

II. RECOMMENDATION.

Authorize a one-time deviation to FAR 16.203-1 for approval of a proposed EPA clause for domestic bulk fuels, which will replace the current DFSC clause for domestic bulk, Clause B19.33, ECONOMIC PRICE ADJUSTMENT - PUBLISHED MARKET PRICE (DOMESTIC BULK). We request the use of this clause to cover all domestic bulk fuel solicitations for a period of one year or until a class deviation is approved.

III. DISCUSSION.

A. DFSC began using EPA provisions in its contracts in 1973 as a result of market changes resulting from the oil embargo that year. Prior to that time, our contracts were awarded on a firm fixed price basis. At that time, we determined to use crude oil prices as the EPA reference base because there were Government controls on domestic crude oil prices and because, in the aggregate, crude oil prices tracked accurately with product market prices, despite wide fluctuations in individual contractors' crude costs over short periods of time. When Government crude price controls were discontinued, many major contractors agreed to price adjustment based on refined product posted prices, but most

small refiners insisted on continuing to use an EPA clause based on crude oil costs. In 1980, with DLA's approval, we began allowing contractors to choose between the two methods of price adjustment.

B. DFSC encountered several evaluation-related problems with allowing contractors to choose postings or crude oil. As a result, DFSC, with DLA's approval, abandoned the use of crude oil costs as an adjustment mechanism in 1981. Contractors were only allowed to use product postings for price adjustment purposes. For JP5 only, again with DLA's approval, we changed in 1982 to using a listing from the Bureau of Labor Statistics (BLS) Producer Price Index, because there were no commercially published postings for JP5. Because the BLS figures for a given month were not published until two or three months later, DFSC calculated an interim price adjustment based on company postings, followed by a final adjustment based on BLS statistics. Because BLS proved to be a good basis for price adjustment, we shortly changed the EPA basis for the other bulk products to BLS figures. DLA approved the change. The interim reference was an independent price listing, the Oil Price Information Service (OPIS) PAD report in lieu of company postings, with BLS figures for the final adjustment.

C. In 1984, we began to use monthly sales price averages published in the *Petroleum Marketing Monthly (PMM)*, published by the Department of Energy. We switched to the PMM because it was superior to BLS and because BLS changed to recording pricing patterns in a manner that rendered it unacceptable for our purposes as an EPA basis. In 1987, a minor change was made in that the basic reference was kept but the effective dates of offer prices was changed to allow offerors to know the base reference price prior to submission of best and final offers.

D. The current system of price adjustment has been used since 1987. All offerors of product to DFSC are required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the PMM. Because the PMM data is not published until the third month following the month for which data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, the final billing adjustments can be substantial. In 1992, the Defense Management Review, as part of a review of all agency clauses, approved the use of the PMM-based EPA clauses. Our authority to use the PMM was reconfirmed by the Director of Defense Procurement in 1993.

E. We propose to substitute industry publications, a more current EPA basis, for the existing PMM methodology. This will provide a number of advantages. First, it will

eliminate the current method, which requires double calculation of price adjustments. Second, because of the time lag between interim and final billing, contractors likely build in a price cushion. It is probable that the Government would save money with contractors no longer having to include a cushion to cover them for price adjustments. Third, the new EPA method is more similar to the way adjustments are done commercially in that commercial publications are widely accepted by industry. Finally, the new method will be much simpler for all parties to use. The DFSC Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable bases for price adjustments. These publications are already used for EPA purposes in other DFSC programs.

F. We are requesting this one-time deviation to cover all bulk requirements for CONUS for a one-year period or until a class deviation is approved. A permanent change will be subsequently requested under separate cover. At this time, the reference price will be based on the spot assessment quotation from Platt's Oilgram Price Report, or, for the Rocky Mountain area, on the OPIS publication. It will be firm for weekly periods. It will be defined as the weekly average of the high and low of the price Monday through Friday (excluding holidays) and shall be effective the following Tuesday through Monday. We also request flexibility to (1) change the frequency of price escalation (e.g., from weekly changes to daily) should that become appropriate in the future, and (2) if recommended by DFSC's Office of Market Research and Analysis, to change publications as circumstances warrant. A copy of the new clause is enclosed.

G. We intend to use B19.34-1 in all domestic bulk solicitations. In those instances where we have additional publications to be used for other line items in a solicitation, we will designate those clauses as B19.34-2, B19.34-3, and so on, as appropriate, for purposes of that solicitation..

H. This is the first request for this deviation.

DEFENSE LOGISTICS AGENCY
HEADQUARTERS
CAMERON STATION
ALEXANDRIA, VIRGINIA 22304-6100

IN REPLY REFER TO AQPLL
FARS DEV 94 - 24

15 NOV 1994

SUBJECT: Individual Deviation to FAR 16.203-1 for Use of New Economic Price Adjustment (EPA) Clause

TO: DFSC-P

1. Your letter of 6 September 1994 requested a one-time deviation for an EPA clause providing for adjustments based upon market price summaries or averages of petroleum products reported by publishers independent of the offerors.

2. The clause forwarded with your letter was similar to, and intended to replace, clause B19.33, ECONOMIC PRICE ADJUSTMENT - PUBLISHED MARKET PRICE (DOMESTIC BULK) (DFSC NOV 1992). Clause B19.33 includes an interim market price-based EPA adjustment with provision for a further adjustment upon availability of market prices reported in a Department of Energy publication covering the reporting period. The proposed clause eliminated the need for the further retroactive adjustment, but otherwise, is substantially the same as clause B19.33. Representatives of your policy, contracting, and legal offices subsequently worked with our point of contact (Mr. Gilbart, AQPLL, x46431) to reformat the proposed clause and incorporate some minor wording changes identical to that used in other approved DFSC clauses. It was agreed that an individual deviation would be provided to cover ongoing buys pending further review to determine requirements for a permanent deviation.

3. A deviation is hereby granted to permit the use of the enclosed EPA clause in all contracts awarded under current DFSC solicitation DLA600-95-R-0061.

4. FARS DEV 94-24 applies.

FOR THE DIRECTOR:

Marilyn S. Barnett

**MARILYN S. BARNETT**
Executive Director
(Procurement)

1 Encl

B19.33 ECONOMIC PRICE ADJUSTMENT - PUBLISHED MARKET PRICE (DOMESTIC BULK) (DFSC NOV 1994)

(a) The Contractor warrants that--

(1) The base unit prices set forth in the Schedule do not include allowances for any portion of the contingency covered by this clause; and

(2) The prices to be invoiced shall be computed in accordance with the provisions of this clause.

(b) **DEFINITIONS.** As used throughout this clause--

(1) The term "base unit price" means the unit price set forth opposite the item in Section B of the Schedule.

(2) The term "market price" means the price to be used in determining an economic price adjustment of the base unit price of an individual product for the market area and time period specified in this clause. The market price is derived from quotes, assessments, or sales prices in the market place for one or several items or commodity groups as reported in a consistent manner in a publication, electronic data base, or other form, as determined by an independen' trade association, governmental bodv, or other third party independent of the contractor.

(i) The term "base market price" means the price as shown in column V of the Table below which is the market price from which economic price adjustments are calculated pursuant to this clause.

(ii) The term "adjusting market price" means the market price for deliveries during the most recent period, as defined in the Table below.

(3) The term "date of delivery" is defined as follows--

(i) FOR TANKER OR BARGE DELIVERIES:

(A) F.O.B. ORIGIN. The date and time vessel commences loading.

(B) F.O.B. DESTINATION. The date and time vessel commences discharging.

(ii) FOR PIPELINE DELIVERIES. The date and time product commences to move past the specified f.o.b. point.

(iii) FOR ALL OTHER TYPES OF DELIVERIES. The date product is received.

(c) **ADJUSTMENTS.**

(1) The price payable shall be the base unit price in effect on the date of delivery increased or decreased by the same number of cents, or fraction thereof, that the adjusting market price increases or decreases, per like unit of measure, from the base market price.

(2) **CALCULATIONS.** All calculations shall be rounded to six decimal places.

(3) **MODIFICATIONS.** Any resultant price changes to the base market price and base unit price shall be executed by the Contracting Officer through a weekly price adjustment modification effective each Tuesday.

(4) **DEFAULT.** Notwithstanding any other provision of this clause, no upward price adjustment shall apply to supplies scheduled under the contract to be delivered before the effective date of the adjustment, unless the Contractor's failure to deliver according to the delivery schedule results from causes beyond the Contractor's control and without its fault or negligence within the meaning of the DEFAULT clause of this contract, in which case the contract shall be amended to make an equitable extension of the delivery schedule.

(5) **UPWARD CEILING ON ECONOMIC PRICE ADJUSTMENT.** The Contractor

agrees that the total increase in any contract unit price, pursuant to these economic price adjustment provisions shall not exceed____percent of the original base unit price in any applicable program year (whether a single year or a multiyear program), -except as provided hereafter.

(i) If at any time the Contractor has reason to believe that within the near future a price adjustment under the provisions of this clause will be required that will exceed the current contract ceiling price for any item, the Contractor shall promptly notify the Contracting Officer in writing of the expected increase. The notification shall include a revised ceiling which the Contractor believes is sufficient to permit completion of remaining contract performance, along with appropriate explanation and documentation as required by the Contracting Officer.

(ii) If the Contracting Officer issues a modification to the contract raising the contract ceiling to cover the actual revised contract price, the Contractor shall be obligated to continue to deliver under orders placed for the specific item(s) in question. If an actual increase in the market price would raise the contract unit price above the current ceiling and the Contracting Officer decides not to modify the contract ceiling to cover such increase, the Contractor shall have no further obligation under this contract to fill pending or future orders for the specific items(s) in question as of the effective date of the increase, as long as the unit price exceeds the ceiling.

(6) **REVISION OF MARKET PRICE INDICATOR.** In the event--

(i) Any applicable market price indicator is discontinued or its method of derivation is altered substantially; or

(ii) The Contracting Officer determines that the market price indicator consistently and substantially fails to reflect market conditions,

the parties shall mutually agree upon an appropriate and comparable substitute and the contract shall be modified to reflect such substitute effective on the date the indicator was discontinued, altered, or began to consistently and substantially fail to reflect market conditions. If the parties fail to agree on an appropriate substitute, the matter shall be resolved in accordance with the DISPUTES clause of the contract.

(d) **CONVERSION FACTORS.** If this clause requires quantity conversions for economic price adjustment purposes, the factors specified in the CONVERSION FACTORS clause shall apply, unless otherwise specified in the Schedule.

(e) **EXAMINATION OF RECORDS.** The Contractor agrees that the Contracting Officer or designated representatives shall have the right to examine the Contractor's books, records, documents, or other data the Contracting Officer deems necessary to verify Contractor adherence to the provisions of this clause.

(f) **TABLE**

| I. | II. | III. | IV. | V. |
|---|---|---|---|---|
| Item No. | Name of Publication | Heading under which market indicator is published and Name of product | Location where market price is applicable | Base Market price as of ________ (excludes all taxes) (see note(s) below) |

NOTE: Buyer shall include a note or notes in the Table which will identify the specific publications(s), method(s), and time period(s) for calculating the market price(s), as exemplified below:

For Platt's Oilgram: "**NOTE:** The East/Gulf Coast adjusting market price will be firm for weekly periods and is defined as the average of the applicable daily Platt's spot assessment quotations effective for the prior week. The simple average of the daily average highs and lows of the prices effective Monday through Friday (excluding any days prices are not published) shall be the adjusting market price effective for the following Tuesday through Monday."

For Oil Price Information Service: "**NOTE:** The Rocky Mountain adjusting market price will be firm for weekly periods and is defined as the Oil Price Information Service Publication applicable weekly quotations effective for the prior week. The simple average of the highs and lows of the prices effective the prior week shall be the adjusting market price effective for Tuesday through Monday."

(DFSC 52.216-9F33)

CAMERON STATION
ALEXANDRIA, VIRGINIA 22304-6160

04 JAN 1995

REPLY REFER TO DFSC-PPR

SUBJECT: Request for Class Deviation and Permanent Coverage in DLAR

TO: AQPLL

1. On 15 November 1994, DLA approved DFSC's request for an individual deviation to FAR 16.203-1 which allows DFSC to use a revised economic price adjustment clause in Solicitation DLA600-95-R-0061, for bulk petroleum products. The deviation, FARS DEV 94-24, approved clause B19.33, which eliminates the need for interim and retroactive price adjustments and allows established industry publications to be used as the basis for the economic price adjustment. Although the approved deviation covered the solicitation in question, it does not provide DFSC with a permanent means for utilizing the revised B19.33 clause in the bulk petroleum program.

2. As discussed in a 12 December 1994 meeting between DFSC and DLA, and in accordance with DLAR 1.490(a)(i), DFSC requests that the substance of the new deviation be incorporated into the DLAR because the class deviation will be needed beyond the normal three-year expiration period. Enclosed is a Memorandum for the Director, DAR Council.

3. During the meeting, it was agreed that the DLAR coverage be broad enough to include all DLA supply centers. Our proposal accomplishes this; however, our Memorandum is specific to fuel. It seems appropriate that DLA address the other supply centers in a cover letter to our Memorandum.

4. We appreciate your prompt attention to this request. The point of contact for this office is Kerry Pilz, extension 45500, for any questions you may have.

Original Signed By
Deputy Director
L. H. CARPENTER
Captain, SC, USN
Director, Contracting
and Production

Encl