Congress authorized the issuance of war risk insurance policies, but later sought to alter the terms of the policies. 292 U.S. at 575-76. Because the insureds' statutory rights vested upon entering the insurance policies, Congress was held to have effected a taking. *Id.* at 579- 89.

Like the rights granted by the government in *Perry* and *Lynch*, the FAR granted Kern and other contractors a right to contracts with prices that could only be adjusted in certain ways. *See MAPCO*, 27 Fed. Cl. at 412 (FAR regulations governing price adjustment clauses intended to protect contractors). This right vested when Kern entered the Contract. *Perry*, 294 U.S. at 330; *Lynch*, 292 U.S. at 576-77.[10] DFSC abrogated Kern's rights when it awarded the Contract with an illegal price adjustment clause. This effected a taking of Kern's rights compensible under the Fifth Amendment. *Id.*; *see generally Buse Timber & Sales, Inc. v. United States*, 45 Fed. Cl. 258, 264 (1999) ("takings of contracts have been found where the government . . . repudiates debts to save money").[11]

Furthermore, DFSC had no valid right to possession and use of the fuel Kern delivered. DFSC could only accede to a right of possession under a lawfully valid contract. As the Court of Federal Claims held in *Integrated Logistics Support Systems International, Inc. v. United States*, 42 Fed. Cl. 30 (1998), it is "upon the transfer of property to the Government pursuant to a *lawfully executed* bilateral agreement, [that] the Government cannot be compelled to render just compensation for the alleged taking of such property." *Id.* at 33-34 (emphasis added). The court

[10] The government may not argue that Kern's rights under the FAR were disposed of when DFSC awarded the Contract. "Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Greenbriar v. United States*, 193 F.3d 1348, 1356 (Fed. Cir. 1999) (quoting *Connolly v. Pension Benefit Guarantee Corp.*, 475 U.S. 211, 223-24 (1986)).

[11] The fact that DFSC violated the law in connection with taking Kern's rights does not preclude a takings claim. *Del-Rio Drilling*, 146 F.3d at 1361-64.

similarly stated in *Scan-Tech Security, L.P. v. United States,* 46 Fed. Cl. 326 (2000), it is only "when the Government asserts its interest in property obtained *pursuant to a valid contract*, [that] no taking occurs." *Id.* at 341 (emphasis added).

Here, the price term of Kern's contract was not lawfully valid. DFSC's payment of a price term that was not lawfully valid did not confer on DFSC a fully supporting right to possess and use the fuel: for the payment of a lawful price is the *quid pro quo* for receiving title. *Heydt v. United States*, 38 Fed. Cl. 286, 305 (1997) (a taking occurs when the government "controls rights or property which have not been purchased"). Because DFSC took possession of and used the fuel without a fully supporting claim of right, Kern has a valid takings claim. *Integrated Logistics Support Systems International*, 42 Fed. Cl. at 33-34; *Scan-Tech Security*, 46 Fed. Cl. at 341. Indeed, courts have consistently held that a "taking occurs when the rightful property, *contract*, or regulatory powers of the government are employed to control rights or property which have not been purchased." *Heydt*, 38 Fed. Cl. at 305 (emphasis added).[12]

---

[12] The mere existence of a contract, of course, cannot preclude a takings claim. As the Court of Federal Claims held in *Integrated Logistics Support*: "That the circumstances confronting plaintiff involve an express contract with the Government is not fatal to plaintiff's Count IV taking claim." 42 Fed. Cl. at 34. Thus, it has long been recognized that, where the government fails to vacate leased property upon termination of a lease, the lessor may assert alternative claims for breach of contract or a Fifth Amendment taking. *Prudential Insurance Co. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986); *Allenfield Associates v. United States*, 40 Fed. Cl. 471, 487 (1998).

Whether the government's interference with a citizen's property rights gives rise to a taking claim, contractual remedies, or both depends on the circumstances of the interference. *Integrated Logistics Support Systems International, Inc.*, 42 Fed. Cl. at 33-34. However, "[t]aking claims are not presumed to be foreclosed by claims for breach of express contract merely because the claims share the same factual background." *Id.* at 34; *see also Medina Construction v. United States,* 43 Fed. Cl. 537, 559 (1999) (stating that plaintiff "might be able to establish facts sufficient to support a Fifth Amendment taking claim as an alternative to its contract claims against the Government.").

Because DFSC effected a taking of Kern's rights under the Fifth Amendment, Kern is entitled to compensation based on the fair market value, inclusive of interest, of the fuel it delivered under the Contract. *See United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980); *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923).[13]

---

[13] Neither the statute of limitations nor the doctrines of laches or waiver preclude Kern's claim. The six-year statute of limitations under the CDA was not enacted until 1995, and does not apply retroactively. *Motorola, Inc. v. West*, 125 F.3d 1470, 1472-73 (Fed. Cir. 1997); FAR § 33.206. Prior to 1995, there was no statute of limitations under the CDA. *Motorola*, 125 F.3d at 1472; *S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 5 (Fed. Cir. 1985); *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995); *Do-well Machine Shop, Inc. v. United States*, 870 F.2d 637, 639-40 (Fed. Cir. 1989).

In addition, the doctrine of laches does not preclude Kern's claim because DFSC has not suffered prejudice from any unreasonable delay. *See Jana, Inc. v. United States*, 936 F.2d 1265, 1269-70 (Fed. Cir. 1991); *see also Cupey Bajo Nursing Home, Inc. v. United States*, 36 Fed. Cl. 122, 127 n.8 (1996). All of the data needed to determine what Kern was paid and the fair market value of the fuel Kern delivered is readily available. Indeed, DFSC just completed litigating claims from this same period in *Pride* and raised no claim of unreasonable delay or prejudice.

Finally, the doctrine of waiver does not bar Kern's claim. Kern was not aware of nor could it as a matter of law have waived DFSC's violation of the FAR. In *Beta Systems*, the Federal Circuit rejected the government's assertion that the contractor waived violation of regulations governing price adjustment clauses when, after objecting to the provisions, the contractor nonetheless accepted the price adjustment. The Federal Circuit held:

> The government's insistence during negotiations on use of Section H-8 in its entirety, and the contractor's acquiescence, does not immunize the government from the consequences of failure of the EPA [economic price adjustment] clause to comply with the law stated in the DAR. . . . The risk of unintentional failure of a contract term to comply with a legal requirement does not fall solely on the contractor. If the BLS index that was selected does not comply with DAR 3-404.3(c)(3)c.5, even approximately, it is not controlling whether or not *Beta* or the government foresaw, or accepted the risk of failing to foresee, this defect in the index.

*Beta Systems*, 838 F.2d at 1185 (paragraphing omitted).

*(Footnote cont'd on next page)*

## IV. KERN IS ENTITLED TO RECOVER $446,728.79

Kern is entitled to be paid the fair market value of fuel it supplied to DFSC under each of the legal theories discussed above. The proper methodology for determining the fair market value of fuel Kern supplied to DFSC under the illegal fuel price adjustment clause was established in *Pride Companies, L.P. v. United States,* No. 95-597C (Fed. Cl. May 10, 2000). Applying the fair market value methodology established in *Pride*, Kern is entitled to recover $446,728.79, plus interest.

*(Footnote cont'd from previous page.)*

In *LaBarge*, the Federal Circuit rejected the government's assertion that the contractor waived a violation of the regulations prohibiting auctions. The Federal Circuit held:

> [I]f government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence or failure to protest. In cases in which a breach of law is inherent in the writing of the contract, reformation is available despite the contractor's initial adherence to the contract provision later shown to be illegal.

*LaBarge*, 46 F.3d at 1552-53 (citation omitted).

The principles underlying the rule that an illegality in a contract cannot be waived were articulated more than a century ago by the Supreme Court as follows:

> Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure [of the illegality] is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons.

*McMullen v. Hoffman*, 174 U.S. 639, 658 (1899); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81 n.6 (1982) ("and if it be suggested that Kaiser should not have waited so long to assert its defense [of illegality], the Court has held that 'rules of estoppel will not be permitted to thwart the purposes of the laws of the United States.'")

### A. Claim Methodology

The court in *Pride* explained the legal standard for determining fair market value for the fuel delivered under DFSC's illegal price adjustment clause as follows:

> We do not calculate damages as though the contract had divided the risk of economic uncertainty properly, or speculate how Pride might have bid the contract with an appropriate EPA [economic price adjustment] provision. We must determine what defendant would have paid for the fuel irrespective of Pride's contract.

*Id.* slip op. at 2-3.

The fair market value, the court held, was "the value of the product to the government." *Id.* at 3. The value to the government was "'not based on costs nor a reasonable return on investment of the seller, but on the reasonable value in the marketplace of the property sold.'" *Id.* (quoting *Cities Service Gas Co. v United States*, 500 F.2d 448, 457 (Ct.Cl. 1974)); *see also Urban Data Systems*, 699 F.2d at 1155.[14]

To determine fair market value, the court first determined the value of the fuel on the Gulf Coast, the refining center of the United States. *Pride,* slip op. at 3. More specifically, the court determined the value of fuel at the mouth of the Explorer Pipeline, which is the pricing point for the Gulf Coast spot market and the location where DFSC maintains its largest Defense Fuel Supply Point ("DFSP Houston"). *Id.*

To calculate the dollar value of the fuel on the Gulf Coast, the court used U.S. Gulf Coast Average Spot prices as published in Platts for the analogous commercial fuel or mix of

[14] While the court in *Pride* determined fair market value in conjunction with an award of *quantum valebant*, the methodology the court adopted is equally applicable to determination of fair market value under the other legal theories of recovery Kern advances.

commercial fuels DFSC purchased. *Id.* at 3-5.[15] To reflect the one-year term of DFSC's contracts, as opposed to a one-time spot sale as reflected in Platts, the court added a long-term contract premium.[16] *Id.*

Because DFSC did not purchase the fuel from Pride on the Gulf Coast but rather at specific military facilities, the Court in *Pride* added to the value of the fuel as calculated on the Gulf Coast the transportation rates from the Gulf Coast to each military facility. *Id.* at 5-7. The court used DFSC's own transportation rates from DFSP Houston to the military facilities where the fuel was purchased. *Id.*[17]

---

[15] It may well be appropriate to calculate the value of the fuel on the Gulf Coast by using Platts U.S. Gulf Coast Spot High prices rather than, as the Court did in *Pride*, by using Platts U.S. Gulf Coast Spot Average prices. While Kern is using Platts Spot Average prices in its claim, Kern's use of these prices should not be construed as a concession that using Platts Spot Average prices is more appropriate than using Platts Spot High prices.

[16] Kern uses a total long-term contract premium of $0.05, which reflects the $0.03 premium for commercial contracts found in *Pride* and an additional $0.02 premium for DFSC contracts. *See Pride* slip op. at 3-5. As Mr. Kenneth Riley, former Vice President of ARCO Petroleum Products Company, and Mr. George West, former Business Manager of Distillate and Residual Products for Shell, testified in *Pride*, DFSC's contracts contain an additional $0.02 premium above that for commercial contracts because of DFSC's more restrictive contract requirements. While this testimony was presented in *Pride*, the court was not asked nor did it have occasion to address this additional premium for DFSC contracts. This $0.05 premium also is supported by the unique refining requirements of DFSC fuels that are not required for commercial fuels.

In addition, while the amount of the long-term premium may have varied during the overall period subject to claim $0.05 is an appropriate average. Similarly, while market relationships between suppliers and commercial airlines began to change in the 1990s, in terms both of the backward integration and use of spot formula pricing, the relationship between DFSC and its suppliers has not fundamentally changed, nor has the amount of the appropriate long-term premium for DFSC contracts.

[17] DFSC transports the overwhelming majority of the fuel it purchases. Accordingly, when DFSC awards contracts each year, it calculates the price of transporting fuel from various DFSPs to the relevant military facilities. DFSC evaluates all available modes of transportation – *e.g.*, truck, tank car, pipeline, or barge – and selects the least-price transportation option. The results of DFSC's evaluation of the least-price transportation option are included in the computer

*(Footnote cont'd on next page)*

Kern uses this same methodology established in *Pride* to calculate the amount of its claim. Indeed, because DFSC supported the methodology adopted by the court in *Pride* for determining the fair market value, the government is judicially estopped from subsequently challenging this methodology. *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469 (6th Cir. 1988).

### B. DFSC's Right To Offset

In *Barrett Refining Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001), the Federal Circuit held that DFSC could assert an offset *ex aequo et bono. Id.* at 1062-64. DFSC's offset is subject to a supplier's claim for fair market value and may not reduce the effective price of a delivery below the initial bid price. *Id.* at 1062, 1064-65.

DFSC's right to offset is intimately related to a supplier's right to recover the fair market value of the fuel it supplied. Thus, in *Barrett*, the Federal Circuit affirmed the Court of Federal Claims' holding that, once DFSC's illegal price adjustment clause is "struck out" of the contract, the "express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered." *Id.* at 1059. It was because payments under the contract were "at least partially unauthorized," that the price term of the contract was replaced by an implied-in-fact contract, which the court affirmed the "parties' inten[ded] to provide for fair market-value consideration of pricing." *Id.* at 1060, 1062.[18]

---

*(Footnote cont'd from previous page.)*

printout of DFSC's bid evaluation model, which is made available to suppliers. These are the transportation rates the court used in *Pride* and that Kern uses here.

[18] In *Barrett*, the Federal Circuit stated that it was "'unwilling to restrict the trial courts to any single basis for determining fair market value.'" *Id.* at 1061 (quoting *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988)). Accordingly, while the lower court in *Barrett* measured

*(Footnote cont'd on next page)*

It was this same invalidity of the contract's pricing term, the Federal Circuit held, that gave rise to DFSC's right to an offset for unauthorized payments: Because "the payments made by the government were based on an illegal price escalation clause and, thus, were unauthorized . . . the government has a right to seek and recover the unauthorized payments it made." *Id.* at 1064.

The Federal Circuit made clear, however, that DFSC's right to offset the amount of the payments made did not extinguish a supplier's right to recover fair market value under the

---

*(Footnote cont'd from previous page.)*

recovery by adjusting the supplier's initial bid price based on changes in Platts, this methodology is not controlling or appropriate in other cases.

Indeed, the methodology used in *Barrett* is fundamentally flawed. Both parties' expert economists agreed in *Pride* that, because the bid price and price adjustment clause are linked, the illegality in the price adjustment clause affected the level of the initial bid prices. This inextricable link between the bid price and the price adjustment clause was acknowledged by the Court of Federal Claims in *Barrett,* which found: "The government's insertion of the Platt's index into the EPA clause of the original contract [in place of the PMM index] would have created a different set of risks for prospective bidders, in turn triggering different bids than those actually submitted by offerors." *Barrett Refining Corporation v. United States*, 45 Fed. Cl. 166, 171 (1999), *aff'd*, 242 F.3d 1055 (Fed. Cir. 2001). Because the bid price and the illegal price adjustment clause are linked, use of the initial bid price in *Barrett* effectively and incorrectly incorporated the effects of DFSC's violation of the law into the fair market value calculation.

Furthermore, the Court of Federal Claims justified its methodology on the grounds that the supplier received special preferences as a small disadvantaged business. *Barrett Refining Corporation v. United States*, 42 Fed. Cl. 128, 134-35 (1998). The court held that the benefits of these special preferences could not be preserved without using the supplier's initial bid price in calculating fair market value. *Id.* The Federal Circuit relied on this justification in affirming the lower court's decision, stating: "Barrett qualified as a small disadvantaged business ("SDB") that, in accordance with an elaborate system of SDB preference factors, affected the base price of these contracts." *Barrett*, 242 F.3d at 1058. This fundamental justification for using the initial bid price, despite the lower court's unchallenged finding that the bid price was linked to the illegal price adjustment clause, has no relevance to Kern's claim. *Id.* at 1059 (quoting *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) for the principle that "'trial courts necessarily must have considerable discretion to select the method of valuation that is most appropriate in light of the facts of the particular case'").