contract's implied pricing term. The court expressly admonished that DFSC's right to offset is "subject to [the supplier's] claim for fair market value," and held that "no award to the government could be so large that it reduced [the supplier's] recovery below fair market value." *Id.* at 1062, 1064. Moreover, the supplier only could be ordered to "refund payments made in excess of the base [or bid] price," an equitable principle that precludes DFSC's overreaching. *Id.* at 1065.[19] In calculating its claim, Kern applies all appropriate offsets and equitable principles of recovery as provided in *Barrett*.[20]

### C. Claim Calculation

Modifying the formula used in *Pride* to reflect the marketplace for fuel sold in California, Kern uses the following formula to calculate the fair market value of the JP-5 it delivered to DFSC:

> (Los Angeles[21] spot price for kerojet[22]) + (long-term contract premium) + (DFSC's transportation rate to the point of delivery).

*Pride*, slip op. at 3, 5. Consistent with the methodology in *Pride*, Kern uses for the day of each

[19] This equitable principle, which established the bid price as a floor to a supplier's recovery, must apply without regard to whether the payments made are greater or lesser than fair market value, inasmuch as the impact of DFSC's violation of the law on the payments made cannot control the measure of recovery or the equitable principles applicable thereto.

[20] Kern does not concede DFSC's right to an offset, or any other claim, nor does Kern waive any defense to such an offset.

[21] Kern uses the transportation rate from DFSP San Pedro, California (near Los Angeles) to Edwards Air Force Base, California and the corresponding Los Angeles prices.

[22] Kerojet is compositionally similar to JP-5.

delivery the average spot prices for kerojet.[23]

Kern includes in the formula the price associated with the contractually required additive FSII at the rate for JP-5 set forth in the contract.[24] (Ex. 1 at 2.) DFSC purchased all JP-5 at Bakersfield, California. Therefore, following the methodology in *Pride*, Kern uses DFSC's own rate for transportation from the Los Angeles market to Bakersfield, California.[25]

As set forth in Exhibit 2, the fair market value of the JP-5 Kern delivered to DFSC is $6,163,637.53. As set forth in Exhibit 3, Kern was paid $5,716,908.74 for these deliveries.[26] Accordingly, the amount of Kern's claim, represented by the difference between the fair market value of the JP-5 it delivered and what it was paid, is $446,728.79.

---

[23] Where Platts did not publish a price on the day of delivery, Kern uses an average of the first available price for the days immediately before and after the delivery.

[24] While Kern uses the contract rates for FSII for purposes of its claim, Kern notes that the fair market value of FSII may well be materially higher.

[25] DFSC's bid evaluation model does not include a transportation rate from the marketplace in Los Angeles to the point of delivery. Kern uses DFSC's comparable transportation rate from DFSP San Pedro to Edwards Air Force Base, California as the closest approximation. Because no DFSC transportation rate from DFSP San Pedro to Edwards Air Force Base is available for 1995, Kern calculates the transportation rate for 1995 by taking the rate from 1994, the closest available year, and making the appropriate increase or decrease in the rate based on the Consumer Price Index-Urban (CPI-U) national averages for those years. Because the CPI-U for 1995 is 2.83% higher than the CPI-U for 1994, Kern increases the transportation rate from DFSP San Pedro to Edwards Air Force Base by 2.83%. Kern reserves the right to supplement its claim with a more appropriate rate if one becomes available.

[26] Calculation of the amount Kern was paid is based on Kern's accounting records kept in the ordinary course of business.

## V. CONCLUSION

DFSC's price adjustment clause B19.33 violated the FAR and was illegal. Kern is therefore entitled to recover the fair market value of the fuel it supplied and submits a certified claim for $446,728.79, plus interest.[27]

[27] Kern's certification of its claim under the Contract is attached as Exhibit 4.

# APPENDIX

**EXHIBIT 1**

AWARD/CONTRACT

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) K — RATING — PAGE 1 OF PAGES 10

2. CONTRACT (PROC. INST. IDENT.) NO. SP0600-95-D-0507

3. EFFECTIVE DATE AUG 29 1995

4. REQUISITION/PURCHASE REQUEST/ PROJECT NO. SC0600-95-0508 AND 0509

5. ISSUED BY CODE SC0600
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION
ALEXANDRIA, VA 22304-6160
BUYER/SYMBOL - A. WRIGHT/DFSC-PZC
PHONE - (703) 274-4308
FAX (703) 274-4608
TLX 209430 / 209432
PPN: 2.2D AND 2.2B

6. ADMINISTERED BY (If other than Item 5) CODE SC0600
PAS - S0512A5514APC DCMAO VAN NUYS: QUALITY ONLY

7. NAME AND ADDRESS OF CONTRACTOR (NO., street, city, county, State, and ZIP Code)
KERN OIL & REFINING CO.
ATTN: GEORGE S. STURGES
7724 EAST PANAMA LANE
BAKERSFIELD, CA 93307

BIDDER CODE: K042 CAGE CODE: 1JX71
CODE FACILITY CODE

8. DELIVERY
[X] FOB ORIGIN [ ] OTHER (See Below)

9. DISCOUNT FOR PROMPT PAYMENT
NET 30 DAYS, NO DISCOUNT

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN — ITEM See Block 12.

11. SHIP TO/MARK FOR CODE
N/A

12. PAYMENT WILL BE MADE BY CODE HQ0104
DEFENSE FINANCE AND ACCOUNTING SERVICE - COLUMBUS CENTER
STOCK FUND DIRECTORATE / FUELS ACCOUNTING AND PAYMENTS DIVISION
ATTN: DFAS-CO-SFFB / P.O. BOX 182317
COLUMBUS, OHIO 43218-6250 FAX: (614) 693-0670

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
[ ] 10 U.S.C. 2304(c)( ) [ ] 41 U.S.C. 253(c)( )

14. ACCOUNTING AND APPROPRIATION DATA SEE CLAUSE G150.11
97X4930.5CFO 01 26.1 S33150

15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT

Kern's offer submitted by SF33(2) dated 3 May 95 as amended by correspondence dated 13, 14 (2), 29 Jun, and 23 Aug 95 is hereby accepted. Solicitation SP0600-95-R-0161 and Amds. 1-4 are incorporated by reference except that the following clauses shall not apply: G9.06, G150, I94, I171, I176, I176.03, I176.05, and K53.

A copy of Clause B14.04, Estimated Supplies To Be Furnished (Contract Schedule), and various other clauses agreed to by the parties are attached.

ESTIMATED 15G. TOTAL AMOUNT OF CONTRACT $6,136,450.00

16. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | |
| X | B | SUPPLIES OR SERVICES AND PRICE/COSTS | 2-4 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| | C | DESCRIPTIONS/SPECS/WORK STATEMENT | | | J | LIST OF ATTACHMENTS | |
| | D | PACKAGING AND MARKING | | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 4 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 5 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 6-10 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE

17. [ ] CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return ____ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documentation: (a) this award/contract, (b) the solicitation, if any and (c) such provisions, representations, certifications, and specifications as are attached or incorporated by reference herein. (Attach. listed herein)

18. [X] AWARD (Contractor is not required to sign this document). Your offer on Solicitation Number SP0600-95-R-0161 and Amendments 0001 thru 0004 including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

19A. NAME AND TITLE OF SIGNER (Type or print)

20A. NAME OF CONTRACTING OFFICER
EDITH P. DUHAINE

19B. NAME OF CONTRACTOR
BY ____________________
(Signature of person authorized to sign)

19C. DATE SIGNED

20B. UNITED STATES OF AMERICA
BY Edith P. Duhaine
(Signature of Contracting Officer)

20C. DATE SIGNED
AUG 29 1995

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE

26-107

STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

0131

B14.04 ESTIMATED SUPPLIES TO BE FURNISHED (DOMESTIC BULK) (DFSC JUN 1992)

(a) Prices indicated hereunder are subject to adjustment pursuant to the terms of this contract.

(b) The maximum and minimum quantities are defined in the DELIVERY-ORDER LIMITATIONS - SCOPE OF CONTRACT clause.

(c) The refined product to be furnished hereunder, f.o.b. point, method of delivery, and estimated quantity are as follows:

DFSC JP5 NSN: 9130-00-273-2379

| ITEM | EST. QTY/GALS | MOD | BASE MARKET PRICE (14 FEB 95) |
|---|---|---|---|
| 0101 | 10,700,000 | TT | $.5735 WITH FSII |

FOB ORIGIN DELIVERY OF 10,700,000 GALLONS OF JP-5 AT BAKERSFIELD, CA.

SCHEDULE NOTES:

1. Payment terms are NET 30 days.

2. Unless the parties agree otherwise the minimum/maximum quantities available for delivery per day are as follows:

| SHIPPING POINT | ITEM | MODE | MINIMUM | MAXIMUM |
|---|---|---|---|---|
| Kern Oil & Refining Co.<br>7724 East Panama Lane<br>Bakersfield, CA 93307-9210 | 0101 | TT | - 0 - | 100,000 gallons |

3. The amount included in the unit price per gallon for line items 0101 for Fuel System Icing Inhibitor (FSII) is $.012. This FSII rate shall remain firm and fixed for the entire period of the contract.

4. The truck loading terminal will be open 7 days per week, 24 hours per day.

5. Contract Line Item Number 0101 represents a set-aside quantity of 10,220,000 gallons and 480,000 gallons of unrestricted quantity.

6. This contract was negotiated and awarded pursuant to competition in Contracting ACT OF 1984 (CICA), P.L. 98-369, FAR Subpart 6.1, Full and Open Competition.

7. Emergency contact point for DFSC during non-duty hours is Logistics Readiness Center (LRC) at (703)274-8105.

B19.33 ECONOMIC PRICE ADJUSTMENT - PUBLISHED MARKET PRICE (DOMESTIC BULK) (DFSC NOV 1994)

(a) The Contractor warrants that--

(1) The base unit prices set forth in the Schedule do not include allowances for any portion of the contingency covered by this clause; and

(2) The prices to be invoiced shall be computed in accordance with the provisions of this clause.

(b) DEFINITIONS. As used throughout this clause--

(1) The term "base unit price" means the unit price set forth opposite the item in Section B of the Schedule.

(2) The term "market price" means the price to be used in determining an economic price adjustment of the base unit price of an individual product for the market area and time period specified in this clause. The market price is derived from quotes, assessments, or sales prices in the market place for one or several items or commodity groups as reported in a consistent manner in a publication, electronic data base, or other form, as determined by an independent trade association, governmental body, or other third party independent of the Contractor.

(i) The term "base market price" means the price as shown in Column V of the Table below which is the market price from which economic price adjustments are calculated pursuant to this clause.

(ii) The term "adjusting market price" means the market price for deliveries during the most recent period, as defined in the Table below.

(3) The term "date of delivery" is defined as follows:

(i) FOR TANKER OR BARGE DELIVERIES.

(A) F.O.B. ORIGIN. The date and time vessel commences loading.

(B) F.O.B. DESTINATION. The date and time vessel commences discharging.

(ii) FOR PIPELINE DELIVERIES. The date and time product commences to move past the specified f.o.b. point.

(iii) FOR ALL OTHER TYPES OF DELIVERIES. The date product is received.

(c) ADJUSTMENTS.

(1) The price payable shall be the base unit price in effect on the date of delivery increased or decreased by the same number of cents, or fraction thereof, that the adjusting market price increases or decreases, per like unit of measure, from the base market price.

(2) CALCULATIONS. All calculations shall be rounded to six decimal places.

(3) MODIFICATIONS. Any resultant price changes to the base market price and base unit price shall be executed by the Contracting Officer through a weekly price adjustment modification effective each Tuesday.

(4) DEFAULT. Notwithstanding any other provision of this clause, no upward price adjustment shall apply to supplies scheduled under the contract to be delivered before the effective date of the adjustment, unless the Contractor's failure to deliver according to the delivery schedule results from causes beyond the Contractor's control and without its fault or negligence within the meaning of the DEFAULT clause of this contract, in which case the contract shall be amended to make an equitable extension of the delivery schedule.

(5) UPWARD CEILING ON ECONOMIC PRICE ADJUSTMENT. The Contractor agrees that the total increase in any contract unit price, pursuant to these economic price adjustment provisions shall not exceed 60 percent of the original base unit price in any applicable program year (whether a single year or multiyear program), except as provided hereafter.

(i) If at any time the Contractor has reason to believe that within the near future a price adjustment under the provisions of this clause will be required that will exceed the current contract ceiling price for any item, the Contractor shall promptly notify the Contracting Officer in writing of the expected increase. The notification shall include a revised ceiling which the Contractor believes is sufficient to permit completion of remaining contract performance, along with appropriate explanation and documentation as required by the Contracting Officer.

(ii) If the Contracting Officer issues a modification to the contract raising the contract ceiling to cover the actual revised contract price, the Contractor shall be obligated to continue to deliver under orders placed for the specific item(s) in question. If an actual increase in the market price would raise the contract unit price above the current ceiling and the Contracting Officer decides not to modify the contract ceiling to cover such increase, the Contractor shall have no further obligation under this contract to fill pending or future orders for the specific item(s) in question as of the effective date of the increase, as long as the unit price exceeds the ceiling.

(6) REVISION OF MARKET PRICE INDICATOR. In the event--

(i) Any applicable market price indicator is discontinued or its method of derivation is altered substantially; or

(ii) The Contracting Officer determines that the market price indicator consistently and substantially fails to reflect market conditions,e parties shall mutually agree upon an appropriate and comparable substitute and the contract shall be modified to reflect such substitute effective on the date the indicator was