4516.203 Fixed Price Contracts with Economic Price Adjustment

4516.203-1 Description.

(a)(S-90) Adjustments based on established prices. Established prices may reflect industry-wide and/or geographically based market price fluctuations for commodity groups, specific supplies or services, or contract end items.

(c)(S-90) Adjustments based on cost indexes of labor or materials. These price adjustments may also be based on increases or decreases in indexes for commodity groups, specific supplies or services, or contract end items.

4516.203-3 Limitations.

(S-90) A fixed price contract with economic price adjustment may also be used to provide for price adjustments authorized in this section.

4516.203-4 Contract clauses.

(S-90) When the contracting officer determines that an existing EPA clause is not appropriate, the contracting officer may develop and use another EPA clause in accordance with 5416.203-1 (a)(S-90) or (c)(S-90). Established prices and cost indexes need not reflect changes in the costs or established prices of a specific contractor. The established price or cost index may be derived from sales prices in the marketplace, quotes, or assessments as reported or made available in a consistent manner in a publication, electronic database, or other form, by an independent trade association, Governmental body, or other third party independent of the contractor. More than one established price or cost index may be combined in a formula for economic price adjustment purposes in the absence of an appropriate single price or cost index.

Dated: July 23, 1999.
William J. Kenny,
Executive Director, Procurement Management.
[FR Doc. 99-19630 Filed 7-30-99; 8:45 am]
BILLING CODE 3620-01-M

**DEFENSE LOGISTICS AGENCY**
DEFENSE ENERGY SUPPORT CENTER
8725 JOHN J. KINGMAN ROAD, SUITE 4950
FORT BELVOIR, VIRGINIA 22060-6222

Certified Mail
Return Receipt Requested

IN REPLY REFER TO DESC-BZ July 26, 2002

Mr. Steve Christovich
Kern Oil and Refining Company
7724 Panama Lane
Bakersfield, California 93307

Dear Mr. Christovich:

This is the contracting officer's final decision on Kern Oil and Refining Company's (Kern) February 28, 2002, claims for approximately $7.7 million under four contracts awarded to Kern between 1984 and 1995.[1] According to Kern, the economic price adjustment (EPA) clauses in its contracts were unauthorized and therefore unenforceable. Kern seeks to have all of these contracts re-priced at a substantial premium. It claims this is necessary so that it will receive fair market value for the petroleum products it supplied. The implication in Kern's claims is that it was harmed because the Government's EPA clauses did not protect Kern from price risk.

I disagree that the EPA clauses in Kern's contracts were unauthorized for two reasons. First, the Federal Acquisition Regulation (FAR) permits agencies to modify EPA clauses so long as they accomplish the objectives set out in FAR 16.203-3. Those objectives are to protect the contractor and the Government against significant fluctuations in material costs or to provide for contract price adjustments in the event of changes in the contractor's established prices. The evidence shows that the clauses used in Kern's contracts achieved the objectives of the FAR. Kern was in fact protected against significant fluctuations in the costs of crude oil as measured by appropriate indices, and the changes in the contract prices caused by the EPA clauses closely tracked the changes in Kern's own prices. Kern has provided no information to the contrary. Second, as detailed below, DESC obtained a deviation approving market-based price adjustment clauses in one of the contracts.

Additionally, there is no basis for granting Kern the relief it seeks. All the circumstances surrounding Kern's dealings with the Government indicate that Kern already received fair market value for the fuel it sold the Government. Re-pricing the fuel years after it was delivered and sold to the

[1] Kern submitted four separate claims covering the four contracts. This decision covers all four claims. The contracts that are the subject of Kern's claims and this final decision are listed in Attachment 1.

Government is simply unjustified. Accordingly, I am denying Kern's claims in their entirety.

## DISCUSSION

The EPA Clauses Used in the Contracts Were Authorized Because They Accomplished the Objectives of EPA Clauses Required by the FAR

1. Kern offered, produced, and sold JP-4 and JP-5 jet fuel under the four contracts that are the subject of these claims. Kern is a commercial enterprise, which sells the majority of its fuel to private, non-governmental entities. While the fuels were made to military specifications and carried military designations, the fuels are similar to commercial fuels.

2. EPA clauses linking changes in Kern's DESC contract prices to changes in product markets appeared in all of Kern's contracts. From 1984-1994, the EPA clauses were based on reports in the Petroleum Marketing Monthly (PMM), a publication of the Department of Energy, Energy Information Administration. These PMM reports contained the average sales prices for petroleum products, which refiners are required to report to the Department of Energy. The 1995 contract used an industry publication, Platts Oilgram Price Report (Platts), for EPA purposes. The EPA clauses worked in a direct and simple way. The clauses ensured that the prices Kern offered and agreed to in its contracts would be adjusted penny for penny according to the identical movements of fuel prices in the EPA indices. Hence, if the index went up one cent, the contract price would likewise go up one cent. If the market prices as reflected in the index went down a penny, the contract price went down a penny. The contract prices were adjusted in this way on a regular basis throughout the terms of the contracts.

3. DESC has compared changes in Kern's prices with the price changes in the market-based EPA clauses in Kern's contracts. The result is a very high correlation between the movements of Kern's prices and the product market indices contained in the contracts. This result is not surprising. Price adjustments based on Kern's prices alone would be expected to closely track price adjustments based on average established prices of multiple market participants. In dealing with a commodity such as fuel, where the products are standard and the market is competitive, a contractor would be forced to align its prices with the market. Otherwise, the contractor would fail to make sales and would lose market share to its competitors. Given these market realities, Kern's own prices would be expected to follow the market.

4. As with Kern's prices, there is a high degree of correlation between the movements in crude prices and the actual movement of prices in Kern's contracts. For purposes of comparison, I used Alaska North Slope crude oil, a benchmark crude oil in the United States. The correlation between crude oil prices and product market prices is not surprising because crude oil is the principal material used in making the product Kern sold to the Government. Because the EPA provisions in Kern's contracts protected it from the potential harms identified in FAR 16.203-3 the clauses are authorized and valid.

Kern is not Entitled to a Remedy Because It Already Received Fair Market Value for its Fuel

5. Aside from the validity of the clauses in its contracts, Kern is not entitled to the remedy it seeks because it already received fair market value for its fuel. Kern's suggestion that, over a period of years, it sold fuel to the Government at below fair market value prices is not credible. Kern sold fuel to the Government in open, free, and arms length transactions, in response to competitive, widely published solicitations. The contracting officers determined that Kern's prices were fair and reasonable on the basis of adequate price competition and/or on the basis of market price data. Kern was at all times knowledgeable of the value of its products in the marketplace. Kern's continuing decision to sell substantial amounts of fuel to the Government over many years at competitively determined prices confirms that it was receiving fair market value for its fuel.

6. Kern's suggestion that an EPA clause tied to market prices caused it to receive less than fair market value for its product is illogical. Assuming that the contract base price is a fair market value price, price adjustments tied to changes in the sales price of the relevant product must result in fair market value prices. There can be no better method of ensuring that prices paid for an item represent fair market value then by adjusting them according to changes in the relevant market prices. Kern can only ground its claims on the supposition that the contract base prices it bid were below fair market value. There is no evidence to support such an assertion. I reject the claim that Kern consciously submitted bids below fair market value on the contracts included in its claim. I find, on the contrary, that Kern did receive fair market value through the operation of the contract EPA clauses.

7. As indicated above, product market escalators appeared in all of Kern's contracts. Kern does not allege that these market indicators failed to accomplish their purpose, namely, to be accurate indicators of actual price movements in the petroleum markets. There is no evidence that Kern ever sought to substitute or change an EPA provision before filing these claims.

Kern never sought to invoke the provision, included in all its contracts, which allowed it to seek a substitute index in the event the contract index failed to track the market. Since Kern was paid strictly in accordance with actual market movements, recorded in the above publications, Kern received fair market value for its products throughout the terms of the contracts.

8. The EPA provisions in Kern's contracts are the types of provisions used in the petroleum industry for term product supply contracts. DESC has been using these price adjustment provisions for more than 20 years for the purchase of more than $60 billion worth of fuel. With the issuance of every solicitation over the years, contractors have had the opportunity to protest the inclusion of these clauses if they thought the clauses would harm them in any way, or deprive them of fair market value for their fuel. Their continuing participation shows the clauses were acceptable to industry and satisfactorily allocated economic risk.

9. In 1995, DESC officially published in the Federal Register a proposed class deviation for the use of a market product escalator in its bulk petroleum solicitations. Kern did not comment on DESC's use of this kind of EPA clause. Indeed, not a single petroleum firm offered comment or objection to DESC's use of such an EPA clause in its contracts.

10. Kern relies on a market-based index, the one the Government has been using since 1995, to structure its claims. Kern's conduct is inconsistent with its claims that it is entitled to re-price its contracts using an alternative notion of market value that it never sought during bidding, contract performance, or in the commercial marketplace.

Kern's Claim Under One Contract Must Fail Because the EPA Clause Was Lawfully Approved by Deviation

11. In December 1992, the MAPCO court decision held that this type of EPA clause was unenforceable because it was not one of the types specifically listed in the FAR, and because, in that particular case, the clause did not protect the contractor from the risk envisioned by the regulation. Following the MAPCO decision, DESC obtained deviations, individual and class, to ensure the validity of its EPA clauses. One of the Kern contracts contains an EPA clause covered by a FAR deviation. Kern argues that the Government's deviations are invalid for a variety of reasons. As discussed below, because Kern's attacks on the deviations are factually and legally erroneous, I find that Contract SP0600-95-D-0507 contained an EPA clause covered by a FAR deviation. Thus, Kern has no basis for its claim.

12. Kern argues that the individual deviation covering Contract SP0600-95-D-0507 is void because under FAR 1.404, individual deviations may only be used for a single contract and DESC awarded multiple contracts under the deviations. However, FAR 1.404 provides for individual deviations that "affect only one contracting action." If the drafters of the FAR intended the result Kern seeks, they could have limited individual deviations to one "contract" rather than employ the broader "one contracting action" terminology. In Pride Companies L. P. v. United States, 2000 U.S. Claims LEXIS 213 (2000), the court rejected the argument Kern makes and ruled that an individual deviation applied to all of the contracts awarded under a particular solicitation. Thus, Contract SP0600-95-D-0507 contains an EPA clause covered by a proper FAR deviation.

13. Kern alleges that DESC failed to comply with the Federal Register publication requirements, Congressional notification requirements of 5 USC § 801, and the Regulatory Flexibility Act (RFA) analysis requirements of 5 USC § 601 et seq. I do not believe that any of these provisions apply to individual deviations. Therefore, I find that the deviation is valid and that Contract SP0600-95-D-0507 contains an EPA clause covered by a proper FAR deviation.

The Government's Procurement Process Complied with the Law

14. Based on the Government's EPA clauses, Kern claims it is entitled to recover "fair market value" for its fuel under the following additional theories: misrepresentation, breach of contract, mutual mistake of fact, failure of consideration, and a 5th Amendment taking. Since the additional theories rest on the erroneous premise that the EPA clause harmed Kern, none of these other theories is viable, either factually or legally.

15. Kern, a small business set-aside negotiations participant, contends that the Government's match price method of conducting small business set-aside negotiations violates Section 27 of the Federal Procurement Policy Act, 41 USC § 423, and that the procedure constitutes an auction. Kern does not explain how the set-aside procedure harmed it. In any event, the procedure complies with the law.

16. Section 27 does not apply to the two Kern contracts that were either awarded or solicited before the July 16, 1989 effective date of the Act. In any event, Section 27 permits the release of proprietary or source selection information during the conduct of a procurement when agency procedures or the contracting officer permit. Because small business concerns were authorized to receive match price information under approved procedures dating to the 1960s, the statute was not violated.

17. Kern erroneously contends that the set-aside procedures constitute an impermissible auction. FAR 19.502-3(c), which discusses partial small business set-asides, and FAR 52.219-7, the partial small business set-aside clause, set forth the very negotiation procedures that DESC uses and Kern asserts are an auction. The Comptroller General has reported that DESC's small business procedures are consistent with applicable procurement and small business laws and regulations. See B-230556, March 23, 1989. Thus, set-aside negotiations, authorized by the FAR for many years, are not an impermissible auction.

18. Kern claims that the Government's use of the 10 per cent evaluation preference for SDB concerns was unlawful, citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995) (bidding preferences are subject to strict judicial scrutiny). Kern suggests that the preference "affected the contract price" but provides no explanation. Since it cannot say how it was harmed, it is not entitled to any remedy.

Kern's Market Value Formula Overstates the Value of Kern's Fuel

19. Kern uses the Pride Companies formula to determine the market value of its fuel. I disagree with this approach because it ignores the base bid price to which the parties agreed. In any event, contemporaneous documents do not support the $.05 per gallon premium above the market index that Kern claims, or anything close to that amount. Kern's own documents and bidding practices refute such a figure. I note that Kern relies on a market-based index, the one the Government has been using since 1995, as the basis for its market value assessment, although Kern simultaneously challenges the legality of such an index as an escalator. The index is an accurate reflection of market value, but Kern's claimed premium is not.

APPEAL RIGHTS

20. This is the final decision of the Contracting Officer. You may appeal this decision to the Armed Services Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Board and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the Board, you may, solely at your election, proceed under the Board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Board, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

21. In addition to these appeal rights, you may request that this dispute be resolved using Alternative Dispute Resolution (ADR) procedures. The use of ADR typically results in relatively expeditious and inexpensive dispute resolution. DESC is committed to using ADR whenever it is appropriate. Please keep in mind that choosing ADR does not suspend the respective 90-day and 12-month time periods for appealing this final decision. If you want to request ADR, or want more information about the various ADR options that are available, please contact me.

Sincerely,

JOHN R. WALKER
Contracting Officer
Bulk Fuels

cc: J. Keith Burt, Esq.

Attachment 1

DLA600-84-D-0521
DLA600-86-D-0484
DLA600-94-D-0537
SP0600-95-D-0507